**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JACOB NEWMAN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **Case No.** |
| Plaintiff, | ) ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) |
| CATERPILLAR, INC., D. JAMES UMPLEBY III, BRADLEY M. HALVERSON and DOUGLAS R. OBERHELMAN, | ) **JURY TRIAL DEMANDED** ) ) ) ) ) |
| Defendants. | ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Jacob Newman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to itself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Caterpillar, Inc. ("Caterpillar" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Caterpillar securities between February 19, 2013 and March 1, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.    Caterpillar designs, manufactures, and markets construction, mining, and forestry machinery. The Company also manufactures engines and other related parts for its equipment, and offers financing and insurance. Caterpillar distributes its products through a worldwide organization of dealers.

3.    Founded in 1925, the Company was formerly known as "Caterpillar Tractor Co." and changed its name to Caterpillar Inc. in 1986. Caterpillar is headquartered in Peoria, Illinois. Caterpillar's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CAT."

4.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Caterpillar unlawfully used foreign subsidiaries to avoid paying billions of dollars in U.S. taxes; (ii) discovery of the foregoing conduct would subject the Company to heightened regulatory scrutiny and potential criminal sanctions; and (iii) as a result of the foregoing, Caterpillar's public statements were materially false and misleading at all relevant times.

5.      On March 2, 2017, law enforcement officials executing a search warrant searched the Company's headquarters in Peoria, Illinois.  *The Peoria Journal Star* newspaper reported, in relevant part:

**Federal agents raid Caterpillar offices as part of tax strategy investigation**

PEORIA — ***Federal officials seized documents and electronic records from three Caterpillar Inc. facilities, including the global headquarters Downtown, on Thursday as an apparent part of a criminal investigation into the company's tax strategy.***

Investigators from an alphabet soup of federal agencies lined up outside the main administration building, a data center in East Peoria and the logistics center in Morton.

"Caterpillar is cooperating," a brief statement from the company read.

***The investigation appears to stem from revelations about the company's tax strategy as outlined in a 2009 federal wrongful termination lawsuit brought by Daniel Schlicksup. The lawsuit alleged the company shifted profits overseas and to offshore shell companies to avoid paying more than $2 billion in U.S. taxes.*** Schlicksup settled the suit in 2012.

Caterpillar, in its annual 10-K filing with the U.S. Securities and Exchange Commission last month, acknowledged a criminal investigation into the tax strategy. The company said in a statement Thursday afternoon that the search warrant related to that issue, "among other things."

Federal officials would not confirm the substance of the investigation.

In the February filing, the company included the following statement on legal proceedings: "On January 8, 2015, the Company received a grand jury subpoena from the U.S. District Court for the Central District of Illinois. The subpoena requests documents and information from the Company relating to, among other things, financial information concerning U.S. and non-U.S. Caterpillar subsidiaries (including undistributed profits of non-U.S. subsidiaries and the movement of cash among U.S. and non-U.S. subsidiaries)."

The statement continued: "The Company has received additional subpoenas relating to this investigation requesting additional documents and information relating to, among other things, the purchase and resale of replacement parts by Caterpillar Inc. and non-U.S. Caterpillar subsidiaries, dividend distributions of certain non-U.S. Caterpillar subsidiaries, and Caterpillar SARL and related structures. The Company is cooperating with this investigation."

> In his complaint against Caterpillar, Schlicksup alleged the company sold and shipped spare parts globally from its warehouse in Morton while attributing at least $5.6 billion of profits from those sales to a unit in Geneva, Switzerland. This scheme, which operated from 2000 to 2009, was known as the "Swiss structure." Caterpillar SARL is based in Geneva.
>
> A different strategy, the "Bermuda structure," allegedly involved shell companies that had no business operations returning profits to the United States without paying taxes on them.
>
> The company denied the allegations.

(Emphases added.)

6.    On that same day, it was further reported that the federal government agencies involved included the Internal Revenue Service's ("IRS") Criminal Investigation Unit, the U.S. Department of Commerce Office Bureau of Industry and Security's Office of Export Enforcement and the Federal Deposit Insurance Corporation's Office of Inspector General. Later that day, the Company issued a statement discussing the federal law enforcement raids to its facilities, stating: "We believe the execution of this search warrant is regarding, among other things, export filings that relate to the CSARL matter," referring to its Swiss subsidiary Caterpillar SARL.

