## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| IN RE CATERPILLAR, INC. SECURITIES LITIGATION | Case No. 1:17-cv-01713 |
|---|---|

## AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................................2

II.    JURISDICTION AND VENUE .........................................................................7

III.   PARTIES ...........................................................................................................8

     A.    Lead Plaintiff ........................................................................................8

     B.    Corporate Defendant ............................................................................8

     C.    Individual Defendants ..........................................................................9

IV.   SUBSTANTIVE ALLEGATIONS ...................................................................11

     A.    Caterpillar's Tax Avoidance Scheme .................................................11

     B.    The 2009 Whistleblower Lawsuit ......................................................13

     C.    Federal Investigations Into Caterpillar's Tax Evasion Scheme...........15

     D.    Federal Law Enforcement Agencies Raid the Company's Offices ......21

     E.    Caterpillar's Financial Statements Were Materially Misstated in Violation of GAAP ...............................................................................27

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...........................................................................................28

     A.    Form 10-K Filed February 19, 2013 ..................................................29

     B.    Form 10-Q Filed May 2, 2013 ...........................................................30

     C.    Form 10-Q Filed August 2, 2013 .......................................................31

     D.    Form 10-Q Filed November 1, 2013 ...................................................31

     E.    Form 10-K Filed February 18, 2014 ..................................................32

     F.    April 1, 2014 Testimony Before the Senate Subcommittee on Homeland Security and Governmental Affairs .....................................................34

     G.    Press Release Issued March 31, 2014 .................................................35

     H.    Form 10-Q Filed May 2, 2014 ...........................................................36

     I.    Form 10-Q Filed August 1, 2014 .......................................................37

     J.    Form 10-Q Filed October 31, 2014......................................................39

     K.    Form 10-K Filed February 17, 2015 ..................................................40

     L.    March 4, 2015 J.P. Morgan Aviation, Transportation and Industrials Conference ..........................................................................................43

     M.    Form 10-Q Filed May 1, 2015 ...........................................................44

     N.    Form 10-Q Filed July 31, 2015...........................................................45

     O.    Form 10-Q Filed October 30, 2015.....................................................47

     P.    Form 10-K Filed February 16, 2016 ..................................................49

     Q.    Form 10-Q Filed May 2, 2016 ...........................................................51

R. Form 10-Q Filed August 3, 2016 ........................................................53

S. Form 10-Q Filed November 2, 2016 ....................................................54

T. Form 10-K Filed February 15, 2017 ....................................................55

U. SOX Certifications Executed Throughout the Class Period ................57

VI. THE TRUTH EMERGES ..................................................................................59

VII. ADDITIONAL SCIENTER ALLEGATIONS ....................................................61

A. The 2009 Whistleblower Lawsuit and Subsequent Government Investigations .........................................................................................61

B. The Individual Defendants' Senior Positions, the Company's Frequent Statements Regarding Tax Strategies, and the Critical Importance of the $2.4 Billion Tax Strategy to Caterpillar's Operations ...........................63

C. Caterpillar's Cover Up, Two Sets of Books, and Spoliation of Evidence ............64

D. The Individual Defendants Had Knowledge of and Access to Information Regarding the Investigations ................................................................65

E. The Individual Defendants Were Motivated to Mislead Investors and Conceal the Company's Non-Compliance with the Investigations to Maximize Their Compensation ................................................................66

F. The Individual Defendants' Failure to Comply with the Company's Code of Conduct Supports an Inference of Scienter ......................................67

G. Executive Departures Support a Strong Inference of Scienter ............69

H. The Individual Defendants' SOX Certifications and Signing of SEC Filings Further Support a Strong Inference of Scienter ........................69

I. The Cumulative Knowledge of Caterpillar's Executives Is Imputed to the Company .........................................................................................70

VIII. LOSS CAUSATION ..........................................................................................71

IX. APPLICABILITY OF PRESUMPTION OF RELIANCE ..................................74

X. CONTROL PERSON ALLEGATIONS ..............................................................75

XI. INAPPLICABILITY OF SAFE HARBOR ........................................................77

XII. CLASS ACTION ALLEGATIONS ....................................................................81

XIII. COUNTS ...........................................................................................................83

XIV. PRAYER FOR RELIEF ....................................................................................86

XV. JURY DEMAND ...............................................................................................87

Lead Plaintiff Société Générale Securities Services GmbH ("Lead Plaintiff" or "SGSS"), brings this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, individually and on behalf of all other persons and entities similarly situated, who purchased or otherwise acquired the publicly traded common stock of Caterpillar Inc. ("Caterpillar" or the "Company") during the period between February 19, 2013, and March 1, 2017, inclusive (the "Class Period"), and were damaged thereby (subject to certain exclusions enumerated in ¶ 248 below).

Lead Plaintiff's allegations are based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based upon, *inter alia*, the independent investigation of Court-appointed Lead Counsel, Motley Rice LLC. This investigation included review and analysis of, among other things: (i) Caterpillar's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports and advisories by securities and financial analysts; (iii) transcripts of Caterpillar's conference calls with analysts and investors; (iv) wire and press releases published by and regarding Caterpillar; (v) news reports and media concerning Caterpillar and other facts related to this action; (vi) data reflecting the price of Caterpillar common stock; and (vii) information readily available on the Internet. Lead Counsel's investigation regarding the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery, including access to the materials that Caterpillar has produced to the SEC, Internal Revenue Service ("IRS"), and other governmental regulators, but not to Lead Plaintiff.

## I.      NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than those defined in ¶ 248 who purchased or otherwise acquired Caterpillar common stock between February 19, 2013, and March 1, 2017, both dates inclusive, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, against the Company and certain current or former members of its senior management team.

2.      Caterpillar designs, manufactures, and markets construction, mining, and forestry machinery.  The Company also manufactures engines and other related parts for its equipment, and offers financing and insurance.  Caterpillar distributes its products through a worldwide organization of dealers.

3.      Founded in 1925, the Company was formerly known as "Caterpillar Tractor Co." and changed its name to Caterpillar Inc. in 1986.  Caterpillar is currently headquartered in Peoria, Illinois, but intends to relocate its corporate headquarters to Deerfield, Illinois.  Caterpillar's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CAT."

4.      This action arises from Caterpillar's years-long attempts to evade applicable U.S. corporate taxes through the creation of a Swiss subsidiary, Caterpillar S.A.R.L. ("CSARL"), in 1999, through which the Company only had to pay an effective tax rate of 4-6% to the Swiss government.  To be a legitimate tax reduction plan, however, CSARL was required to perform substantial operations and have a proper business purpose.  Rather than doing so, Caterpillar shifted profits to CSARL without making any substantial changes in the Company's business operations, which continued to be performed in the United States where the vast majority of Caterpillar's employees were situated.  In fact, since U.S. employees were responsible for the

profits and insisted on being rewarded accordingly, Caterpillar kept two sets of books, one of which reported the profits as emanating from CSARL for tax purposes, and a second that rewarded U.S. employees with bonuses for generating the same profits. When a former employee brought a whistleblower lawsuit and revealed that the scheme was a deliberate attempt to evade taxes by the highest levels of management, Caterpillar settled the lawsuit and thereafter denied any such accusations and publicly defended its tax position as legitimate.

5. Following the whistleblower lawsuit, as the IRS, Congress, and other government agencies began investigating, Caterpillar continued to defend its tax position and claimed it was fully cooperating with government investigators, all the while downplaying the substantial risks that its tax position had created, even after the Senate held hearings and the U.S. Senate Democratic staff issued a report in 2014 (the "Senate Report") concluding that Caterpillar's tax scheme was not legitimate and found that the Company had evaded $2.4 billion in taxes.

6. Throughout the Class Period, Defendants made materially false and misleading statements and omitted material information regarding the substantial risk to Caterpillar's tax position, and the nature and extent of the IRS's investigation into the Company's operations. Defendants also falsely represented that Caterpillar was cooperating with law enforcement investigations into the Company's use of CSARL.

7. In addition, throughout the Class Period, Caterpillar repeatedly stated that its financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). Defendants, however, intentionally or with extreme recklessness failed to inform investors that the Company's tax position was more likely than not unsustainable upon examination by the IRS, making those financial statements materially false and misleading.

Indeed, had Defendants believed that Caterpillar's tax position was sustainable, they would have had no reason not to cooperate with government investigations into the Company's tax position.

8. In early 2013, the Company disclosed that the IRS was investigating Caterpillar's tax returns for the years 2007 to 2009. Specifically, on February 19, 2013, the first day of the Class Period, Caterpillar filed a Form 10-K with the SEC, in which it stated "[t]he IRS is currently examining our U.S. tax returns for 2007 to 2009." Caterpillar reassured investors that "[i]n the opinion of management, the ultimate disposition of these matters will not have a material adverse effect on our consolidated financial position, liquidity or results of operations."

9. In a March 31, 2014 press release titled "Caterpillar Executive to Testify Before U.S. Senate Subcommittee About Company's Business Structure: Company acts ethically, complies with tax law and pays its taxes," Caterpillar noted that:

> In testimony tomorrow before the U.S. Senate Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations (PSI), Caterpillar Inc. . . . Vice President with responsibility for the Finance Services Division Julie Lagacy will discuss Caterpillar's prudent and lawful business planning that is common among responsible U.S. multinational corporations.

> "Caterpillar takes very seriously its obligation to follow tax law and pay what it owes," said Julie Lagacy. ". . . Caterpillar's philosophy is that our business structure drives our tax structure. We comply with the tax laws enacted by Congress, by the states and by all of the many jurisdictions in which we conduct business."

10. In 2014, in conjunction with the Permanent Subcommittee on Investigations' April 1, 2014 hearing, Senate Democrats concluded that Caterpillar had avoided paying $2.4 billion in U.S. taxes since 2000 by shifting profits to its affiliate in Switzerland. Because the Company's scheme is ongoing, that number continues to increase every year.

11. Following the Senate hearings, government agencies intensified their investigations into the Company's tax avoidance scheme. In response, Caterpillar repeatedly reassured investors it believed it had a good faith basis for its tax position, that government agency investigations were

far narrower than was in fact the case, and that the Company was fully cooperating with the investigations.

12.     For example, on February 17, 2015, Caterpillar filed a Form 10-K with the SEC (the "2014 Form 10-K"), which noted that the Company had received a grand jury subpoena from the U.S. District Court for the Central District of Illinois.  The 2014 Form 10-K stated, in pertinent part:

> On January 8, 2015, the Company received a grand jury subpoena from the U.S. District Court for the Central District of Illinois.  The subpoena requests documents and information from the Company relating to, among other things, financial information concerning U.S. and non-U.S. Caterpillar subsidiaries (including undistributed profits of non-U.S. subsidiaries and the movement of cash among U.S. and non-U.S. subsidiaries).  ***The Company is cooperating with this investigation***.  The Company is unable to predict the outcome or reasonably estimate any potential loss; however, we currently believe that this matter will not have a material adverse effect on the Company's consolidated results of operations, financial position or liquidity.

(Emphasis added).

13.     Caterpillar repeated its assurance of cooperation throughout the Class Period.  In reality, however, contrary to the Company's representations that it was "cooperating" with the government investigations, Caterpillar was allegedly using aliases and other "efforts to thwart or avoid law enforcement scrutiny," according to a search warrant that was later executed.

14.     Such were Caterpillar's efforts to thwart the investigations that government agencies had no choice but the take the highly unusual step of seeking search warrants and raiding the Company's offices.

15.     On February 24, 2017, U.S. District Judge Harold A. Baker issued search warrants for three of Caterpillar's businesses, including its headquarters, in Peoria, Illinois.  The search warrants sought "[a]ny items evidencing violations of Title 13, United States Code, Section

5

305(a)(1) (failure to file or submitting false electronic export information) and Title 15, United States Code, Sections 78m and 78ff (false and misleading financial reports and statements)."

16. On March 2, 2017, officials from the IRS, the Federal Deposit Insurance Corp. ("FDIC"), and the Commerce Department's Bureau of Industry and Security ("BIS") Export Enforcement executed the search warrants and searched the Company's headquarters in Peoria, Illinois, as well as two other locations.

17. Later on March 2, 2017, Caterpillar issued a statement stating its belief that "the execution of this search warrant is regarding, among other things, export filings that relate to the CSARL matter."

18. On the news of the raids, which revealed both Caterpillar's failure to cooperate with the IRS's investigations and the substantial risk to the Company's stated tax position, Caterpillar's share price fell $4.22 per share, or 4.28%, to close at $94.36 per share on March 2, 2017, removing hundreds of millions of dollars in market capitalization, and severely damaging investors.

19. On March 7, 2017, *The New York Times* detailed a report commissioned by the government that accused Caterpillar of carrying out tax and accounting fraud. The author of the 85-page report, Dr. Leslie A. Robinson ("Dr. Robinson"), an independent expert and accounting professor at the Tuck School of Business at Dartmouth College, stated that "Caterpillar did not comply with either U.S. tax law or U.S. financial reporting rules." Dr. Robinson concluded: "I believe that the company's noncompliance with these rules was deliberate and primarily with the intention of maintaining a higher share price. These actions were fraudulent rather than negligent."

20. On July 2, 2017, *The Wall Street Journal* reported that the IRS found evidence supporting its suspicions of tax evasion by the Company in the wake of the March raid, including numerous required export filings. In addition, relevant to Caterpillar's failure to cooperate with

the investigations into its tax evasion, *The Wall Street Journal* stated that federal investigators had found that the Company had failed to submit a raft of required paperwork tied to exports in recent years, and unearthed discrepancies between Caterpillar's regular filings and what it provided to authorities in response to subpoenas prior to the raids.

21.     On May 1, 2017, less than two months after the execution of the search warrants, Defendant Buda (defined below) resigned.  On August 1, 2017, amid the continuing investigations, Caterpillar unexpectedly announced that Defendant Halverson (defined below) will retire early in 2018.

22.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## II.      JURISDICTION AND VENUE

23.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

24.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Caterpillar's principal executive offices will be relocated to this District, the Company has several plants or facilities that are located within this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

25.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

26.     Lead Plaintiff Société Générale Securities Services GmbH is an institutional investor based in Unterföhring, Germany, that oversees approximately $4.3 billion in assets on behalf of thousands of beneficiaries.  As set forth in the Certification previously filed with the Court (ECF No. 14-1), SGSS fund PT-MASTER purchased Caterpillar common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure set forth in ¶¶ 177-79 below.  By order dated June 9, 2017 (ECF No. 24), the Court appointed SGSS as Lead Plaintiff in this action.