7.    On this news, Caterpillar's share price fell $4.22, or 4.28%, to close at $94.36 per share on March 2, 2017.

8.    Later that day, after the market had closed, *Bloomberg News* published an article entitled "Caterpillar Goes From White House Kudos to Multi-Agency Raid." The article reported, in relevant part:

> Caterpillar, which traces its roots back 125 years, has long fought government allegations that it owed taxes on profits from parts shipments involving its Caterpillar SARL unit, which is based in Geneva. In a filing last month, Caterpillar said it is "vigorously contesting the proposed increases to tax and penalties" of about $2 billion.
>
> . . .

4

Bloomberg News obtained copies of three related search warrants, signed Feb. 24 by U.S. Judge Harold Baker, that authorized seizure of a broad range of documents and electronic files related to Caterpillar's Swiss affiliate, CSARL. Authorities, the warrants said, sought evidence related to potential crimes, including "failure to file or submitting false electronic export information" and "false and misleading financial reports and statements."

Authorities sought data about products moving between the U.S. and Switzerland and/or CSARL, sales outside the U.S., and end users of exported items.

The warrants, which are under court seal, suggested other nefarious conduct. They sought data on "export controls in the United States and other countries, use of aliases, and efforts to thwart or avoid law enforcement scrutiny."

They also were looking for names of people who may have been contacted about "export offenses," and they wanted "counter forensic programs" designed to eliminate data.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

12.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).   Caterpillar conducts business within this Judicial District.

13.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired Caterpillar securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Caterpillar is incorporated in Delaware. The Company's principal executive offices are located at 100 NE Adams Street, Peoria, Illinois 61629. Caterpillar's shares trade on the NYSE under the ticker symbol "CAT."

16.     Defendant D. James Umpleby III ("Umpleby") has served as the Company's Chief Executive Officer ("CEO") since January 2017.

17.     Defendant Douglas R. Oberhelman ("Oberhelman") served as the Company's CEO from July 2010 until January 2017, and has served as the Company's Executive Chairman since January 2017.

18.     Defendant Bradley M. Halverson ("Halverson") has served at all relevant times as the Company's Chief Financial Officer ("CFO").

19.     The defendants referenced above in ¶¶ 16-18 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Caterpillar Inc. designs, manufactures, and markets construction, mining, and forestry machinery. The Company also manufactures engines and other related parts for its

equipment, and offers financing and insurance. Caterpillar distributes its products through a worldwide organization of dealers.

**Materially False and Misleading Statements Issued During the Class Period**

21.     The Class Period begins on February 19, 2013, when Caterpillar filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2012 (the "2012 10-K").  For the quarter, Caterpillar reported net income of $697 million, or $1.04 per diluted share, on revenue of $16.08 billion, compared to net income of $1.55 billion, or $2.32 per diluted share, on revenue of $17.24 billion for the same period in the prior year.  For fiscal year 2012, Caterpillar reported net income of $5.68 billion, or $8.48 per diluted share, on revenue of $65.88 billion, compared to net income of $4.92 billion, or $7.40 per diluted share, on revenue of $60.14 billion for fiscal year 2011.

22.     In the 2012 10-K, Caterpillar stated, in part:

**Code of Ethics**

Our Worldwide Code of Conduct (Code), first published in 1974 and most recently updated in 2010, sets a high standard for honesty and ethical behavior by every employee, including the principal executive officer, principal financial officer, controller and principal accounting officer.  The Code is posted on our website at www.Caterpillar.com/code and is incorporated by reference as Exhibit 14 to this Form 10-K.  To obtain a copy of the Code at no charge, submit a written request to the Corporate Secretary at 100 NE Adams Street, Peoria, Illinois 61629-6490.  We will post on our website any required amendments to or waivers granted under our Code pursuant to SEC or New York Stock Exchange disclosure rules.

23.     In Caterpillar's Code of Conduct, the Company stated, in part:

**We Ensure Accuracy and Completeness of Our Financial Reports and Accounting Records**

Investors, creditors, regulatory authorities and others have a legitimate interest in our company's financial and accounting information.  The integrity of

Caterpillar's financial reports and accounting records is based on validity, accuracy, completeness, timeliness and understandability of basic information supporting entries to the company's books of account. We will ensure every accounting or financial entry accurately reflects what is described by the supporting information. Each person at Caterpillar – not just those in finance and accounting – has a role in ensuring our financial records are complete and accurate and internal controls are honored. The same standards of integrity that apply to external financial reporting also apply to the financial statements that are used as internal management tools.