### B. Corporate Defendant

27.     Defendant Caterpillar is incorporated in Delaware.  The Company's principal executive offices are located at 100 NE Adams Street, Peoria, Illinois, but the Company has announced its intention to relocate its corporate headquarters to Deerfield, Illinois.  Caterpillar designs, develops, manufactures, markets, and sells construction, mining, and forestry machinery. The Company also manufactures engines and other related parts for its equipment, and offers financing and insurance.  Caterpillar principally operates through its three product segments – Construction Industries, Resource Industries, and Energy & Transportation – and also provides financing and related services through its Financial Products segment.  The Company distributes its products through a worldwide organization of dealers.  With 2016 sales and revenues of $38.537 billion, Caterpillar is the world's leading manufacturer of construction and mining equipment, diesel and natural gas engines, industrial gas turbines, and diesel-electric locomotives. Caterpillar's shares trade on the NYSE under the ticker symbol "CAT."

C.     **Individual Defendants**

28.     Defendant D. James Umpleby III ("Umpleby") has served as the Company's Chief Executive Officer ("CEO") since January 2017 and is a member of the Company's Board of Directors.  Defendant Umpleby joined the Company in 1980.  He held various high-level positions at the Company prior to becoming its CEO, including Caterpillar's Group President and member of Caterpillar's Executive Office from January 2013 until 2017.

29.     Defendant Douglas R. Oberhelman ("Oberhelman") served as the Company's CEO from July 2010 until January 2017, and served as the Company's Executive Chairman until his retirement on March 31, 2017.  Defendant Oberhelman joined Caterpillar in 1975 as a credit analyst in the treasury department.  He became a Caterpillar Vice President in 1995, serving as the Chief Financial Officer ("CFO") from 1995 to 1998.  Following his position as CFO, he served as Vice President of the Engine Products Division from 1998 until 2002, when he became the Group President and member of the Executive Office.  As Group President, Defendant Oberhelman was responsible for, among other things, auditing and compliance, global purchasing, remanufacturing, corporate treasury tax, and investor relations.

30.     Defendant Bradley M. Halverson ("Halverson") served as the Company's CFO at all relevant times during the Class Period.  In this role, Defendant Halverson reports directly to the CEO, Defendant Umpleby, and previously reported to Defendant Oberhelman during his tenure as CEO.  In addition to serving as the Company's CFO, Halverson is also one of the Company's group presidents.  In his current roles, he oversees the Finance Services Division, Human Services Division, Global Information Services, Financial Products Division, Global Supply Network Division, as well as Corporate Auditing.  Defendant Halverson joined the Company in 1988 as an accountant.  He held various roles within the Company, including Vice President of Finance Services Division from 2010 to 2012, wherein he managed Corporate Auditing, Corporate

Treasury, Global Tax & Trade, Global Revenue Management, and Enterprise Cost & Business Analysis. Defendant Halverson also served as the Corporate Controller from 2004 through 2010. On August 1, 2017, Caterpillar unexpectedly announced that Defendant Halverson will retire in early 2018.

31.     Defendant James B. Buda ("Buda") served as Executive Vice President of Law and Public Policy from 2012 until his retirement on May 1, 2017. Defendant Buda joined the Company in 1987 as an attorney in the legal department. From 2001 to 2010, Defendant Buda was Vice President of the Legal Services Division. In addition to that role, Defendant Buda also served as Caterpillar's Chief Legal Officer from 2001 until 2012. Prior to his role as Executive Vice President of Law and Public Policy, Defendant Buda was Senior Vice President of the Company from February 2011 to 2012. Defendant Buda resigned on May 1, 2017.

32.     Defendant Jananne A. Copeland ("Copeland") served as the Company's Chief Accounting Officer ("CAO") at all relevant times during the Class Period. Defendant Copeland joined Caterpillar in 2002 as a Corporate Consolidations and Tax Accounting Manager. She became the Corporate Financial Reporting Manager in the Corporate Services Division in 2004 until 2006. From 2006 through 2007, Defendant Copeland served as the Corporate Financial Reporting Manager for the Global Finance and Strategic Support Division, after which she became the Chief Accounting Officer. In addition to serving as the Company's CAO, Defendant Copeland was the Company's Corporate Controller from 2010 until 2012.

33.     The defendants referenced above in ¶¶ 28-32 are sometimes referred to herein as the "Individual Defendants."

10

IV.     **SUBSTANTIVE ALLEGATIONS**

A.      **Caterpillar's Tax Avoidance Scheme**

34.     Domestic corporations are subject to a U.S. statutory tax rate of up to 35% on their worldwide income, which is the highest statutory rate among the Organisation for Economic Co-operation and Development countries and among the highest in the world.  However, through the use of various tax planning strategies, the effective tax rate of U.S. corporations has been estimated to be much less.  Companies use tax provisions that permit multinational corporations to defer U.S. tax on active business earnings of their offshore subsidiaries until those earnings are brought back to the United States.  The ability of U.S. corporations to earn foreign income through overseas subsidiaries without paying U.S. tax until the subsidiaries' earnings are repatriated is known as "deferral."

35.     One major method used by multinational corporations to shift profits from high-tax to low-tax jurisdictions, and then defer the resulting income from U.S. taxation, is through the transfer of profitable business income, operations, or assets to offshore subsidiaries.

36.     For example, corporations have created foreign subsidiaries to supply parts that the U.S. entity then purchases as a way of shifting profits from the United States to the overseas supplier.  However, to ensure there is a legitimate business purpose for such activity and to account for the value transferred, Congress and the IRS established a system of transfer pricing regulations to ensure that multinational corporations accurately assess the value of what is being transferred and do not use such transfers to evade U.S. taxes.

37.     Principles addressing these transfers are codified under Section 482 and Section 367 of the Internal Revenue Code and are largely built upon the requirement that the transfers must be conducted as if they were arm's-length dealings between unrelated parties.

38.     In 1999, Caterpillar created a wholly owned subsidiary, CSARL, in Switzerland, to lower the Company's U.S. taxes and shift profits to a low tax jurisdiction.  To justify the tax treatment, CSARL was purportedly created to handle parts sales to customers outside of the United States and to provide services with regard to U.S. sales.  Caterpillar gave CSARL a license to distribute all of its replacement parts outside the United States and paid CSARL a fee for performing various support functions, including projecting future demand and tracking the Company's global inventory.  Despite this arrangement, Caterpillar kept the overwhelming majority of its employees and business operations in the United States.

39.     The Company designated CSARL as its "global purchaser" of purchased finished replacement parts ("PFRPs"), which were manufactured by third-party suppliers.  In this role, CSARL purchased the PFRPs and then immediately resold them to Caterpillar in the United States or, over time, sold them to non-U.S. independent dealers, Caterpillar affiliates, or customers.

40.     Caterpillar and CSARL entered into multiple agreements with one another, including licensing agreements and servicing agreements.  As to the licensing agreements, CSARL agreed to pay Caterpillar a royalty between 4% and 6% for all sales of Caterpillar's products.  In addition, Caterpillar and CSARL entered into a servicing agreement whereby CSARL agreed to pay Caterpillar's costs plus a 5% markup for the Company to continue to perform a number of core functions, including managing the worldwide parts inventory, supervising suppliers, forecasting parts demand, supervising parts logistics, and storing CSARL-owned parts in the United States.

41.     As a result of the arrangement – which, according to internal documents had a "minimal business substance" – Caterpillar channeled at least 85% of its replacement parts profits

12

through CSARL, saving the Company about $300 million each year in U.S. taxes, and totaling approximately $2.4 billion at the time of the Senate hearings in 2014.

### B. The 2009 Whistleblower Lawsuit

42. On June 12, 2009, Daniel Schlicksup ("Schlicksup"), a former Global Tax Strategy Manager at Caterpillar, filed a civil action against Defendants Buda, Oberhelman, and the Company, as well as Edward J. Rapp ("Rapp"), David B. Burritt, Alice Barbour ("Barbour"), and Robin D. Beran, under provisions of the Sarbanes-Oxley Act of 2002 and the Illinois Whistleblower Act, which prohibit retaliation against corporate whistleblowers. Schlicksup alleged that the Company retaliated against him for his repeated efforts to warn Company executives that the Swiss tax strategy implemented in 1999 may be in violation of U.S. tax law.

43. Since the beginning of the Swiss tax strategy in 1999, Schlicksup alerted Defendants Buda and Oberhelman, as well as others within the Company, that he believed Caterpillar was engaged in violations of Sections 1341, 1343, and 1348 of Title 18 of the U.S. Code, as well as rules or regulations of the SEC, and other provisions of federal law related to fraud against shareholders.

44. Schlicksup emailed a memorandum on May 1, 2008 (the "May 1, 2008 Memo") to Rapp and Defendant Oberhelman (who, at the time, were both executive officers and group presidents at Caterpillar) detailing specific conduct that the Company was engaged in that Schlicksup believed to be illegal. As part of that memo, Schlicksup also provided nearly 140 pages of supporting documentation.

45. Schlicksup described how the Company shifted billions of dollars in profits from U.S.-based parts sales to its Swiss subsidiary, CSARL, including how the Company sold and shipped spare parts globally from its warehouse in Morton, Illinois, while attributing at least $5.6 billion of profits from those sales to CSARL in Geneva, Switzerland. This scheme, known

as the "Swiss structure," operated from 2000 onwards and allowed the Company to avoid paying billions of dollars in U.S. federal income taxes.

46.     Schlicksup further detailed how Caterpillar employed offshore shell companies – known as the "Bermuda structure" – to repatriate the profits that had been taxed at a lower rate in Switzerland without paying any U.S. taxes.

47.     For example, in 2003, as part of the "tax dodge," the Company paid U.S. federal income tax of $160 million lower than what it would have owed without the Swiss structure.

48.     Following the May 1, 2008 Memo, which detailed the issues with the Swiss structure and the Bermuda structure, Caterpillar retaliated against Schlicksup and threatened him with termination, which Schlicksup believed was "part of a cover-up of at least $2,000,000,000 of taxes otherwise due and owing and also a related overstatement of earnings in violation of federal securities laws."

49.     As evidence of the retaliation, Schlicksup outlined a series of events that occurred following his email to Rapp and Defendant Oberhelman with the May 1, 2008 Memo:

a.      Schlicksup had attempted to meet with Oberhelman and Rapp to discuss the issues raised in the May 1, 2008 Memo, but was repeatedly rebuffed.  Instead, on or around May 14, 2008, Oberhelman and Rapp provided Barbour (the Human Resource Manager for the Chief Financial Officer) a copy of the May 1, 2008 Memo.

b.      One week later, on or about May 20, 2008, Rapp and Oberhelman further forwarded Schlicksup's May 1, 2008 Memo to the Company's Office of Business Practices ("OBP") to resolve.  The OBP then informed Schlicksup that they had his

complaint, which in large part was also about their office, and they were reviewing it.

c.     Then, on or about August 12, 2008, Rapp and Defendant Buda met and determined that Schlicksup had to be moved out of the CFO's Division.

d.     Following this meeting, on or about August 26, 2008, Schlicksup met with Barbour and a Vice President of Caterpillar and was told that he had to take a lateral transfer "outside of the Chief Financial Officer's Division" or he would be terminated.

e.     Schlicksup accepted the lateral move in fear of being terminated.

50.     Schlicksup then raised his concerns in a November 21, 2008 administrative filing with the Occupational Safety and Health Administration ("OSHA"), to which he attached the May 1, 2008 Memo.  In his OSHA filing, he identified Defendants Buda and Oberhelman, as well as Rapp, as alleged violators of the Corporate and Criminal Fraud Accountability Act of the Sarbanes-Oxley Act due to their knowledge and lack of action.

51.     In connection with Schlicksup's lawsuit, Defendant Copeland was deposed on May 5, 2011, during which she testified that CSARL's financial numbers were calculated according to GAAP.  Caterpillar ultimately settled the lawsuit with Schlicksup in 2012.

**C.     Federal Investigations Into Caterpillar's Tax Evasion Scheme**

52.     While Schlicksup and the Company settled the lawsuit in 2012, Schlicksup's complaint prompted an investigation by the U.S. Senate's Permanent Subcommittee on Investigations into Caterpillar's tax filings and operations between 2000 and 2009.

53.     In early 2013, the Company disclosed that the IRS was examining its tax returns for the years 2007 to 2009.  Specifically, on February 19, 2013, the first day of the Class Period,

15

Caterpillar filed a Form 10-K with the SEC, in which it stated that "*[t]he IRS is currently examining our U.S. tax returns for 2007 to 2009*." (Emphasis added.)

54.     Later, in connection with a Permanent Subcommittee on Investigations hearing on April 1, 2014, the U.S. Senate Democratic staff issued the Senate Report, which concluded that Caterpillar had avoided paying $2.4 billion in U.S. taxes since 2000 by shifting profits to CSARL.

55.     The Senate Report noted that it "came to the Subcommittee's attention after a civil lawsuit was filed by a former Caterpillar employee who had served as Caterpillar's 'Global Tax Strategy Manager,' a position created specifically for him by the Chief Financial Officer. The lawsuit alleged that Caterpillar had sold and shipped replacement parts for its machines from a warehouse in Illinois, while improperly attributing billions of dollars of profits from those sales to a related Swiss affiliate."

56.     The Senate Report noted that Caterpillar had paid PricewaterhouseCoopers ("PwC") $55 million to develop the tax strategy. Under the strategy, Caterpillar transferred the rights to profits from its parts business to CSARL, even though no employees or business activities were relocated to Switzerland. In exchange, CSARL paid a small royalty, and the income was taxed at a special rate of 4% to 6% that Caterpillar had negotiated with the Swiss government.

57.     As part of the scheme, Caterpillar effectively kept two sets of books. The public one attributed the bulk of its parts profits to CSARL, with its significantly lower tax rate. An internal ledger known as "accountable profits" tracked the operating income of the divisions and calculated employee bonuses accordingly, according to the Senate Report.

58.     In part, the Senate Report stated that:

after the adoption of a Swiss tax strategy in 1999, [Caterpillar] reported 15% or less of those profits in the United States and shifted 85% or more of the profits to Switzerland. Caterpillar accomplished that profit shift without making any real

changes in its business operations. It continued to manage and lead the parts business from the United States.

59. The Senate Report noted that Caterpillar did so "despite the fact that its U.S. operations continued to play a far larger role in the parts sold to non-U.S. customers than its Swiss operations." The Senate Report also stated that:

> only 400 employees, less than one-half of one percent, work in Switzerland. Of its 125 manufacturing facilities worldwide, 54 are in the United States, while none are located in Switzerland. In 2012, of the $2 billion Caterpillar spent on research and development, 80% was spent in the United States, while less than 10% was spent in Switzerland.