**We Are Fair, Honest and Open in Our Communications**

As employees, we communicate with each other in a respectful, fair, honest and open manner. As a public company, we have a responsibility to communicate information about our business to our stakeholders clearly, accurately and honestly. The disclosures we make in our reports and filings submitted to the U.S. Securities and Exchange Commission and to other governmental and regulatory agencies must be full, fair, accurate, timely and understandable. When we communicate publicly, we are consistent in our messages. Only designated spokespersons may communicate on behalf of Caterpillar or respond to requests for information from the media, governments, analysts and stockholders. When we release information about Caterpillar to the public, we do it fairly and impartially, without favoring any individual or group.

24. The 2012 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Oberhelman and Halverson, stating that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25. On May 2, 2013, Caterpillar filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2013 (the "Q1 2013 10-Q"). For the quarter, Caterpillar reported net income of $880 million, or $1.31 per diluted share, on revenue of $13.21 billion, compared to net income of $1.59 billion, or $2.37 per diluted share, on revenue of $15.98 billion for the same period in the prior year.

26. The Q1 2013 10-Q contained signed certifications pursuant to SOX by Defendants Oberhelman and Halverson, stating that the financial information contained in the

Q1 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

27.     On August 2, 2013, Caterpillar filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2013 (the "Q2 2013 10-Q").  For the quarter, Caterpillar reported net income of $960 million, or $1.45 per diluted share, on revenue of $14.62 billion, compared to net income of $1.7 billion, or $2.54 per diluted share, on revenue of $17.37 billion for the same period in the prior year.

28.     The Q2 2013 10-Q contained signed certifications pursuant to SOX by Defendants Oberhelman and Halverson, stating that the financial information contained in the Q2 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

29.     On November 1, 2013, Caterpillar filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2013 (the "Q3 2013 10-Q").  For the quarter, Caterpillar reported net income of $946 million, or $1.45 per diluted share, on revenue of $13.42 billion, compared to net income of $1.7 billion, or $2.54 per diluted share, on revenue of $16.45 billion for the same period in the prior year.

30.     The Q3 2013 10-Q contained signed certifications pursuant to SOX by Defendants Oberhelman and Halverson, stating that the financial information contained in the Q3 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.     On February 18, 2014, Caterpillar filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "2013 10-K").  For the quarter, Caterpillar reported net income of

$1 billion, or $1.54 per diluted share, on revenue of $14.4 billion, compared to net income of $697 million, or $1.04 per diluted share, on revenue of $16.08 billion for the same period in the prior year. For fiscal year 2013, Caterpillar reported net income of $3.79 billion, or $5.75 per diluted share, on revenue of $55.66 billion, compared to net income of $5.68 billion, or $8.48 per diluted share, on revenue of $65.88 billion for fiscal year 2012.

32.     In the 2013 10-K, Caterpillar stated, in part:

**Code of Ethics**

Our Worldwide Code of Conduct (Code), first published in 1974 and most recently updated in 2010, sets a high standard for honesty and ethical behavior by every employee, including the principal executive officer, principal financial officer, controller and principal accounting officer. The Code is posted on our website at www.Caterpillar.com/code and is incorporated by reference as Exhibit 14 to this Form 10-K. To obtain a copy of the Code at no charge, submit a written request to the Corporate Secretary at 100 NE Adams Street, Peoria, Illinois 61629-6490. We will post on our website any required amendments to or waivers granted under our Code pursuant to SEC or New York Stock Exchange disclosure rules.

33.     Caterpillar's Code of Conduct contained the representations described *supra* at ¶ 23.

34.     The 2013 10-K contained signed certifications pursuant to SOX by Defendants Oberhelman and Halverson, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

35.     On May 2, 2014, Caterpillar filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q"). For the quarter, Caterpillar reported net income of $922 million, or $1.44 per diluted share, on revenue of $13.24 billion, compared to net income of $880 million, or $1.31 per diluted share, on revenue of $13.21 for the same period in the prior year.

36.     The Q1 2014 10-Q contained signed certifications pursuant to SOX by Defendants Oberhelman and Halverson, stating that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37.     On August 1, 2014, Caterpillar filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q"). For the quarter, Caterpillar reported net income of $1 billion, or $1.57 per diluted share, on revenue of $14.15 billion, compared to net income of $960 million, or $1.45 per diluted share, on revenue of $14.62 billion for the same period in the prior year.