60. The Senate Report concluded that "[t]he same contrast applies to Caterpillar's parts business." The Senate Report noted that:

> [o]f the nearly 8,300 Caterpillar employees specializing in parts, about 4,900 work in the United States, including almost all of the senior parts executives. Switzerland has about 65 employees working on parts, with one division head managing parts distribution in Europe and one worldwide parts manager who reports to a division head in the United States.

61. Regarding distribution, the Senate Report stated that:

> [o]f the company's 19 parts warehouses and distribution facilities worldwide, 10 are located in the United States storing 1.5 billion parts, including its largest distribution center in Morton, Illinois; no warehouses are located in Switzerland. Caterpillar's parts inventory is also managed and operated primarily from the United States using U.S.-run worldwide parts tracking, forecasting, and delivery systems that have no counterparts in Switzerland. In 2012, Caterpillar Board minutes described its parts distribution business as "U.S. centric."

62. The Senate Report added that "[d]espite the fact that its parts business is managed and led primarily from the United States, Caterpillar used a series of complex transactions to designate a new Swiss affiliate called CSARL as its 'global parts purchaser,' and license CSARL to sell Caterpillar third party manufactured parts to Caterpillar's non-U.S. dealers." In addition:

> Caterpillar also signed a servicing agreement with CSARL in which it agreed to keep performing the core functions supporting the non-U.S. parts sales, including overseeing the U.S. parts supplier network, forecasting parts demand, managing the company's worldwide parts inventory, storing the parts, and shipping them from

17

the United States. Caterpillar agreed to perform those functions in exchange for a service fee equal to its costs plus 5%. As a result of those licensing and servicing agreements, over the next thirteen years from 2000 to 2012, Caterpillar shifted to CSARL in Switzerland taxable income from its non-U.S. parts sales totaling more than $8 billion, and deferred or avoided paying U.S. taxes totaling about $2.4 billion.

63. PwC was essential to the development of this tax scheme. As the Senate Report noted, "Caterpillar paid over $55 million to PricewaterhouseCoopers (PWC), one of the largest accounting firms in the world and Caterpillar's longtime auditor, to develop and implement the Swiss tax strategy, which was designed explicitly to reduce the company's taxes." In so doing, "[b]y simultaneously acting as both auditor and tax consultant for the company, PWC audited and approved the very tax strategy sold by the firm to Caterpillar, raising significant conflict of interest concerns."

64. The Senate Report detailed concerns **within Caterpillar** about the legality of the scheme, stating that "[w]ithin the company itself, two professionals in the tax department warned that the Swiss tax strategy lacked economic substance and had no business purpose other than tax avoidance, raising their concerns to officers at the highest levels of the company through an anonymous letter in 2004, and a series of emails and memoranda by the company's Global Tax Strategy Manager beginning in 2007."

65. The Senate Report also detailed how, in 2008, "the Global Tax Strategy Manager wrote to the head of the Caterpillar tax department: 'With all due respect, the business substance issue related to the CSARL Parts Distribution is the pink elephant issue worth a Billion dollars on the balance sheet.' By 2010, Caterpillar's finance department calculated that, as a result of the Swiss tax strategy, the company's 'Effective Tax Rate ha[d] dropped to lowest in the Dow 30.'"

66.     The Senate Report further made the following "Findings and Recommendations":

**Findings.**    Based on the Subcommittee's investigation, the Report makes the following findings of fact.

**(1)**     **Operating a U.S. Centric Business.**    Caterpillar's third-party manufactured replacement parts business, which provides the company with its highest profit margins, is managed and led primarily from the United States.

**(2)**     **Reversing U.S.-Swiss Allocation of Parts Profits.**   Caterpillar negotiated a 4% to 6% effective tax rate with Switzerland and, in 1999, executed a tax strategy in which the company stopped allocating 85% or more of its non-U.S. replacement parts profits to the United States and 15% or less to Switzerland, and instead allocated 15% or less of those profits to the United States and 85% or more to Switzerland.

**(3)**     **Generating $2.4 billion in Tax Benefits.**   After executing its Swiss tax strategy, over a 13-year period beginning in 2000, Caterpillar allocated more than $8 billion in non-U.S. parts profits to its Swiss affiliate, CSARL, and has so far deferred paying $2.4 billion in U.S. taxes on those profits.

**(4)**     **Using Contradictory Valuations.**   To justify sending 85% of its non-U.S. parts profits to its Swiss affiliate, CSARL, Caterpillar asserted that CSARL's development and support of its offshore dealer network was highly valuable, but when it later transferred to CSARL another marketing company performing the same functions, Caterpillar treated the value of those functions as negligible.

**(5)**     **Employing a Tax-Motivated "Virtual Inventory."**   To track CSARL-owned parts stored in Caterpillar's U.S. warehouses, Caterpillar devised a "virtual inventory" system that used "virtual bins" of commingled CSARL and Caterpillar parts and only retroactively, after a sale, identified the specific parts belonging to CSARL.  The virtual inventory system created a second set of inventory books for tax purposes and operated in addition to Caterpillar's global inventory system which tracked parts for business purposes.

**(6)**     **Creating a Potential Conflict of Interest.**   By acting as both Caterpillar's independent auditor and tax consultant, PricewaterhouseCoopers (PWC) auditors audited and approved the very Swiss tax strategy sold by PWC tax consultants to the company, creating an apparent, if not actual, conflict of interest.  PWC was paid over $55 million for developing and implementing Caterpillar's offshore tax strategy.

19

67.    Following the release of the Senate Report, government investigations of the Company continued to gather pace.  On February 17, 2015, Caterpillar filed the 2014 Form 10-K with the SEC, in which it stated:

> On January 8, 2015, the Company received a grand jury subpoena from the U.S. District Court for the Central District of Illinois.  The subpoena requests documents and information from the Company relating to, among other things, financial information concerning U.S. and non-U.S. Caterpillar subsidiaries (including undistributed profits of non-U.S. subsidiaries and the movement of cash among U.S. and non-U.S. subsidiaries).

68.    In the filing, Caterpillar stated:  "***The Company is cooperating with this investigation***."  (Emphasis added).

69.    In that same filing, the Company also stated in relevant part:

> On January 30, 2015, we received a Revenue Agent's Report (RAR) from the Internal Revenue Service (IRS) indicating the end of the field examination of our U.S. income tax returns for 2007 to 2009 including the impact of a loss carryback to 2005.  The IRS has proposed to tax in the United States profits earned from certain parts transactions by CSARL based on the IRS examination team's application of "substance-over-form" or "assignment-of-income" judicial doctrines.  ***We believe that the relevant transactions complied with applicable tax laws and did not violate judicial doctrines***.  The purchase of parts by CSARL from unrelated parties and the subsequent sale of those parts to unrelated dealers outside the United States have substantial legal, commercial, and economic consequences for the parties involved.  We have filed U.S. income tax returns on this same basis for years after 2009.  ***We currently believe the ultimate disposition of this matter will not have a material adverse effect on our consolidated financial position, liquidity or results of operations.***

(Emphasis added).

70.    On October 30, 2015, Caterpillar filed a Form 10-Q with the SEC (the "October 30, 2015 Form 10-Q") in which it disclosed that it had received additional subpoenas from an Illinois grand jury in connection with an investigation into how the Company's use of U.S. and foreign subsidiaries affected its tax practices.  The probe concerned "undistributed profits of non-U.S.

subsidiaries and the movement of cash among U.S. and non-U.S. subsidiaries." The October 30,

2015 Form 10-Q reassured investors that Caterpillar was cooperating with the investigation:

> The company has received additional subpoenas relating to this investigation requesting additional documents and information relating to, among other things, the purchase and resale of replacement parts by Caterpillar Inc. and non-U.S. Caterpillar subsidiaries, dividend distributions of certain non-U.S. Caterpillar subsidiaries, and Caterpillar SARL and related structures. ***The company is cooperating with this investigation***.

(Emphasis added).

71.     In connection with this public filing, Caterpillar spokeswoman Rachel Potts told

Law360 that the subpoenas were in line with the Company's ongoing cooperation with the

investigation and, in its view, "do not represent an expansion of the investigation."

### D.     Federal Law Enforcement Agencies Raid the Company's Offices

72.     Despite its representations to the contrary, Caterpillar was not cooperating with the

government investigations.   Instead, the Company obstructed the investigations, forcing

investigators to take the highly unusual step of requesting, and then executing, search warrants.

Caterpillar knew that its tax position was untenable.  According to Dr. Robinson, Caterpillar did

so anyway, "***deliberate[ly] and primarily with the intention of maintaining a higher share price***."

73.     On February 24, 2017, U.S. District Judge Harold A. Baker issued search warrants

that included photographs of the three facilities that federal agents subsequently searched, as well

as the parameters of the search.  Those search warrants focused on Caterpillar's business with

CSARL and stated that federal agents should look for, among other things:  (i) "any and all

documents regarding the movement of any products between the United States and Switzerland

and/or CSARL or any other foreign country"; (ii) "any and all documents regarding the

relationship between Caterpillar Inc. and CSARL and/or any other non-U.S. based entities"; and

(iii) "any and all financial records involving sales, order purchases, customers, business transactions involving exports or shipments to Switzerland and/or CSARL."

74. In addition, the search warrants indicated that authorities were looking for end user information on Caterpillar exports and the Company's "use of aliases" and other "efforts to thwart or avoid law enforcement scrutiny."

75. Federal agents executed the search warrants on March 2, 2017. Federal guidelines, commentators, and former federal prosecutors all agree that such raids on large multinational corporations are extremely rare in a situation where a company already has disclosed that it is voluntarily cooperating in an investigation and that raids only arise when the government is concerned that the company has obstructed or failed to fully cooperate and there is a risk of loss of evidence. The IRS is usually "very collaborative in trying to reach an understanding in terms of facts and finding a resolution," according to Robert Rostan ("Rostan"), chief financial officer at Training The Street, commenting on the raids at Caterpillar's offices. Rostan added that "[a] raid from the IRS is extremely unusual, but also, to see the IRS with other federal agencies involved is unusual as well. What they would be looking for is some sort of evidence contrary to their tax position."

76. Moreover, the number of cases in which government agencies use search warrants is small compared to those using grand jury subpoenas. Similarly, most evidence in such cases is not obtained by searches and seizures, but rather by voluntary responses to grand jury subpoenas. However, the issuance of a grand jury subpoena comes with risks for the federal agencies conducting the investigation. It takes time to comply with a subpoena, and the evidence remains in the control of the target who may delay responding, destroy evidence, or otherwise place it out of reach of the authorities.

77.     In fact, agencies like the IRS and Department of Justice ("DOJ") guide against such extreme discovery methods during criminal investigations.   The IRS follows policies and procedures that are established in its Internal Revenue Manual ("IRM"), the majority of which emphasize restraint during an investigation.   In advising its Criminal Investigation Unit on investigative techniques, the IRM indicates that "[s]pecial agents should be aware that not every investigation requires execution of a search warrant," IRM § 9.4.9.1.2, and that search warrants "will be utilized with restraint and only in significant tax investigations," *id*. at § 9.4.9.2.5.

78.     The IRS's policy advocates adherence to the least intrusive investigative method possible.   For that reason, agents are advised that they "***must*** use the least intrusive means possible to obtain evidence," *id*. at § 9.4.9.6.1 (emphasis added), and that "[a]ll other investigative tools . . . should be considered before deciding that a search warrant is the least intrusive means to acquire evidence," *id*. at § 9.4.9.2.5.

79.     In deciding whether a search warrant represents the best and least intrusive method to secure evidence, the government is encouraged to use DOJ and IRS procedures.   *Id*. at § 9.5.2.5.7.   This decision often hinges on whether crucial evidence of a crime cannot be obtained through voluntary cooperation.   The main factors to be considered include:   (i) any objective evidence indicating the subject may destroy the evidence; (ii) any objective evidence of the subject's attempt to obstruct the investigation; (iii) facts that establish that other attempts to acquire the records were ineffective; and (iv) facts that indicate that other methods of acquiring the records may compromise the investigation.   *Id*. at § 9.4.9.2.7.

23

80. Following the execution of the search warrants as against the Company, the *Peoria Journal Star* reported, in relevant part:

**Federal agents raid Caterpillar offices as part of tax strategy investigation**

PEORIA – Federal officials seized documents and electronic records from three Caterpillar Inc. facilities, including the global headquarters Downtown, on Thursday as an apparent part of a criminal investigation into the company's tax strategy.

. . . .

The investigation appears to stem from revelations about the company's tax strategy as outlined in a 2009 federal wrongful termination lawsuit brought by Daniel Schlicksup. The lawsuit alleged the company shifted profits overseas and to offshore shell companies to avoid paying more than $2 billion in U.S. taxes. Schlicksup settled the suit in 2012.

Caterpillar, in its annual 10-K filing with the U.S. Securities and Exchange Commission last month, acknowledged a criminal investigation into the tax strategy.

81. Following the raids, on March 2, 2017, a Caterpillar spokesperson confirmed that the execution of the search warrant "is regarding, among other things, export filings that relate to the CSARL matter."

82. After the market closed on March 2, 2017, *Bloomberg News* published an article entitled "Caterpillar Goes from White House Kudos to Multi-Agency Raid." The article reported, in relevant part:

Bloomberg News obtained copies of three related search warrants, signed Feb. 24 by U.S. Judge Harold Baker, that authorized seizure of a broad range of documents and electronic files related to Caterpillar's Swiss affiliate, CSARL. Authorities, the warrants said, sought evidence related to potential crimes, including "failure to file or submitting false electronic export information" and "***false and misleading financial reports and statements***."

Authorities sought data about products moving between the U.S. and Switzerland and/or CSARL, sales outside the U.S., and end users of exported items.

24

The warrants, which are under court seal, suggested other nefarious conduct. They sought data on "export controls in the United States and other countries, use of aliases, and *efforts to thwart or avoid law enforcement scrutiny*."

They also were looking for names of people who may have been contacted about "export offenses," and they wanted "counter forensic programs" designed to eliminate data.

(Emphasis added.)

83.     On March 7, 2017, *The New York Times* detailed a report commissioned by the government that accused Caterpillar of carrying out tax and accounting fraud. In the 85-page report, Dr. Robinson, an accounting professor at the Tuck School of Business at Dartmouth College, stated that "Caterpillar did not comply with either U.S. tax law or U.S. financial reporting rules." In a direct rebuke of Caterpillar, Dr. Robinson stated: "I believe that the company's noncompliance with these rules was deliberate and primarily with the intention of maintaining a higher share price. These actions were fraudulent rather than negligent." The Company received a copy of the report on March 9, 2017.