38.     The Q2 2014 10-Q contained signed certifications pursuant to SOX by Defendants Oberhelman and Halverson, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

39.     On October 31, 2014, Caterpillar filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q"). For the quarter, Caterpillar reported net income of $1.02 billion, or $1.63 per diluted share, on revenue of $13.55 billion, compared to net income of $946 million, or $1.45 per diluted share, on revenue of $13.42 billion for the same period in the prior year.

40.     The Q3 2014 10-Q contained signed certifications pursuant to SOX by Defendants Oberhelman and Halverson, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

41.     On February 17, 2015, Caterpillar filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K"). For the quarter, Caterpillar reported net income of $757 million, or $1.23 per diluted share, on revenue of $14.24 billion, compared to net income of $1.0 billion, or $1.54 per diluted share, on revenue of $14.4 billion for the same period in the prior year. For fiscal year 2014, Caterpillar reported net income of $3.69 billion, or $5.88 per diluted share, on revenue of $55.18 billion, compared to net income of $3.78 billion, or $5.75 per diluted share, on revenue of $55.65 billion for fiscal year 2013.

42.     In the 2014 10-K, the Company stated in relevant part:

**Item 3. Legal Proceedings**

On January 8, 2015, the Company received a grand jury subpoena from the U.S. District Court for the Central District of Illinois. The subpoena requests documents and information from the Company relating to, among other things, financial information concerning U.S. and non-U.S. Caterpillar subsidiaries (including undistributed profits of non-U.S. subsidiaries and the movement of cash among U.S. and non-U.S. subsidiaries). The Company is cooperating with this investigation. The Company is unable to predict the outcome or reasonably estimate any potential loss; however, we currently believe that this matter will not have a material adverse effect on the Company's consolidated results of operations, financial position or liquidity.

On September 12, 2014, the SEC notified the Company that it was conducting an informal investigation relating to Caterpillar SARL and related structures. The SEC asked the Company to preserve relevant documents and, on a voluntary basis, the Company made a presentation to the staff of the SEC on these topics. The Company is cooperating with the SEC regarding this investigation. The Company is unable to predict the outcome or reasonably estimate any potential loss; however, we currently believe that this matter will not have a material adverse effect on the Company's consolidated results of operations, financial position or liquidity.

                                        ***

**Code of Ethics**

Our Worldwide Code of Conduct (Code), first published in 1974 and most recently updated in 2015, sets a high standard for honesty and ethical behavior by every employee, including the principal executive officer, principal financial officer, controller and principal accounting officer. The Code is posted on our website at www.Caterpillar.com/code and is Exhibit 14 to this Form 10-K. To

                                        12

obtain a copy of the Code at no charge, submit a written request to the Corporate Secretary at 100 NE Adams Street, Peoria, IL 61629-6490. We post on our website any required amendments to or waivers granted under our Code pursuant to SEC or New York Stock Exchange disclosure rules.

43.    Caterpillar's Code of Conduct contained the representations described *supra* at ¶ 23.

44.    The 2014 10-K contained signed certifications pursuant to SOX by Defendants Oberhelman and Halverson, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

45.    On May 1, 2015 Caterpillar filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). For the quarter, Caterpillar reported net income of $1.24 billion, or $2.03 per diluted share, on revenue of $12.7 billion, compared to net income of $922 million, or $1.44 per diluted share, on revenue of $13.24 billion for the same period in the prior year.

46.    The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Oberhelman and Halverson, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

47.    On July 31, 2015 Caterpillar filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). For the quarter, Caterpillar reported net income of $802 million, or $1.31 per diluted share, on revenue of $12.31 billion, compared to net income of $999 million, or $1.57 per diluted share, on revenue of $14.15 billion for the same period in the prior year.

48.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Oberhelman and Halverson, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

49.     On October 30, 2015, Caterpillar filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, Caterpillar reported net income of $559 million, or $0.94 per diluted share, on revenue of $10.96 billion, compared to net income of $1.01 billion, or $1.63 per diluted share, on revenue of $13.54 billion for the same period in the prior year.