84.     Former federal prosecutors, commentators, and experienced white collar attorneys agreed that the execution of a search warrant signaled that Caterpillar was not cooperating, despite its representations to the contrary. For example, on or about March 15, 2017, Adam Fayne, a partner of Arnstein & Lehr LLP's tax and white collar criminal practice groups, told Law360: "I don't know why any company like Caterpillar, a Fortune 500 company, which has a large legal team and really highly paid, good legal counsel, would get raided unless the government felt they were possibly suppressing evidence or destroying evidence and they thought they had no choice."

85.     *Crain's* opined that the "raid on Caterpillar's headquarters suggests federal authorities think the company's cooperation with the government leaves something to be desired." Renato Mariotti, a partner at Thomas Coburn LLP and a former assistant U.S. attorney in Chicago, similarly told *Crain's* that, "[t]he fact the federal government has decided to obtain and execute a

search warrant indicates they are concerned evidence will not be preserved or turned over to them unless they seize it themselves . . . . It's a big step to send agents into the headquarters of a big company to seize documents."

86.     On June 1, 2017, *Bloomberg* reported that "U.S. prosecutors almost never resort to splashy raids on mom-and-apple-pie companies such as Caterpillar, a huge exporter that's kept 46,500 jobs in the U.S."  The article added that "[f]ormer federal prosecutors say the most likely reason for the raid is that investigators felt Cat hadn't been forthcoming with information – or they were worried that someone would destroy evidence, as Arthur Andersen did with Enron documents."

87.     Given the nature of the raid, the most plausible inference is that the Company was not, as it represented to the market, "cooperating with the investigation."  Even if Caterpillar complied with some grand jury subpoena requests, that does not equal cooperation.  In her remarks at the New York City Bar Association's Fourth Annual White Collar Crime Institute, Assistant Attorney General Leslie R. Caldwell, when discussing a company's cooperation with a government investigation, stated:  "Compliance with our subpoenas is not cooperation.  Public relations talking points are not cooperation.  A whitewash about the facts of any individual's involvement is not cooperation."

88.     On July 3, 2017, *The Wall Street Journal* reported that "[f]ederal investigators believe Caterpillar Inc. failed to submit numerous required export filings with the government in recent years" and that "[i]nvestigators have identified discrepancies between what Caterpillar turned over to authorities in response to subpoenas before the raids and the company's regular filings with the U.S. Department of Commerce's Automated Export System, the people familiar with the matter said."

26

89.     On August 1, 2017, the Company filed a Form 8-K with the SEC that announced the unexpected retirement of Defendant Halverson, which followed the resignation of Defendant Buda on May 1, 2017.

**E.      Caterpillar's Financial Statements Were Materially Misstated in Violation of GAAP**

90.     GAAP constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

91.     GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

92.     SEC and NYSE rules and regulations require that publicly traded companies such as Caterpillar include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC.  *See* Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation S-X.

93.     SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).

94.     As a U.S. corporation, Caterpillar represented that it prepared its financial statements according to GAAP.  Throughout the Class Period, the Company assured investors that its consolidated financial statements were prepared in accordance with GAAP.  *See* ¶¶ 101, 105, 107, 109, 111, 121, 125, 129, 133, 142, 146, 150, 154, 160, 164, 168.

95.     Under GAAP, an uncertain tax position liability is generally defined as a present or possible obligation that arises from past events in which there is uncertainty as to the probability

that the obligation will result in an outflow of resources or uncertainty as to the amount of the outflow.

96.     Under GAAP ASC 740, an entity must recognize in its financial statements the "effects of a tax position when it is more likely than not, based on the technical merits, that the position will be sustained upon examination" by the relevant tax authority.  ASC 740-10-25-6.

97.     In its Form 10-K filings during the Class Period, Caterpillar claimed that it measured the benefit for such positions "as the largest benefit more likely than not of being realized upon ultimate settlement with a taxing authority that has full knowledge of all relevant information."  ¶ 135, 156.

98.     Ultimately, the execution of the search warrants revealed to the market that the Company was not cooperating with the investigations and, by implication, that Caterpillar did not, in fact, believe that the benefits for the tax positions reflected in its financial disclosures were "more likely than not" to be "realized upon ultimate settlement with a taxing authority that has full knowledge of all relevant information."

99.     Accordingly, throughout the Class Period Caterpillar overstated its financial results by recording as revenue hundreds of millions of dollars that it would likely have to remit to the IRS.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS [1]

100.    Throughout the Class Period, Defendants made materially false and misleading statements and omitted material information concerning Caterpillar's compliance with

---

[1] In this section, statements that are ***bold and italicized*** are specifically alleged to be false and misleading.

government investigations, the extent of the government's investigations, and the substantial risks to Caterpillar's tax position.

### A. Form 10-K Filed February 19, 2013

101.   On February 19, 2013, the first day of the Class Period, the Company filed a Form 10-K with the SEC (the "2012 Form 10-K"), which was signed by Defendants Oberhelman, Halverson, Buda, and Copeland.   In pertinent part, the 2012 Form 10-K stated that "*[o]ur consolidated financial statements are prepared in accordance with GAAP*."

102.   In addition, the 2012 Form 10-K stated:

*The IRS is currently examining our U.S. tax returns for 2007 to 2009.  In our major non-U.S. jurisdictions, tax years are typically subject to examination for three to eight years.  In the opinion of management, the ultimate disposition of these matters will not have a material adverse effect on our consolidated financial position, liquidity or results of operations*.

103.   Caterpillar's representation that its financial statements were prepared "in accordance with GAAP," referenced in ¶ 101, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

104.   The statements referenced in ¶ 102 were materially false and misleading and omitted material information:

a.   While claiming the IRS was examining its 2007 to 2009 tax returns, Caterpillar concealed that the investigations were focused on the Company's tax evasion scheme through CSARL, which extended beyond 2007 to 2009 and resulted in Caterpillar materially overstating its profitability by understating its tax obligations;

b.  As demonstrated by the execution of the search warrants, Caterpillar was not cooperating with the IRS's investigation; and

c.  As demonstrated by the execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion" regarding the legality of the Company's tax strategy.  In particular, Caterpillar omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations.  Instead, Caterpillar continued to lead its business from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

**B.      Form 10-Q Filed May 2, 2013**

105.    On May 2, 2013, the Company filed a Form 10-Q with the SEC (the "May 2, 2013 Form 10-Q"), which was signed by Defendants Oberhelman, Halverson, Buda, and Copeland.  In pertinent part, the May 2, 2013 Form 10-Q stated that that "***[t]he financial statements have been prepared in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission***."

106.    Caterpillar's representation that its financial statements were prepared "in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission," referenced in ¶ 105, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not that its tax

position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

### C. Form 10-Q Filed August 2, 2013

107. On August 2, 2013, the Company filed a Form 10-Q with the SEC (the "August 2, 2013 Form 10-Q"), which was signed by Defendants Oberhelman, Halverson, Buda, and Copeland. In pertinent part, the August 2, 2013 Form 10-Q stated that "*[t]he financial statements have been prepared in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission*."

108. Caterpillar's representation that its financial statements were prepared "in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission," referenced in ¶ 107, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

### D. Form 10-Q Filed November 1, 2013

109. On November 1, 2013, the Company filed a Form 10-Q with the SEC (the "November 1, 2013 Form 10-Q"), which was signed by Defendants Oberhelman, Halverson, Buda, and Copeland. In pertinent part, the November 1, 2013 Form 10-Q stated that that "*[t]he financial statements have been prepared in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission*."

31

110. Caterpillar's representation that its financial statements were prepared "in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission," referenced in ¶ 109, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

### E.  Form 10-K Filed February 18, 2014

111. On February 18, 2014, the Company filed a Form 10-K with the SEC (the "2013 Form 10-K"), which was signed by Defendants Oberhelman, Halverson, Buda, and Copeland. In pertinent part, the 2012 Form 10-K stated that "*[o]ur consolidated financial statements are prepared in accordance with GAAP*."

112. The 2013 Form 10-K also stated the following:

> *The IRS is currently examining our U.S. tax returns for 2007 to 2009 including the impact of a loss carryback to 2005*. While we have not yet received a Revenue Agent's Report generally issued at the end of the field examination process, we have received Notices of Proposed Adjustment from the IRS relating to U.S. taxation of certain non-U.S. operations and foreign tax credits. We disagree with these proposed adjustments, and to the extent that adjustments are assessed upon completion of the field examination relating to these matters, we would vigorously contest the adjustments in appeals. The completion of the field examination for this audit is expected in 2014. *In our major non-U.S. jurisdictions, tax years are typically subject to examination for three to eight years. In the opinion of management, the ultimate disposition of these matters will not have a material adverse effect on our consolidated financial position, liquidity or results of operations*. Due to the uncertainty related to the timing and potential outcome of these matters, we can not estimate the range of reasonably possible change in unrecognized tax benefits in the next 12 months.

113. Caterpillar's representation that its financial statements were prepared "in accordance with GAAP," referenced in ¶ 111, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely

than not that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

114.    The statements referenced in ¶ 112 were materially false and misleading and omitted material information:

a.    While claiming the IRS was examining its 2007 to 2009 tax returns, Caterpillar concealed that the investigations were focused on the Company's tax evasion scheme through CSARL, which extended beyond 2007 to 2009 and resulted in Caterpillar materially overstating its profitability by understating its tax obligations;

b.    As demonstrated by the execution of the search warrants, Caterpillar was not cooperating with the IRS's investigation; and

c.    As demonstrated by the execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion" regarding the legality of the Company's tax strategy.  In particular, Caterpillar omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations.  Instead, Caterpillar continued to lead its business from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

**F.** **April 1, 2014 Testimony Before the Senate Subcommittee on Homeland Security and Governmental Affairs**

115.     Following the commencement of the government investigations, Caterpillar was called to testify before Congress.  On April 1, 2014, in testimony before Senate Subcommittee on Homeland Security and Governmental Affairs, Julie Lagacy ("Lagacy'), the Company's VP Finance Services Division, made the following statements:

- "[The 1999 transaction] did not change how profits were allocated; rather, it correctly identified in 1999 where the profits were earned."

- "We want to emphasize that *Caterpillar has fully complied with U.S. tax law* with respect to the restructuring and transactions that you have asked us to discuss today."

- "*CSARL is no mere shell*, but rather a major operating company employing hundreds of personnel in Geneva, including many of the people who perform the strategically critical work of interfacing with dealers in non-U.S. markets."

- "CSARL actually has much more 'substance' than is necessary for its supply chain transactions to be respected for tax purposes."

- "If CSARL stands out among the hundreds of large multinational structures prevalent in the marketplace, it would be for the unusually high degree of business substance in the buying and selling entity . . . ."

- "Caterpillar's in-house tax professionals and outside advisors manage tax risk every day, and *all remain convinced that the restructuring and subsequent transaction comply with the tax code* and case law dealing with the need for transactional form to comport with transactional substance.  *Caterpillar has never had any reservation about any fundamental 'substance' issue relating to CSARL's purchases and sales of replacement parts* . . . ."

- "*Caterpillar further notes that the restructuring was in no way a tax shelter and was not originated as an idea by PricewaterhouseCoopers*."

- "[W]e did have a former employee – he did file an employment lawsuit.  That was resolved, and all of his concerns were taken seriously, and all of the experts, both internally and externally, PricewaterhouseCoopers and McDermott Will & Emery, found there to be no merit in his concerns."

116.     As a managerial employee of Caterpillar, Lagacy's statements are attributable to the Company.

117.    The statements referenced in ¶ 115 were materially false and misleading because, as demonstrated by the execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion" regarding the legality of the Company's tax strategy.  In particular, Caterpillar omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations.  Instead, Caterpillar continued to lead its business from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

### G.    Press Release Issued March 31, 2014

118.    On March 31, 2014, Caterpillar filed a press release titled "Caterpillar Executive to Testify Before U.S. Senate Subcommittee About Company's Business Structure:  Company acts ethically, complies with tax law and pays its taxes."  In that document, the Company stated:

> "*Caterpillar takes very seriously its obligation to follow tax law and pay what it owes*," said Julie Lagacy.  ". . . Caterpillar's philosophy is that our business structure drives our tax structure.  *We comply with the tax laws enacted by Congress, by the states and by all of the many jurisdictions in when we conduct business*."

119.    As a managerial employee of Caterpillar, Lagacy's comments are attributable to the Company.

120.    The statements in ¶ 118 were materially false and misleading because, as demonstrated by the execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion" regarding the legality of the Company's tax strategy.  In particular, Caterpillar omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations.  Instead, Caterpillar continued to lead its business

from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

### H. Form 10-Q Filed May 2, 2014

121.    On May 2, 2014, the Company filed a Form 10-Q with the SEC (the "May 2, 2014 Form 10-Q"), which was signed by Defendants Oberhelman, Halverson, Buda, and Copeland. In pertinent part, the May 2, 2014 Form 10-Q reported: "*[t]he financial statements have been prepared in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission*."

122.    The May 2, 2014 Form 10-Q also stated:

> *The IRS is currently examining our U.S. tax returns for 2007 to 2009 including the impact of a loss carryback to 2005 . . . . In the opinion of management, the ultimate disposition of these matters will not have a material adverse effect on our consolidated financial position, liquidity or results of operations*.

123.    Caterpillar's representation that its financial statements were prepared "in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission," referenced in ¶ 121, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

36

124.    The statements referenced in ¶ 122 were materially false and misleading and omitted material information:

a.    While claiming the IRS was examining its 2007 to 2009 tax returns, Caterpillar concealed that the investigations were focused on the Company's tax evasion scheme through CSARL, which extended beyond 2007 to 2009 and resulted in Caterpillar materially overstating its profitability by understating its tax obligations;

b.    As demonstrated by the execution of the search warrants, Caterpillar was not cooperating with the IRS's investigation; and

c.    As demonstrated by the execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion" regarding the legality of the Company's tax strategy.  In particular, Caterpillar omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations.  Instead, Caterpillar continued to lead its business from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

**I.    Form 10-Q Filed August 1, 2014**

125.    On August 1, 2014, the Company filed a Form 10-Q with the SEC (the "August 1, 2014 Form 10-Q"), which was signed by Defendants Oberhelman, Halverson, Buda, and Copeland.  In pertinent part, the August 1, 2014 Form 10-Q reported:  "*[t]he financial statements have been prepared in conformity with generally accepted accounting principles in the United*

37

*States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission*."

126.    The August 1, 2014 Form 10-Q also stated:

*The IRS is currently examining our U.S. tax returns for 2007 to 2009 including the impact of a loss carryback to 2005 . . . . In the opinion of management, the ultimate disposition of these matters will not have a material adverse effect on our consolidated financial position, liquidity or results of operations*.