50.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Oberhelman and Halverson, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

51.     On February 16, 2016, Caterpillar filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 10-K").  For the quarter, Caterpillar reported a net loss of $94 million, or $0.16 per diluted share, on revenue of $11.03 billion, compared to net income of $757 million, or $1.23 per diluted share, on revenue of $14.24 billion for the same period in the prior year.  For fiscal year 2015, Caterpillar reported net income of $2.51 billion, or $4.18 per diluted share, on revenue of $47.01 billion, compared to net income of $3.69 billion, or $5.88 per diluted share, on revenue of $55.18 billion for fiscal year 2014.

52.     In the 2015 10-K, the Company stated in relevant part:

Income taxes are based on the statutory tax rate of the jurisdiction in which earnings are subject to taxation. That statutory rate may differ from the statutory

14

tax rate of the jurisdiction in which that entity is incorporated. Taxes are paid in the jurisdictions where earnings are subject to taxation. The effective tax rate differs from the U.S. statutory rate in part due to indefinitely reinvested profits of non-U.S. subsidiaries being subject to statutory tax rates which are generally lower than the U.S. rate of 35 percent. The indefinitely reinvested profits of Caterpillar SARL (CSARL), primarily taxable in Switzerland, contribute the most significant amount of this difference. On January 30, 2015, we received a Revenue Agent's Report (RAR) from the Internal Revenue Service (IRS) indicating the end of the field examination of our U.S. income tax returns for 2007 to 2009 including the impact of a loss carryback to 2005. The IRS has proposed to tax in the United States profits earned from certain parts transactions by CSARL based on the IRS examination team's application of "substance-over-form" or "assignment-of-income" judicial doctrines. We are vigorously contesting this adjustment through the IRS appeals process. We believe that the relevant transactions complied with applicable tax laws and did not violate judicial doctrines. The purchase of parts by CSARL from unrelated parties and the subsequent sale of those parts to unrelated dealers outside the United States have substantial legal, commercial, and economic consequences for the parties involved. We have filed U.S. income tax returns on this same basis for years after 2009. We currently believe the ultimate disposition of this matter will not have a material adverse effect on our consolidated financial position, liquidity or results of operations.

***

**Code of Ethics**

Our Worldwide Code of Conduct (Code), first published in 1974 and most recently updated in 2015, sets a high standard for honesty and ethical behavior by every employee, including the principal executive officer, principal financial officer, controller and principal accounting officer. The Code is posted on our website at www.Caterpillar.com/code. To obtain a copy of the Code at no charge, submit a written request to the Corporate Secretary at 100 NE Adams Street, Peoria, IL 61629-6490. We post on our website at www.Caterpillar.com/code any required amendments to or waivers granted under our Code pursuant to SEC or New York Stock Exchange disclosure rules.

53. Caterpillar's Code of Conduct contained the representations described *supra* at ¶ 23.

54. The 2015 10-K contained signed certifications pursuant to SOX by Defendants Oberhelman and Halverson, stating that the financial information contained in the 2015 10-K

was accurate and disclosed any material changes to the Company's internal control over financial reporting.

55.     On May 2, 2016 Caterpillar filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").  For the quarter, Caterpillar reported net income of $271 million, or $0.46 per diluted share, on revenue of $9.46 billion, compared to net income of $1.24 billion, or $2.03 per diluted share, on revenue of $12.7 billion for the same period in the prior year.

56.     The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Oberhelman and Halverson, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

57.     On August 3, 2016 Caterpillar filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").  For the quarter, Caterpillar reported net income of $550 million, or $0.93 per diluted share, on revenue of $10.34 billion, compared to net income of $802 million, or $1.31 per diluted share, on revenue of $12.31 billion for the same period in the prior year.

58.     The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Oberhelman and Halverson, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

59.     On November 2, 2016 Caterpillar filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q").  For the quarter, Caterpillar reported net income of $283 million,

or $0.48 per diluted share, on revenue of $9.16 billion, compared to net income of $559 million, or $0.94 per diluted share, on revenue of $10.96 billion for the same period in the prior year.

60.    The Q3 2016 10-Q contained signed certifications pursuant to SOX by Defendants Oberhelman and Halverson, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

61.    On February 15, 2017, Caterpillar filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 10-K"). For the quarter, Caterpillar reported a net loss of $1.17 billion, or $2.00 per diluted share, on revenue of $9.57 billion, compared to a net loss of $94 million, or $0.16 per diluted share, on revenue of $11.03 billion for the same period in the prior year. For fiscal year 2016, Caterpillar reported a net loss of $67 million, or $0.11 per diluted share, on revenue of $38.53 billion, compared to net income of $2.51 billion, or $4.18 per diluted share, on revenue of $47.01 billion for fiscal year 2015.