127.    Caterpillar's representation that its financial statements were prepared "in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission," referenced in ¶ 125, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

128.    The statements referenced in ¶ 126 were materially false and misleading and omitted material information:

a.      While claiming the IRS was examining its 2007 to 2009 tax returns, Caterpillar concealed that the investigations were focused on the Company's tax evasion scheme through CSARL, which extended beyond 2007 to 2009 and resulted in Caterpillar materially overstating its profitability by understating its tax obligations;

b.      As demonstrated by the execution of the search warrants, Caterpillar was not cooperating with the IRS's investigation; and

c.      As demonstrated by the execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion"

regarding the legality of the Company's tax strategy. In particular, Caterpillar omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations. Instead, Caterpillar continued to lead its business from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

**J.      Form 10-Q Filed October 31, 2014**

129.    On October 31, 2014, the Company filed a Form 10-Q with the SEC (the "October 31, 2014 Form 10-Q"), which was signed by Defendants Oberhelman, Halverson, Buda, and Copeland. In pertinent part, the October 31, 2014 Form 10-Q reported: "*[t]he financial statements have been prepared in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission*."

130.    The October 31, 2014 Form 10-Q also stated:

> *The IRS is currently examining our U.S. tax returns for 2007 to 2009 including the impact of a loss carryback to 2005 . . . . In the opinion of management, the ultimate disposition of these matters will not have a material adverse effect on our consolidated financial position, liquidity or results of operations*.

131.    Caterpillar's representation that its financial statements were prepared "in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission," referenced in ¶ 129, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not

that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

132.    The statements referenced in ¶ 130 were materially false and misleading and omitted material information:

a.    While claiming the IRS was examining its 2007 to 2009 tax returns, Caterpillar concealed that the investigations were focused on the Company's tax evasion scheme through CSARL, which extended beyond 2007 to 2009 and resulted in Caterpillar materially overstating its profitability by understating its tax obligations;

b.    As demonstrated by the execution of the search warrants, Caterpillar was not cooperating with the IRS's investigation; and

c.    As demonstrated by the execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion" regarding the legality of the Company's tax strategy.  In particular, Caterpillar omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations.  Instead, Caterpillar continued to lead its business from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

**K.    Form 10-K Filed February 17, 2015**

133.    On February 17, 2015, Caterpillar filed the 2014 Form 10-K with the SEC, which was signed by Defendants Oberhelman, Halverson, Buda, and Copeland.  In pertinent part, the

2014 Form 10-K stated that "*[o]ur consolidated financial statements are prepared in accordance with GAAP*."

134.    The Company stated in the 2014 Form 10-K that it was "cooperating" with government investigation:

**Item 3. Legal Proceedings**

On January 8, 2015, the Company received a grand jury subpoena from the U.S. District Court for the Central District of Illinois.  The subpoena requests documents and information from the Company relating to, among other things, financial information concerning U.S. and non-U.S. Caterpillar subsidiaries (including undistributed profits of non-U.S. subsidiaries and the movement of cash among U.S. and non-U.S. subsidiaries).  *The Company is cooperating with this investigation*.  The Company is unable to predict the outcome or reasonably estimate any potential loss; however, *we currently believe that this matter will not have a material adverse effect on the Company's consolidated results of operations, financial position or liquidity*.

135.    The 2014 Form 10-K also stated:

*Despite our belief that our tax return positions are consistent with applicable tax laws*, we believe that taxing authorities could challenge certain positions. Settlement of any challenge can result in no change, a complete disallowance, or some partial adjustment reached through negotiations or litigation.  We record tax benefits for uncertain tax positions based upon management's evaluation of the information available at the reporting date.  To be recognized in the financial statements, a tax benefit must be at least more likely than not of being sustained based on technical merits.  The benefit for positions meeting the recognition threshold is measured as the largest benefit more likely than not of being realized upon ultimate settlement with a taxing authority that has full knowledge of all relevant information.  Significant judgment is required in making these determinations and adjustments to unrecognized tax benefits may be necessary to reflect actual taxes payable upon settlement.  Adjustments related to positions impacting the effective tax rate affect the provision for income taxes.  Adjustments related to positions impacting the timing of deductions impact deferred tax assets and liabilities.

136.    In addition, Caterpillar stated the following in the 2014 Form 10-K:

On January 30, 2015, we received a Revenue Agent's Report (RAR) from the Internal Revenue Service (IRS) indicating the end of the field examination of our U.S. tax returns for 2007 to 2009 including the impact of a loss carryback to 2005. The RAR proposed tax increases and penalties for these years of approximately

$1 billion primarily related to two significant areas that we intend to vigorously contest through the IRS Appeals process.

. . . .

Based on the information currently available, we do not anticipate a significant increase or decrease to our recognized tax benefits for these matters within the next 12 months. ***We currently believe the ultimate disposition of these matters will not have a material adverse effect on our consolidated financial position, liquidity or results of operations. We expect the IRS field examination of our U.S. tax returns for 2010 to 2012 to begin in 2015***. In our major non-U.S. jurisdictions, tax years are typically subject to examination for three to eight years.

137. Caterpillar's representation that its financial statements were prepared "in accordance with GAAP," referenced in ¶ 133, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

138. The statements referenced in ¶¶ 134-36 were materially false and misleading and omitted material information:

a. As demonstrated by the execution of the search warrants, Caterpillar was not cooperating with the IRS's investigation; and

b. As demonstrated by the execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion" regarding the legality of the Company's tax strategy. In particular, Caterpillar omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations. Instead, Caterpillar continued to lead its business from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign

42

profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

**L.     March 4, 2015 J.P. Morgan Aviation, Transportation and Industrials Conference**

139.    On March 4, 2015, the Company participated in the J.P. Morgan Aviation, Transportation and Industrials Conference.   Richard D. Moore ("Moore"), then Caterpillar's Director of Investor Relations, participated on behalf of Caterpillar.   During the conference, the following discussion occurred:

<Q>:  While you're on the SEC, can you talk a little bit if you may on – if you can on the tax issues that have come up recently?

<A - Richard D. Moore>:  Yeah.  And I think, you're referring again to some of the items in the 10-K and most – some of those referred to our CSARL subsidiary and there's been a lot of public information on this even including a Senate subcommittee hearing last April.  And as we said then and still strongly believe, we completely follow the tax law and we pay our taxes.  That's kind of the bottom line of it.  *But we've been cooperating with the IRS*, and they completed their revenue agent report, and we are going to vigorously contest their conclusions on that for back taxes or penalties, however you want to define that.

And again, I think the bottom line is we strongly believe that we follow the tax laws and we pay our taxes.  And so, that's really about all we've done.  There's quite a bit of disclosure in the 10-K on that as well, and it's probably too early to comment any further on that at this time.[2]

140.    Moore also stated:  "*We believe that again our structures, our transactions, were in full accordance with the tax laws . . . we haven't increased the reserves or tax rate expectations for that*."

141.    The statements referenced in ¶ 139 were materially false and misleading because Caterpillar was not cooperating with the IRS investigation.  The statement referenced in ¶ 140 was materially false and misleading and omitted material information because, as demonstrated by the

---

[2] As a representative of Caterpillar, Moore's statements are attributable to the Company.

execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion" regarding the legality of the Company's tax strategy. In particular, Caterpillar omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations. Instead, Caterpillar continued to lead its business from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

### M. Form 10-Q Filed May 1, 2015

142. On May 1, 2015, Caterpillar filed a quarterly report on Form 10-Q with the SEC (the "May 1, 2015 Form 10-Q"), which was signed by Defendants Oberhelman, Halverson, Buda, and Copeland. In the May 1, 2015 Form 10-Q, Caterpillar stated, in part, that the Company's "*financial statements have been prepared in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission*."

143. The May 1, 2015 Form 10-Q also stated:

On January 8, 2015, the Company received a grand jury subpoena from the U.S. District Court for the Central District of Illinois. The subpoena requests documents and information from the Company relating to, among other things, financial information concerning U.S. and non-U.S. Caterpillar subsidiaries (including undistributed profits of non-U.S. subsidiaries and the movement of cash among U.S. and non-U.S. subsidiaries). The Company received an additional subpoena relating to this investigation requesting additional documents and information relating to, among other things, the purchase and resale of replacement parts by Caterpillar Inc. and non-U.S. Caterpillar subsidiaries. *The Company is cooperating with this investigation*. The Company is unable to predict the outcome or reasonably estimate any potential loss; however, *we currently believe that this matter will not have a material adverse effect on the Company's consolidated results of operations, financial position or liquidity*.

144. Caterpillar's representation that its financial statements were prepared "in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission," referenced in ¶ 142, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

145. The statements referenced in ¶ 143 were materially false and misleading and omitted material information:

   a.   As demonstrated by the execution of the search warrants, Caterpillar was not cooperating with the IRS's investigation; and

   b.   As demonstrated by the execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion" regarding the legality of the Company's tax strategy. In particular, Caterpillar omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations. Instead, Caterpillar continued to lead its business from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

## N.   Form 10-Q Filed July 31, 2015

146. On July 31, 2015, Caterpillar filed a quarterly report on Form 10-Q with the SEC (the "July 31, 2015 Form 10-Q"), which was signed by Defendants Oberhelman, Halverson, Buda,

and Copeland.  The July 31, 2015 Form 10-Q stated, in part, that the Company's "***financial statements have been prepared in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission***."

147.    The July 31, 2015 Form 10-Q also stated:

On January 8, 2015, the Company received a grand jury subpoena from the U.S. District Court for the Central District of Illinois.  The subpoena requests documents and information from the Company relating to, among other things, financial information concerning U.S. and non-U.S. Caterpillar subsidiaries (including undistributed profits of non-U.S. subsidiaries and the movement of cash among U.S. and non-U.S. subsidiaries).  The Company received an additional subpoena relating to this investigation requesting additional documents and information relating to, among other things, the purchase and resale of replacement parts by Caterpillar Inc. and non-U.S. Caterpillar subsidiaries.  ***The Company is cooperating with this investigation***.  The Company is unable to predict the outcome or reasonably estimate any potential loss; however, ***we currently believe that this matter will not have a material adverse effect on the Company's consolidated results of operations, financial position or liquidity***.

148.    Caterpillar's representation that its financial statements were prepared "in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission," referenced in ¶ 146, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

149.    The statements referenced in ¶ 147 were materially false and misleading and omitted material information:

a.      As demonstrated by the execution of the search warrants, Caterpillar was not cooperating with the IRS's investigation; and

    b.      As demonstrated by the execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion" regarding the legality of the Company's tax strategy.  In particular, Caterpillar omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations.  Instead, Caterpillar continued to lead its business from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

**O.**      **Form 10-Q Filed October 30, 2015**

150.    On October 30, 2015, Caterpillar filed the October 30, 2015 Form 10-Q, which was signed by Defendants Oberhelman, Halverson, Buda, and Copeland.  The October 20, 2015 Form 10-Q stated, in part, that the Company's "*financial statements have been prepared in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission*."

151.    The October 30, 2015 Form 10-Q also stated:

On January 8, 2015, the Company received a grand jury subpoena from the U.S. District Court for the Central District of Illinois.  The subpoena requests documents and information from the Company relating to, among other things, financial information concerning U.S. and non-U.S. Caterpillar subsidiaries (including undistributed profits of non-U.S. subsidiaries and the movement of cash among U.S. and non-U.S. subsidiaries).  The Company has received additional subpoenas relating to this investigation requesting additional documents and information relating to, among other things, the purchase and resale of replacement parts by Caterpillar Inc. and non-U.S. Caterpillar subsidiaries, dividend distributions of certain non-U.S. Caterpillar subsidiaries, and Caterpillar SARL and related structures.  ***The Company is cooperating with this investigation***.  The Company is unable to predict the outcome or reasonably estimate any potential loss; however,

*we currently believe that this matter will not have a material adverse effect on the Company's consolidated results of operations, financial position or liquidity*.

152.     Caterpillar's representation that its financial statements were prepared "in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission," referenced in ¶ 150, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

153.     The statements referenced in ¶ 151 were materially false and misleading and omitted material information:

a.     As demonstrated by the execution of the search warrants, Caterpillar was not cooperating with the IRS's investigation; and

b.     As demonstrated by the execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion" regarding the legality of the Company's tax strategy.  In particular, Caterpillar omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations.  Instead, Caterpillar continued to lead its business from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

48

### P. Form 10-K Filed February 16, 2016

154. On February 16, 2016, Caterpillar filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 Form 10-K"). The 2015 Form 10-K was signed by Defendants Oberhelman, Halverson, Buda, and Copeland. In the 2015 Form 10-K, the Company stated in relevant part that "*[o]ur consolidated financial statements are prepared in accordance with GAAP*."

155. The 2015 Form 10-K also stated:

On January 8, 2015, the Company received a grand jury subpoena from the U.S. District Court for the Central District of Illinois. The subpoena requests documents and information from the Company relating to, among other things, financial information concerning U.S. and non-U.S. Caterpillar subsidiaries (including undistributed profits of non-U.S. subsidiaries and the movement of cash among U.S. and non-U.S. subsidiaries). The Company has received additional subpoenas relating to this investigation requesting additional documents and information relating to, among other things, the purchase and resale of replacement parts by Caterpillar Inc. and non-U.S. Caterpillar subsidiaries, dividend distributions of certain non-U.S. Caterpillar subsidiaries, and Caterpillar SARL and related structures. *The Company is cooperating with this investigation*. The Company is unable to predict the outcome or reasonably estimate any potential loss; however, *we currently believe that this matter will not have a material adverse effect on the Company's consolidated results of operations, financial position or liquidity*.

156. The 2015 Form 10-K also stated:

*Despite our belief that our tax return positions are consistent with applicable tax laws*, we believe that taxing authorities could challenge certain positions. Settlement of any challenge can result in no change, a complete disallowance, or some partial adjustment reached through negotiations or litigation. We record tax benefits for uncertain tax positions based upon management's evaluation of the information available at the reporting date. To be recognized in the financial statements, a tax benefit must be at least more likely than not of being sustained based on technical merits. The benefit for positions meeting the recognition threshold is measured as the largest benefit more likely than not of being realized upon ultimate settlement with a taxing authority that has full knowledge of all relevant information. Significant judgment is required in making these determinations and adjustments to unrecognized tax benefits may be necessary to reflect actual taxes payable upon settlement. Adjustments related to positions impacting the effective tax rate affect the provision for income taxes. Adjustments

related to positions impacting the timing of deductions impact deferred tax assets and liabilities.

. . . .