62.    In the 2016 10-K, the Company stated in relevant part:

In January 2015, we received a Revenue Agent's Report (RAR) from the IRS indicating the end of the field examination of our U.S. income tax returns for 2007 to 2009 including the impact of a loss carryback to 2005. The IRS field examination for 2010 to 2012 that began in 2015 is expected to be completed in 2017. In November 2016, we received notices of proposed adjustments from the IRS for the 2010 to 2012 exam. In both these audits, the IRS has proposed to tax in the United States profits earned from certain parts transactions by CSARL, based on the IRS examination team's application of the "substance-over-form" or "assignment-of-income" judicial doctrines. We are vigorously contesting the proposed increases to tax and penalties for these years of approximately $2 billion. We believe that the relevant transactions complied with applicable tax laws and did not violate judicial doctrines. We have filed U.S. income tax returns on this same basis for years after 2012. Based on the information currently available, we do not anticipate a significant increase or decrease to our unrecognized tax benefits for this matter within the next 12 months. We currently

17

believe the ultimate disposition of this matter will not have a material adverse effect on our consolidated financial position, liquidity or results of operations.

***

**Code of Ethics**

Our Worldwide Code of Conduct (Code), first published in 1974 and most recently updated in 2015, sets a high standard for honesty and ethical behavior by every employee, including the principal executive officer, principal financial officer, controller and principal accounting officer. The Code is posted on our website at www.Caterpillar.com/code. To obtain a copy of the Code at no charge, submit a written request to the Corporate Secretary at 100 NE Adams Street, Peoria, IL 61629-6490. We post on our website at www.Caterpillar.com/code any required amendments to or waivers granted under our Code pursuant to SEC or New York Stock Exchange disclosure rules.

63.     Caterpillar's Code of Conduct contained the representations described *supra* at ¶ 23.

64.     The 2016 10-K contained signed certifications pursuant to SOX by Defendants Umpleby and Halverson, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

65.     The statements referenced in ¶¶ 21-64 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) Caterpillar unlawfully used foreign subsidiaries to avoid paying billions of dollars in U.S. taxes; (ii) discovery of the foregoing conduct would subject the Company to heightened regulatory scrutiny and potential criminal sanctions; and (iii) as a result of the foregoing, Caterpillar's public statements were materially false and misleading at all relevant times.

**<u>The Truth Emerges</u>**

18

66.     On March 2, 2017, law enforcement officials executing a search warrant searched the Company's headquarters in Peoria, Illinois. *The Peoria Journal Star* newspaper reported, in relevant part:

**Federal agents raid Caterpillar offices as part of tax strategy investigation**

PEORIA — ***Federal officials seized documents and electronic records from three Caterpillar Inc. facilities, including the global headquarters Downtown, on Thursday as an apparent part of a criminal investigation into the company's tax strategy.***

Investigators from an alphabet soup of federal agencies lined up outside the main administration building, a data center in East Peoria and the logistics center in Morton.

"Caterpillar is cooperating," a brief statement from the company read.

***The investigation appears to stem from revelations about the company's tax strategy as outlined in a 2009 federal wrongful termination lawsuit brought by Daniel Schlicksup. The lawsuit alleged the company shifted profits overseas and to offshore shell companies to avoid paying more than $2 billion in U.S. taxes.*** Schlicksup settled the suit in 2012.

Caterpillar, in its annual 10-K filing with the U.S. Securities and Exchange Commission last month, acknowledged a criminal investigation into the tax strategy. The company said in a statement Thursday afternoon that the search warrant related to that issue, "among other things."

Federal officials would not confirm the substance of the investigation.

In the February filing, the company included the following statement on legal proceedings: "On January 8, 2015, the Company received a grand jury subpoena from the U.S. District Court for the Central District of Illinois. The subpoena requests documents and information from the Company relating to, among other things, financial information concerning U.S. and non-U.S. Caterpillar subsidiaries (including undistributed profits of non-U.S. subsidiaries and the movement of cash among U.S. and non-U.S. subsidiaries)."

The statement continued: "The Company has received additional subpoenas relating to this investigation requesting additional documents and information relating to, among other things, the purchase and resale of replacement parts by Caterpillar Inc. and non-U.S. Caterpillar subsidiaries, dividend distributions of certain non-U.S. Caterpillar subsidiaries, and Caterpillar SARL and related structures. The Company is cooperating with this investigation."