The IRS has proposed to tax in the United States profits earned from certain parts transactions by CSARL based on the IRS examination team's application of "substance-over-form" or "assignment-of-income" judicial doctrines. We are vigorously contesting this adjustment through the IRS appeals process. *We believe that the relevant transactions complied with applicable tax laws and did not violate judicial doctrines*. The purchase of parts by CSARL from unrelated parties and the subsequent sale of those parts to unrelated dealers outside the United States have substantial legal, commercial, and economic consequences for the parties involved. We have filed U.S. income tax returns on this same basis for years after 2009. *We currently believe the ultimate disposition of this matter will not have a material adverse effect on our consolidated financial position, liquidity or results of operations*.

157. Caterpillar also stated in the 2015 Form 10-K: "*The IRS field examination of our U.S. income tax returns for 2010 to 2012 began in 2015*."

158. Caterpillar's representation that its financial statements were prepared "in accordance with GAAP," referenced in ¶ 154, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

159. The statements referenced in ¶¶ 155-57 were materially false and misleading and omitted material information:

a.    While claiming the IRS had commenced a "field examination" of the examination of the Company's tax returns for 2010 to 2012, Caterpillar concealed that the investigations were focused on the Company's tax evasion scheme through CSARL, which extended beyond 2010 to 2012 and resulted in Caterpillar materially overstating its profitability by understating its tax obligations;

b.  As demonstrated by the execution of the search warrants, Caterpillar was not cooperating with the IRS's investigation; and

c.  As demonstrated by the execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion" regarding the legality of the Company's tax strategy.  In particular, Caterpillar omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations.  Instead, Caterpillar continued to lead its business from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

**Q.  Form 10-Q Filed May 2, 2016**

160.  On May 2, 2016, Caterpillar filed a quarterly report on Form 10-Q with the SEC (the "May 2, 2016 Form 10-Q"), which was signed by Defendants Oberhelman, Halverson, Buda, and Copeland.  The May 2, 2016 Form 10-Q stated, in part, that the Company's "***financial statements have been prepared in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission***."

161.  The May 2, 2016 Form 10-Q also stated:

On January 8, 2015, the Company received a grand jury subpoena from the U.S. District Court for the Central District of Illinois.  The subpoena requests documents and information from the Company relating to, among other things, financial information concerning U.S. and non-U.S. Caterpillar subsidiaries (including undistributed profits of non-U.S. subsidiaries and the movement of cash among U.S. and non-U.S. subsidiaries).  The Company has received additional subpoenas relating to this investigation requesting additional documents and information

51

relating to, among other things, the purchase and resale of replacement parts by Caterpillar Inc. and non-U.S. Caterpillar subsidiaries, dividend distributions of certain non-U.S. Caterpillar subsidiaries, and Caterpillar SARL and related structures. ***The Company is cooperating with this investigation***. The Company is unable to predict the outcome or reasonably estimate any potential loss; however, ***we currently believe that this matter will not have a material adverse effect on the Company's consolidated results of operations, financial position or liquidity***.

162.    Caterpillar's representation that its financial statements were prepared "in conformity with generally accepted accounting principles and pursuant to the rules and regulations of the Securities and Exchange Commission," referenced in ¶ 160, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

163.    The statements referenced in ¶ 161 were materially false and misleading and omitted material information:

a.      As demonstrated by the execution of the search warrants, Caterpillar was not cooperating with the IRS's investigation; and

b.      As demonstrated by the execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion" regarding the legality of the Company's tax strategy.  In particular, Caterpillar omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations.  Instead, Caterpillar continued to lead its business from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

### R.     Form 10-Q Filed August 3, 2016

164.    On August 3, 2016, Caterpillar filed a quarterly report on Form 10-Q with the SEC (the "August 3, 2016 Form 10-Q"), which was signed by Defendants Oberhelman, Halverson, Buda, and Copeland.   The August 3, 2016 Form 10-Q stated, in part, that the Company's "*financial statements have been prepared in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission*."

165.    The August 3, 2016 Form 10-Q also stated:

> On January 8, 2015, the Company received a grand jury subpoena from the U.S. District Court for the Central District of Illinois.  The subpoena requests documents and information from the Company relating to, among other things, financial information concerning U.S. and non-U.S. Caterpillar subsidiaries (including undistributed profits of non-U.S. subsidiaries and the movement of cash among U.S. and non-U.S. subsidiaries).  The Company has received additional subpoenas relating to this investigation requesting additional documents and information relating to, among other things, the purchase and resale of replacement parts by Caterpillar Inc. and non-U.S. Caterpillar subsidiaries, dividend distributions of certain non-U.S. Caterpillar subsidiaries, and Caterpillar SARL and related structures.  ***The Company is cooperating with this investigation***.  The Company is unable to predict the outcome or reasonably estimate any potential loss; however, ***we currently believe that this matter will not have a material adverse effect on the Company's consolidated results of operations, financial position or liquidity***.

166.    Caterpillar's representation that its financial statements were prepared "in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission," referenced in ¶ 164, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

167.    The statements referenced in ¶ 165 were materially false and misleading and omitted material information:

a.    As demonstrated by the execution of the search warrants, Caterpillar was not cooperating with the IRS's investigation; and

b.    As demonstrated by the execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion" regarding the legality of the Company's tax strategy.  In particular, Caterpillar omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations.  Instead, Caterpillar continued to lead its business from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

**S.    Form 10-Q Filed November 2, 2016**

168.    On November 2, 2016, Caterpillar filed a quarterly report on Form 10-Q with the SEC (the "November 2, 2016 Form 10-Q"), which was signed by Defendants Oberhelman, Halverson, Buda, and Copeland.  The November 2, 2016 Form 10-Q stated, in pertinent part, that the Company's "***financial statements have been prepared in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission (SEC)***."

169.    Caterpillar's representation that its financial statements were prepared "in conformity with generally accepted accounting principles in the United States of America (U.S. GAAP) and pursuant to the rules and regulations of the Securities and Exchange

Commission (SEC)," referenced in ¶ 168, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

**T.      Form 10-K Filed February 15, 2017**

170.     On February 15, 2017, Caterpillar filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 Form 10-K"). The 2016 Form 10-K was signed by Defendants Umpleby, Oberhelman, Halverson, Buda, and Copeland. In the 2016 Form 10-K, the Company stated, in relevant part, that "*transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles*."

171.     The Company also stated the following in the 2016 Form 10-K:

On January 8, 2015, the Company received a grand jury subpoena from the U.S. District Court for the Central District of Illinois. The subpoena requests documents and information from the Company relating to, among other things, financial information concerning U.S. and non-U.S. Caterpillar subsidiaries (including undistributed profits of non-U.S. subsidiaries and the movement of cash among U.S. and non-U.S. subsidiaries). The Company has received additional subpoenas relating to this investigation requesting additional documents and information relating to, among other things, the purchase and resale of replacement parts by Caterpillar Inc. and non-U.S. Caterpillar subsidiaries, dividend distributions of certain non-U.S. Caterpillar subsidiaries, and Caterpillar SARL and related structures. ***The Company is cooperating with this investigation***. The Company is unable to predict the outcome or reasonably estimate any potential loss; however, ***we currently believe that this matter will not have a material adverse effect on the Company's consolidated results of operations, financial position or liquidity***.

. . . .

In January 2015, we received a Revenue Agent's Report (RAR) from the IRS indicating the end of the field examination of our U.S. income tax returns for 2007 to 2009 including the impact of a loss carryback to 2005. ***The IRS field examination for 2010 to 2012 that began in 2015 is expected to be completed in***

*2017*.  In November 2016, we received notices of proposed adjustments from the IRS for the 2010 to 2012 exam.  In both these audits, the IRS has proposed to tax in the United States profits earned from certain parts transactions by CSARL, based on the IRS examination team's application of the "substance-over-form" or "assignment-of-income" judicial doctrines.  We are vigorously contesting the proposed increases to tax and penalties for these years of approximately $2 billion. We believe that the relevant transactions complied with applicable tax laws and did not violate judicial doctrines.  We have filed U.S. income tax returns on this same basis for years after 2012.  Based on the information currently available, we do not anticipate a significant increase or decrease to our unrecognized tax benefits for this matter within the next 12 months.  *We currently believe the ultimate disposition of this matter will not have a material adverse effect on our consolidated financial position, liquidity or results of operations*.

172.    Caterpillar's representation that its financial statements were prepared "in accordance with generally accepted accounting principles," referenced in ¶ 170, was false and misleading because the Company was required to recognize and record a tax position liability in excess of $2 billion as it was more likely than not that its tax position did not comply U.S. tax laws and would therefore result in the assessment of additional taxes.

173.    The statements referenced in ¶ 171 were materially false and misleading and omitted material information:

a.    While claiming the IRS had commenced a "field examination" of the examination of the Company's tax returns for 2010 to 2012, Caterpillar concealed that the investigations were focused on the Company's tax evasion scheme through CSARL, which extended beyond 2010 to 2012 and resulted in Caterpillar materially overstating its profitability by understating its tax obligations;

b.    As demonstrated by the execution of the search warrants, Caterpillar was not cooperating with the IRS's investigation; and

c.    As demonstrated by the execution of the search warrants and Dr. Robinson's report, the Company omitted to disclose material facts that undermined its "opinion" regarding the legality of the Company's tax strategy.  In particular, Caterpillar

omitted that Caterpillar's CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations. Instead, Caterpillar continued to lead its business from the United States (where the majority of its employees were located) and maintained two sets of accounting records, one for the purpose of reporting foreign profits to evade U.S. taxes and another to reward the U.S. employees who generated such profits.

**U. SOX Certifications Executed Throughout the Class Period**

174. In connection with each quarterly and annual report Caterpillar filed with the SEC during the Class Period, Defendants Oberhelman and Halverson, *see* ¶¶ 101, 105, 107, 109, 111, 121, 125, 129, 133, 142, 146, 150, 154, 160, 164, 168, and later Defendants Umpleby and Halverson, *see* ¶ 170, signed certifications pursuant to the Sarbanes-Oxley Act ("SOX"). Pursuant to Section 302 of SOX, and also covered by Sections 304 and 906 of SOX, Defendants Oberhelman, Halverson, and Umpleby certified that they had designed and evaluated effective internal and disclosure controls over financial reporting, which assured the reliability of financial reporting, and also that the financial statements fairly and accurately presented the financial condition of the Company. For example, in connection with the Company's 2012 Form 10-K filed on February 19, 2013, Defendants Oberhelman and Halverson certified as follows:

1. I have reviewed this annual report on Form 10-K of Caterpillar Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

175.  The SOX certifications signed by Defendants Oberhelman, Halverson, and Umpleby during the Class Period, which were identical or substantially similar to that referenced in ¶ 174, were materially false and misleading when made because Caterpillar "did not maintain

an effective control environment" as of the date of the filings, as the Company failed to cooperate with the government investigations despite its representations to the contrary.

176.    Additionally, the statements contained in the Company's SEC filings, as well as all of the SOX certifications submitted throughout the Class Period, were materially false and misleading when made.  Contrary to the representation that the Company's SEC filings did "not contain any untrue statement of a material fact" or any material omission, the SEC filings to which these certifications were appended contained numerous materially false and misleading statements and omissions, as set forth herein.

## VI.    THE TRUTH EMERGES

177.    On March 2, 2017, law enforcement officials executed a search warrant and searched three of Caterpillar's facilities, including the Company's headquarters in Peoria, Illinois. *The Peoria Journal Star* newspaper reported, in relevant part that "[f]ederal officials seized documents and electronic records from three Caterpillar Inc. facilities, including the global headquarters Downtown, on Thursday as an apparent part of a criminal investigation into the company's tax strategy."

178.    On that same day, it was further reported that the federal government agencies involved included the IRS's Criminal Investigation Unit, the U.S. Department of Commerce Office BIS's Office of Export Enforcement, and the FDIC's Office of Inspector General.  Later that day, the Company issued a statement discussing the federal law enforcement raids to its facilities, stating:  "We believe the execution of this search warrant is regarding, among other things, export filings that relate to the CSARL matter."

179.    On this news, Caterpillar's share price fell $4.22, or 4.28%, to close at $94.36 per share on March 2, 2017, causing a loss of hundreds of millions of dollars in market capitalization, and damaging Lead Plaintiff and members of the Class.

180.    Investors were shocked to learn of the search warrant which, as explained by commentators and former federal prosecutors, revealed that Caterpillar's lack of cooperation was sufficiently concerning to the government that it felt compelled to execute a search to avoid destruction of evidence or failure to produce evidence.  The raids also showed that Caterpillar did not genuinely believe in the merits of its tax position, which was much riskier than disclosed to the market.

181.    Later that day, after the market had closed, *Bloomberg News* published an article entitled "Caterpillar Goes From White House Kudos to Multi-Agency Raid."  The article stated, in relevant part, that the warrants "sought evidence related to potential crimes, including 'failure to file or submitting false electronic export information' and 'false and misleading financial reports and statements.'"  The warrants also "sought data on 'export controls in the United States and other countries, use of aliases, and efforts to thwart or avoid law enforcement scrutiny'" and "names of people who may have been contacted about 'export offenses,' and they wanted 'counter forensic programs' designed to eliminate data."

182.    Analysts attributed the decline in the Company's share price to the execution of the search warrants.  Following the execution of the search warrant, on March 2, 2017, Jeffries reported as follows:

> The original inquiry was for tax years 2007-2009 and subsequently expanded to 2012.  If indeed this latest inquiry does expand the time frame to the 2016 period, it may be logical to expect the IRS to add to the proposed tax liability.  Pretax income from 2007-2012 totaled $30.7bn of which $8bn was attributed to CSARL (~26% of total) on which the IRS is seeking $2.4bn in taxes/penalties (~30% of CSARL income).  Based on this math and assuming CAT's business processes have not changed (as suggested in the 10-K) it would follow that of the $17.6bn in pretax income CAT generated from 2013-2016 roughly $4.6bn could potentially have gone through CSARL and at a similar tax/penalty rate the IRS could look to seek an additional $1.4bn.

183.    Evercore ESI also issued an analyst report on March 2, 2017, that stated, in part, that "obviously this specific news on CAT is the main reason for the weakness."

184.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    The 2009 Whistleblower Lawsuit and Subsequent Government Investigations

185.    The government began its investigation seeking Caterpillar's cooperation through a series of subpoenas.  This was consistent with the government's internal guidelines and patterns and practices of not escalating tax investigations unnecessarily and seeking cooperation rather than disrupting the operations of a major corporation such as Caterpillar.  The Company disclosed the subpoenas and repeatedly – but falsely – claimed that it was fully cooperating.  Despite the ongoing overt investigation, the government sought and obtained judicial permission to execute three search warrants in 2017.  The execution of the search warrants demonstrates that government regulators had reason to believe that Caterpillar was not fully cooperating and/or was obstructing their investigations.  Moreover, as revealed in the executed search warrants, the government was concerned that Caterpillar was using aliases, and other "*efforts to thwart or avoid law enforcement scrutiny*."  This demonstrates that Caterpillar's stated cooperation was false and also undermines Defendants' claim that the Company's tax position was supportable and legitimate.  Moreover, it is well-settled that evidence that a defendant has taken steps to cover up a misdeed is strong proof of scienter.