19

In his complaint against Caterpillar, Schlicksup alleged the company sold and shipped spare parts globally from its warehouse in Morton while attributing at least $5.6 billion of profits from those sales to a unit in Geneva, Switzerland. This scheme, which operated from 2000 to 2009, was known as the "Swiss structure." Caterpillar SARL is based in Geneva.

A different strategy, the "Bermuda structure," allegedly involved shell companies that had no business operations returning profits to the United States without paying taxes on them.

The company denied the allegations.

(Emphasis added.)

67.     On that same day, it was further reported that the federal government agencies involved included the Internal Revenue Service's Criminal Investigation Unit, the U.S. Department of Commerce Office Bureau of Industry and Security's Office of Export Enforcement and the Federal Deposit Insurance Corporation's Office of Inspector General. Later that day, the Company issued a statement discussing the federal law enforcement raids to its facilities, stating: "We believe the execution of this search warrant is regarding, among other things, export filings that relate to the CSARL matter."

68.     On this news, Caterpillar's share price fell $4.22, or 4.28%, to close at $94.36 per share on March 2, 2017.

69.     Later that day, after the market had closed, *Bloomberg News* published an article entitled "Caterpillar Goes From White House Kudos to Multi-Agency Raid."   The article reported, in relevant part:

Caterpillar, which traces its roots back 125 years, has long fought government allegations that it owed taxes on profits from parts shipments involving its Caterpillar SARL unit, which is based in Geneva. In a filing last month, Caterpillar said it is "vigorously contesting the proposed increases to tax and penalties" of about $2 billion.

. . .

Bloomberg News obtained copies of three related search warrants, signed Feb. 24 by U.S. Judge Harold Baker, that authorized seizure of a broad range of documents and electronic files related to Caterpillar's Swiss affiliate, CSARL. Authorities, the warrants said, sought evidence related to potential crimes, including "failure to file or submitting false electronic export information" and "false and misleading financial reports and statements."

Authorities sought data about products moving between the U.S. and Switzerland and/or CSARL, sales outside the U.S., and end users of exported items.

The warrants, which are under court seal, suggested other nefarious conduct. They sought data on "export controls in the United States and other countries, use of aliases, and efforts to thwart or avoid law enforcement scrutiny."

They also were looking for names of people who may have been contacted about "export offenses," and they wanted "counter forensic programs" designed to eliminate data.

70.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Caterpillar securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

72.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Caterpillar securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can

be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Caterpillar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

73.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

74.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

75.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Caterpillar;

- whether the Individual Defendants caused Caterpillar to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Caterpillar securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

76.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

77.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Caterpillar securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Caterpillar securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

78.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

79.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State*

*of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

80.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

82.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Caterpillar securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Caterpillar securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

83.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Caterpillar securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Caterpillar's finances and business prospects.

84.      By virtue of their positions at Caterpillar, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

85.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Caterpillar, the Individual Defendants had knowledge of the details of Caterpillar's internal affairs.

86.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

Caterpillar. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Caterpillar's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Caterpillar securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Caterpillar's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Caterpillar securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

87. During the Class Period, Caterpillar securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Caterpillar securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Caterpillar securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Caterpillar securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

88.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

89.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

90.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

91.     During the Class Period, the Individual Defendants participated in the operation and management of Caterpillar, and conducted and participated, directly and indirectly, in the conduct of Caterpillar's business affairs.  Because of their senior positions, they knew the adverse non-public information about Caterpillar's misstatement of income and expenses and false financial statements.

92.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Caterpillar's financial condition and results of operations, and to correct promptly any public statements issued by Caterpillar which had become materially false or misleading.

93.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

releases and public filings which Caterpillar disseminated in the marketplace during the Class Period concerning Caterpillar's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Caterpillar to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Caterpillar within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Caterpillar securities.

94.    Each of the Individual Defendants, therefore, acted as a controlling person of Caterpillar. By reason of their senior management positions and/or being directors of Caterpillar, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Caterpillar to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Caterpillar and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

95.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Caterpillar.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated: March 3, 2017

Respectfully submitted,

*/s/ Louis C. Ludwig*
Louis C. Ludwig
Patrick V. Dahlstrom
**POMERANTZ LLP**
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com
Email:  lcludwig@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
          ahood@pomlaw.com
          hchang@pomlaw.com

*Attorneys for Plaintiff*