186.    As detailed above, *see* ¶¶ 42-51, the 2009 whistleblower complaint, which named, among others, Defendants Oberhelman, Buda, and the Company as defendants, alleged that the

Company had engaged in conduct that was in violation of U.S. tax laws. These defendants therefore cannot plausibly deny knowledge of the underlying matters, especially as they took action in response to the 2009 whistleblower complaint.

187.    Specifically, the whistleblower lawsuit alleged that the Company had operated a scheme, known as the "Swiss structure," wherein it avoided paying more than $2 billion in U.S. federal income taxes by shifting billions of dollars in profits from its U.S.-based parts sales to CSARL in Switzerland. Furthermore, the lawsuit alleged that the Company employed offshore shell companies – the "Bermuda structure" – to repatriate the profits that had been taxed at a lower rate in Switzerland, all without paying any U.S. taxes. Schlicksup further stated that he had made numerous attempts to contact his supervisors, including some of the Individual Defendants, to discuss the purported illegal conduct, but was repeatedly ignored and instead faced retaliation.

188.    On March 7, 2017, *The New York Times* detailed a report commissioned by the government that accused Caterpillar of tax and accounting fraud. Dr. Robinson stated that "Caterpillar did not comply with either U.S. tax law or U.S. financial reporting rules" and concluded that: "I believe that the company's noncompliance with these rules was deliberate and primarily with the intention of maintaining a higher share price. These actions were fraudulent rather than negligent."

189.    On June 1, 2017, *Bloomberg* reported that "U.S. prosecutors almost never resort to splashy raids on mom-and-apple-pie companies such as Caterpillar, a huge exporter that's kept 46,500 jobs in the U.S." The article added that "[f]ormer federal prosecutors say the most likely reason for the raid is that investigators felt Cat hadn't been forthcoming with information – or they were worried that someone would destroy evidence, as Arthur Andersen did with Enron documents."

190.    On July 2, 2017, *The Wall Street Journal* reported that "Federal investigators believe Caterpillar Inc. failed to submit numerous required export filings with the government in recent years . . . ." The article noted that the searches "offer an avenue for investigators to examine whether the missing export submissions were part of a possible effort by [Caterpillar] to avoid paying taxes." In addition, *The Wall Street Journal* stated that "[i]nvestigators have identified discrepancies between what Caterpillar turned over to authorities in response to subpoenas before the raids and the company's regular filings with the U.S. Department of Commerce's Automated Export System."

191.    The importance of the tax scheme to Caterpillar's business – and the financial implications if the Company was forced to return the billions of dollars sought by the IRS – further supports an inference of scienter. As discussed above, lower tax rates were fundamental to Caterpillar's business model, rendering it a core operation of the Company. The tax benefits that Caterpillar derived from CSARL increased the Company's profitability substantially. The importance and magnitude of the tax scheme to Caterpillar supports an inference that the Individual Defendants knew of or, at minimum, recklessly misrepresented the Company's compliance with the investigations.

**B.      The Individual Defendants' Senior Positions, the Company's Frequent Statements Regarding Tax Strategies, and the Critical Importance of the $2.4 Billion Tax Strategy to Caterpillar's Operations**

192.    As set forth above, the Company made numerous specific statements regarding the Company's tax position, operations, government investigations, and purported compliance with applicable laws and regulations. These specific statements reflect the fact that the Individual Defendants were in receipt of information regarding each of these subjects. The only other plausible inferences that can be drawn from these specific pronouncements is that the Individual

Defendants either fabricated the information that the Company provided to investors and the market or they deliberately ignored information they possessed regarding such matters. In either event, such deliberate recklessness would satisfy the scienter requirement.

193. Not only did Defendants frequently comment on Caterpillar's purported tax compliance, but the tax strategies were critical to enhancing the Company's profitability. Through the creation of CSARL, Caterpillar was able to divert billions of dollars in profits from its U.S.-based parts sales to Switzerland without making any substantial change to its business model. The lower tax rate in Switzerland was fundamental to Caterpillar's business model, rendering it a core operation of the Company. This scheme, known as the "Swiss structure," effectively saved the Company over $2.4 billion (and counting) in U.S. federal income taxes. The tax benefits that Caterpillar derived from its Swiss subsidiary increased the Company's profitability substantially. As a result of the Swiss tax strategy, Caterpillar's finance department calculated that the Company's "effective tax rate ha[d] dropped to the lowest in the Dow 30" by 2010.

194. Knowledge of falsity can be imputed to key officers who should have known of facts relating to the core operations of their company.

## C. Caterpillar's Cover Up, Two Sets of Books, and Spoliation of Evidence

195. During the Class Period, Caterpillar effectively maintained two sets of books. The public one, which attributed the bulk of parts profits to CSARL with its much lower Swiss tax rate, was created for the purpose of reporting foreign profits to evade U.S. taxes. The second book, an internal ledger known as the "accountable profits," tracked the actual individual operating income of the Company's various business divisions and calculated employee bonuses accordingly. *See* ¶ 57.

196.    In contrast to the profits recorded for tax purposes in the public ledger, the Company's second book, "accountable profits," allocated the majority of the parts profits to business divisions in the U.S., and only a routine distributor's share to CSARL, which was the same share CSARL's predecessor as well as Caterpillar's other marketing companies traditionally received.

197.    In other words, despite the increase in CSARL's profit allocation for tax purposes, CSARL's "accountable profits" within Caterpillar remained consistent even after 1999.

198.    When, as here, a company engages in a cover up of wrongdoing during government investigations, scienter is readily inferred.  During the Class Period, Caterpillar effectively kept two sets of books, which evidences an intent to cover up the scheme.

199.    Similarly, the execution of the search warrants demonstrates that government regulators had reason to believe that Caterpillar was destroying evidence, using aliases, and other "*efforts to thwart or avoid law enforcement scrutiny*," and, in fact, not cooperating with the investigations.  These efforts were of such a magnitude that government investigators had no choice but the take the highly unusual step of raiding the Company's offices.  *See* ¶¶ 84-86.

200.    Further, as detailed above, *The Wall Street Journal* reported that the government investigations have since uncovered evidence sought by the search warrants and have unearthed discrepancies between the Company's regular filings and what it relayed to authorities in response to subpoenas prior to the raids.  *See* ¶ 88.

### D.    The Individual Defendants Had Knowledge of and Access to Information Regarding the Investigations

201.    Numerous allegations set forth above give rise to a particularly strong inference that the Individual Defendants knew and were actively involved in the decisions not to cooperate

with the investigations. As the Company's most senior executives, the Individual Defendants were intimately familiar with Caterpillar's operations.

202.    The duration of the misconduct also supports an inference of scienter. As alleged above, each of the Individual Defendants was aware that Caterpillar was under investigation by the IRS and other government agencies starting well before the Class Period. That this scheme lasted for such a significant period of time demonstrates that the fraud alleged herein was not the result of a temporary lapse in otherwise rigorous management oversight, but rather was caused be a sustained course of misconduct facilitated by senior executives – which further demonstrates scienter.

### E.  The Individual Defendants Were Motivated to Mislead Investors and Conceal the Company's Non-Compliance with the Investigations to Maximize Their Compensation

203.    During the Class Period, Defendants Oberhelman, Umpleby, and Halverson collectively received more than $117 million in compensation, which was heavily weighted on stock awards and other incentive compensation. Defendant Oberhelman earned about $1.6 million in annual salary, yet he received annual stock awards and other incentive compensation totaling over $58 million during the Class Period. Defendant Umpleby earned between $661,000 and $825,000 in annual salary, yet he received annual stock awards and other incentive plan compensation totaling nearly $26 million during the Class Period. Defendant Halverson earned $661,000 to $786,000 in annual salary, yet he received annual stock awards and other incentive compensation totaling over $19 million during the Class Period.

204.    Throughout the Class Period, the amount of variable or "at risk" compensation paid to Defendants Oberhelman, Umpleby, and Halverson was based on various proxies for profitability and the Company's share price, among other factors. For example, Caterpillar's 2017 Proxy Statement noted that for all Named Executives Officers ("NEOs"), which in 2016 included

Oberhelman, Halverson, and Umpleby, "the largest portion (ranging from 50 percent to 80 percent) of their [Annual Incentive Performance] opportunity was based on Enterprise Operating Profit and Operating Profit After Capital Charge (OPACC) of each NEO's respective businesses." Thus, these Individual Defendants directly benefited financially by the Company's "belief" that its tax position was legitimate and by ensuring the Company did not comply with the IRS's investigation so that Caterpillar's share price would remain inflated during the Class Period.

205.    Similarly, Dr. Robinson's report concluded that Defendants' scheme was fraudulent and calculated to keep the price of Caterpillar's share price high, which in turn directly affected the Individual Defendants' income and continued employment.   Accordingly, the Individual Defendants were strongly incentivized to misrepresent the likelihood that Caterpillar's tax scheme was not legitimate and to conceal the Company's non-cooperation with the investigations to inflate the price of Caterpillar shares.

### F.    The Individual Defendants' Failure to Comply with the Company's Code of Conduct Supports an Inference of Scienter

206.    In the 2012 Form 10-K, Caterpillar referenced its Worldwide Code of Conduct (the "2013 Code of Conduct"), which was publicly available during the Class Period and stated, in part:

**Code of Ethics**

Our Worldwide Code of Conduct (Code), first published in 1974 and most recently updated in 2010, sets a high standard for honesty and ethical behavior by every employee, including the principal executive officer, principal financial officer, controller and principal accounting officer.  The Code is posted on our website at www.Caterpillar.com/code and is incorporated by reference as Exhibit 14 to this Form 10-K.

207.    The 2013 Code of Conduct also stated:

**We Ensure Accuracy and Completeness of Our Financial Reports and Accounting Records**

Investors, creditors, regulatory authorities and others have a legitimate interest in our company's financial and accounting information.  The integrity of Caterpillar's

67

financial reports and accounting records is based on validity, accuracy, completeness, timeliness and understandability of basic information supporting entries to the company's books of account. We will ensure every accounting or financial entry accurately reflects what is described by the supporting information. Each person at Caterpillar – not just those in finance and accounting – has a role in ensuring our financial records are complete and accurate and internal controls are honored. The same standards of integrity that apply to external financial reporting also apply to the financial statements that are used as internal management tools.

**We Are Fair, Honest and Open in Our Communications**

As employees, we communicate with each other in a respectful, fair, honest and open manner. As a public company, we have a responsibility to communicate information about our business to our stakeholders clearly, accurately and honestly. The disclosures we make in our reports and filings submitted to the U.S. Securities and Exchange Commission and to other governmental and regulatory agencies must be full, fair, accurate, timely and understandable. When we communicate publicly, we are consistent in our messages. Only designated spokespersons may communicate on behalf of Caterpillar or respond to requests for information from the media, governments, analysts and stockholders. When we release information about Caterpillar to the public, we do it fairly and impartially, without favoring any individual or group.

208.    In its Worldwide Code of Conduct released in 2015 (the "2015 Code of Conduct"), which was referenced in the 2014 Form 10-K, the 2015 Form 10-K, and the 2016 Form 10-K and made publicly available on the Company's website, Caterpillar stated:

> We hold ourselves to the highest standard of integrity and ethical behavior. We tell the truth. We promise only what we can reasonably expect to deliver. We strive to keep our commitments. Our company's stockholders, customers, dealers, distributors, suppliers, those with whom we do business and our fellow employees must be able to trust what we say and believe that we will always keep our word.
>
> . . . .
>
> **WE ENSURE ACCURACY AND COMPLETENESS OF OUR FINANCIAL REPORTS AND ACCOUNTING RECORDS**
>
> Investors, creditors, regulatory authorities and others have a legitimate interest in our company's financial and accounting information. The integrity of Caterpillar's financial reports and accounting records is based on validity, accuracy, completeness, timeliness and understandability of basic information supporting entries to the company's books of account. We will ensure every accounting or financial entry accurately reflects what is described by the supporting information. Each person at Caterpillar – not just those in finance and accounting – has a role in

ensuring our financial records are complete and accurate and internal controls are honored. The same standards of integrity that apply to external financial reporting also apply to the financial statements that are used as internal management tools.

209.    The 2015 Code of Conduct also stated: "The disclosures we make in our reports and filings submitted to the U.S. Securities and Exchange Commission and to other governmental and regulatory agencies must be full, fair, accurate, timely and understandable."

210.    As the most senior employees at Caterpillar, the Individual Defendants were expected to have knowledge of and abide by the 2013 Code of Conduct and 2015 Code of Conduct. Flagrant breaches of corporate policies, such as the ones detailed herein, provide further support for the scienter inference.

### G.    Executive Departures Support a Strong Inference of Scienter

211.    On October 17, 2016, the Company announced that Defendant Oberhelman would retire on January 1, 2017, one year earlier than previously planned.

212.    On February 9, 2017, Caterpillar issued a press release announcing that Defendant Buda was retiring from the Company effective May 1, 2017.

213.    Further, following the Class Period, on August 1, 2017, amid the continued investigation, the Company unexpectedly announced that Defendant Halverson had resigned effective early 2018.

### H.    The Individual Defendants' SOX Certifications and Signing of SEC Filings Further Support a Strong Inference of Scienter

214.    The SOX Certifications executed by Defendants Oberhelman, Umpleby, and Halverson are a particularly strong indicator of scienter because the malfeasance at issue directly implicates the adequacy of the Company's internal control systems. *See* ¶ 174. As detailed herein, during the Class Period, Caterpillar's internal controls were woefully inadequate and, in many respects, virtually non-existent.

215.     Moreover, as signatories to the Company's SEC filings, *see* ¶¶ 101, 105, 107, 109, 111, 121, 125, 129, 133, 142, 146, 150, 154, 160, 164, 168, 170, the Individual Defendants had an affirmative obligation to familiarize themselves with the facts relevant to Caterpillar's core operations.  To the extent that the Individual Defendants failed to fulfill that obligation, their recklessness would satisfy the scienter element of a claim brought under Section 10(b) and Rule 10b-5.

### I.     The Cumulative Knowledge of Caterpillar's Executives Is Imputed to the Company

216.     As detailed herein, senior Company officials were, at all relevant times, aware of numerous, undisclosed adverse facts relating to (a) the extent of the government agency investigations into Caterpillar's compliance with applicable tax laws; (b) the Company's lack of compliance with those investigations; and (c) the lack of a legitimate basis for Caterpillar's tax position.  Those allegations establish a strong inference that Caterpillar as an entity acted with the requisite scienter throughout the Class Period.  The cumulative knowledge of all members of the Company's senior management team, including the Individual Defendants, regarding these matters is properly imputed to Caterpillar.

217.     Throughout the Class Period, several Caterpillar executives had knowledge of the government's investigations and the extent of the Company's non-compliance with those probes.  For example, Defendants Oberhelman and Buda, as well as Rapp, were informed of the wrongdoing in the 2009 whistleblower lawsuit and the Company, including through Defendant Copeland, provided testimony to Congress regarding these matters.  *See* ¶¶ 42-51.

218.     When reviewed collectively, as required by applicable law, Lead Plaintiff's allegations support a strong inference of fraudulent intent on the part of the Defendants or, at the

very least, the strong inference that Defendants' conduct was severely reckless. In either case, scienter has been adequately pled.

## VIII. LOSS CAUSATION

219. Lead Plaintiff incorporates by reference the allegations set forth above. During the Class Period, Defendants publicly disseminated materially false and misleading statements and omitted material facts concerning the Company's belief in the legitimacy of its tax positions, its operations, and its true financial condition. Defendants also concealed from investors that Caterpillar was not cooperating in the investigations, the extent of the investigations, and the extent of the risks of the Company's tax positions and likely tax liabilities.

220. The conduct alleged herein and the materially false and misleading statements and omissions made during the Class Period caused Caterpillar's common stock to trade at artificially inflated prices, reaching as high as $111.46 per share during the Class Period, thereby operating as a fraud on investors in the Company's common stock.

221. When the truth was disclosed on March 2, 2017, Caterpillar's stock price declined significantly as the artificial inflation was removed from the stock price.

222. In response to the revelation of the truth, an Evercore ESI analyst report dated March 2, 2017 reported:

> News out midday that Federal officials executed a search warrant at three Caterpillar, Inc. facilities in the Tri-County Area (near Peoria, IL) today – including the corporate headquarters (Peoria headquarters, East Peoria factory and Morton, Illinois location – with Morton facility among the more telling, I believe, what this is all about, a parts profits tax structure scheme for CAT through a Switzerland affiliate).
>
> CAT stock is down ~5%+ today – a weak tape with the sector down broadly but ***obviously this specific news on CAT is the main reason for the weakness***.

(Emphasis added.)

71

223.    The following chart shows a comparison of CAT to a competitor index consisting of the seven companies that trade on the NYSE that are listed by Caterpillar in its 2016 Form 10-K as competitors (Komatsu Ltd., Hyundai Heavy Industries Co., Ltd., Volvo Group, CNH Industrial N.V., Hitachi Construction Machinery Co., Ltd, Deere & Company, and Doosan Infracore Co., Ltd.):



224.    The following chart shows Caterpillar's share price vs. volume of trades in the days leading up to and including the revelation of the fraud on March 2, 2017:



225.    Thus, the March 2, 2017 stock drop was a direct consequence of the market learning the truth and/or the materialization of the risks concealed by Defendants throughout the Class Period.  The timing and magnitude of the price decline in Caterpillar's common stock negate any inference that the loss suffered by Lead Plaintiff and the Class was caused by changed market conditions, macroeconomic, or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  Accordingly, as a result of their purchases of Caterpillar common stock during the Class Period, Lead Plaintiff and the Class suffered economic loss and damages under the federal securities laws.

## IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE

226.    Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon omissions of material fact that Defendants were under a duty to disclose.

227.    In addition, Lead Plaintiff and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory, because Caterpillar's common stock traded in an efficient market during the Class Period, as follows:

a.     The Company's common stock was actively traded on the NYSE, an informationally efficient market, throughout the Class Period.  Shares were highly liquid during the Class Period, with an average daily volume of 5,604,237 shares traded;

b.     As a regulated issuer, Caterpillar filed periodic public reports with the SEC and the NYSE;

c.     The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

d.     The market reacted promptly to public information disseminated by the Company;

e.     Caterpillar's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force

and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace; and

f.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Caterpillar's common stock.

228.    Therefore, the market for Caterpillar common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Caterpillar's share price. Under these circumstances, all purchasers of Caterpillar common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

## X.    CONTROL PERSON ALLEGATIONS

229.    By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Caterpillar, its business, operations, operational trends, finances, and present and future business prospects. The Individual Defendants would ascertain such information through the Company's internal corporate documents, conversations, and connections with other corporate officers, bankers, traders, risk officers, marketing experts, employees, attendance at management and Board meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as the Company officers and/or directors.

230.    It is appropriate to presume that the materially false, misleading, and incomplete information conveyed in Caterpillar's public filings, press releases, and public statements, as alleged herein, was the result of the collective actions of the Individual Defendants identified above. The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary

information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

231.    The Individual Defendants were involved in drafting, producing, reviewing, approving, and/or disseminating the materially false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the fact that materially false and misleading statements were being issued regarding the Company and themselves, and approved or ratified these statements, in violation of the federal securities laws.

232.    As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, each of the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Caterpillar's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.  The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

233.    The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of Caterpillar, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to

prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein.

234. The Individual Defendants are all liable as a participant in a scheme, plan, and course of conduct that operated as a fraud and deceit on Class Period purchasers of Caterpillar's common stock.

## XI. INAPPLICABILITY OF SAFE HARBOR

235. Defendants acted with scienter because at the time that they issued public documents and other statements in Caterpillar's name they knew, or with extreme recklessness disregarded, the fact that such statements were materially false and misleading or omitted material facts. Moreover, Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

236. As set forth in detail throughout this Complaint, Defendants, by virtue of their control over, and/or receipt of, Caterpillar's materially misleading statements and their positions with the Company that made them privy to confidential proprietary information, used such information to inflate artificially the Company's financial results. Defendants were informed of, participated in, and knew of the improprieties and unlawful conduct alleged herein and understood their material effect on the Company's business and future prospects. With respect to non-forward-looking statements and omissions, Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

237. The Private Securities Litigation Reform Act's statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false

statements pleaded in this Complaint. None of the statements pleaded herein are forward-looking statements and no such statement was identified as a forward-looking statement when made. Rather, the statements alleged herein to be materially false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

238. For example, under the Company's "risk factors," the 2012 Form 10-K stated:

We are subject to income taxes in the United States and numerous foreign jurisdictions. Our domestic and international tax liabilities are dependent upon the location of earnings among these different jurisdictions. Our provision for income taxes and cash tax liability in the future could be adversely affected by numerous factors, including income before taxes being lower than anticipated in countries with lower statutory tax rates and higher than anticipated in countries with higher statutory tax rates, changes in the valuation of deferred tax assets and liabilities, as well as, changes in tax laws and regulations. We are also subject to the continuous examination of our income tax returns by the U.S. Internal Revenue Service and other tax authorities. The results of audit and examination of previously filed tax returns and continuing assessments of our tax exposures may have an adverse effect on the company's provision for income taxes and cash tax liability.

239. In the Company's "risk factors," the 2013 Form 10-K stated:

We may incur additional tax expense or become subject to additional tax exposure. We are subject to income taxes in the United States and numerous foreign jurisdictions. Our domestic and international tax liabilities are dependent upon the location of earnings among these different jurisdictions. Our provision for income taxes and cash tax liability in the future could be adversely affected by numerous factors, including income before taxes being lower than anticipated in countries with lower statutory tax rates and higher than anticipated in countries with higher statutory tax rates, changes in the valuation of deferred tax assets and liabilities, as well as, changes in tax laws and regulations. We are also subject to the continuous examination of our income tax returns by the U.S. Internal Revenue Service and other tax authorities. The results of audit and examination of previously filed tax returns and continuing assessments of our tax exposures may have an adverse effect on the company's provision for income taxes and cash tax liability.

240.    Caterpillar's risk disclosures had not been updated from the 2012 Form 10-K, even though the Company's risk profile had increased in light of the confirmed Senate and IRS investigations. These risks were not merely speculative, as demonstrated by the findings in the Senate Report shortly after the filing of the 2013 Form 10-K and the subsequent execution of search warrants against the Company.

241.    Under Caterpillar's risk disclosures, the 2014 Form 10-K stated:

> We may incur additional tax expense or become subject to additional tax exposure. We are subject to income taxes in the United States and numerous foreign jurisdictions. Our domestic and international tax liabilities are dependent upon the location of earnings among these different jurisdictions. Our future results of operations could be adversely affected by changes in the effective tax rate as a result of a change in the mix of earnings in countries with differing statutory tax rates, changes in our overall profitability, changes in tax legislation and rates, changes in generally accepted accounting principles, changes in the valuation of deferred tax assets and liabilities, changes in the amount of earnings permanently reinvested offshore, the results of audits and examinations of previously filed tax returns and continuing assessments of our tax exposures. We are also subject to the continuous examination of our income tax returns by the U.S. Internal Revenue Service and other tax authorities. . . . We regularly assess the likelihood of an adverse outcome resulting from these examinations to determine the adequacy of our provision for taxes. There can be no assurance as to the outcome of these examinations. If our effective tax rates were to increase, or if the ultimate determination of our taxes owed is for an amount in excess of amounts previously accrued, our operating results, cash flows and financial condition could be adversely affected.

242.    The "risk factors" in the 2014 Form 10-K, referenced in ¶ 241, omitted and failed to disclose the specific risks associated with the current IRS and Senate investigations and the likelihood that the results of those investigations were likely to have a material impact on the Company's operations.

243.    The 2015 Form 10-K disclosed the following in the Company's "risk factors":

> We are also subject to the continuous examination of our income tax returns by the U.S. Internal Revenue Service and other tax authorities. We regularly assess the likelihood of an adverse outcome resulting from these examinations. If our effective tax rates were to increase, or if the ultimate determination of our taxes owed is for an amount in excess of amounts previously accrued, our operating results, cash flows and financial condition could be adversely affected.

244. The "risk factors" in the 2015 Form 10-K, referenced in ¶ 243, omitted and failed to disclose the specific risks associated with the current IRS and Senate investigations and the likelihood that the results of those investigations were likely to have a material impact on the Company's operations.

245. The 2016 Form 10-K disclosed the following in the Company's "risk factors":

**We may incur additional tax expense or become subject to additional tax exposure.**

. . . We are also subject to the continuous examination of our income tax returns by the U.S. Internal Revenue Service and other tax authorities. We regularly assess the likelihood of an adverse outcome resulting from these examinations. If our effective tax rates were to increase, or if the ultimate determination of our taxes owed is for an amount in excess of amounts previously accrued, our operating results, cash flows and financial condition could be adversely affected.

246. This "risk factor" in the 2016 Form 10-K, referenced in ¶ 245, omitted and failed to disclose that Caterpillar's risk profile was much increased as a result of the IRS's continued investigation.

247. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XII.   CLASS ACTION ALLEGATIONS

248.   Lead Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased the common stock of Caterpillar between February 19, 2013 and March 1, 2017, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are:  Defendants; members of the immediate families of the Individual Defendants; the Company's subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

249.   The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, the Company had between approximately 582.23 million and 657.70 million shares of common stock outstanding and actively trading on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

250.   Lead Plaintiff's claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

251. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

252. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

    a.      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

    b.      whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

    c.      whether and to what extent the market price of Caterpillar's common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

    d.      whether Defendants acted with the requisite level of scienter;

    e.      whether the Individual Defendants were controlling persons of the Company;

    f.      whether reliance may be presumed; and

    g.      whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

253. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members

of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII. COUNTS

### COUNT I
### Violation of § 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

254. Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

255. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

256. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Caterpillar's common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

257. The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or

disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

258.   As set forth above, Defendants made their materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Caterpillar's common stock during the Class Period.

259.   In ignorance of the materially false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for the Company's common stock, Lead Plaintiff and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period.  But for the fraud, Lead Plaintiff and members of the Class would not have purchased the Company's common stock at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Caterpillar's common stock declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

260.   By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5.

<div align="center">

**Count II**
**Violation of § 20(a) of the Exchange Act**
**Against the Individual Defendants**

</div>

261.   Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

262.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against each of the Individual Defendants.

263.    As alleged above, Caterpillar violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omitting material information in connection with the purchase and sale of the Company's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.  This fraudulent conduct was undertaken with scienter, and Caterpillar is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

264.    As set forth above, the Individual Defendants were controlling persons of Caterpillar during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same.

265.    By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

266.    The Individual Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased Caterpillar's common stock during the Class Period.

267.    In ignorance of the materially false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for the Company's common stock, Lead Plaintiff and other members of the Class purchased the Company's common stock at an artificially inflated price during the Class Period.  But for the fraud, Lead Plaintiff and members of the Class would not have purchased the Company's common stock at artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of the Company's common stock declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Caterpillar's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth began to be disclosed.

268.    By reason of the foregoing, the Individual Defendants are liable to Lead Plaintiff and the members of the Class as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## XIV.   PRAYER FOR RELIEF

269.    WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

a.      Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Motley Rice LLC as class counsel pursuant to Rule 23(g);

b.      Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

c.      Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

      d.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorney's fees and costs incurred; and

      e.      Granting such other and further relief as the Court deems just and proper.

## XV.   JURY DEMAND

270.     Lead Plaintiff demands a trial by jury of all issues so triable.

Dated: August 8, 2017             Respectfully submitted,

                                  */s/ Christopher F. Moriarty*

                                    Gregg S. Levin (*pro hac vice*)
                                    James M. Hughes (*pro hac vice*)
                                    Christopher F. Moriarty (N.D. Ill. # SC100187)
                                    Erin C. Casey
                                    Rebecca E. Jacobs
                                    **MOTLEY RICE LLC**
                                    28 Bridgeside Blvd.
                                    Mt. Pleasant, South Carolina  29464
                                    Telephone:  (843) 216-9000
                                    Facsimile:  (843) 216-9450
                                    Emails:       glevin@motleyrice.com
                                                jhughes@motleyrice.com
                                              cmoriarty@motleyrice.com
                                              ecasey@motleyrice.com
                                              rjacobs@motleyrice.com

                                    *Lead Counsel*

                                    **ROBBINS GELLER RUDMAN**
                                      **& DOWD LLP**
                                    James E. Barz (IL Bar # 6255605)
                                    Frank A. Richter (IL Bar # 6310011)
                                    200 South Wacker Drive, 31st Floor
                                    Chicago, Illinois  60606
                                    Telephone:  (312) 674-4674
                                    Facsimile:  (312) 674-4676
                                    Emails:       jbarz@rgrdlaw.com
                                              frichter@rgrdlaw.com

                                    *Local Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 8, 2017.

_s/ Christopher F. Moriarty_
Christopher F. Moriarty