**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| IN RE CATERPILLAR INC. SECURITIES ) | Case No. 1:17-cv-01713 |
| LITIGATION ) | Hon. Sharon Johnson Coleman |
| ) | |
| ) | |
| ) | |
| ) | |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS**

James P. Gillespie, P.C., *pro hac vice*
K. Winn Allen, *pro hac vice*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
james.gillespie@kirkland.com
winn.allen@kirkland.com
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Mark Filip, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
mark.filip@kirkland.com
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for Defendants Caterpillar Inc.,*
*D. James Umpleby III, Douglas R.*
*Oberhelman, Bradley M. Halverson,*
*James B. Buda, and Jananne A. Copeland*

October 10, 2017

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    A.    The CSARL Tax Dispute ......................................................................... 3

    B.    Similar Litigation Is Filed And Dismissed In The Central District Of Illinois ................................................................................................ 13

    C.    March 2, 2017 Execution Of Search Warrants And Filing Of This Class Action.................................................................................................. 14

PLEADING STANDARDS.................................................................................. 15

ARGUMENT ...................................................................................................... 16

I.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT ............................................... 16

    A.    SGSS Fails To Plead Actionable Misstatements Or Omissions Of Material Fact.................................................................................................... 16

        1.    Caterpillar's Statements Regarding the Soundness of the CSARL Tax Position Are Not Misstatements of Material Fact ............................ 17

        2.    Caterpillar's Statements That it Was Cooperating with the Government's Investigations Are Not Misstatements of Material Fact.................................................................................................. 23

    B.    The Amended Complaint Does Not Plead Facts Giving Rise To A "Strong Inference" Of Scienter ......................................................................... 25

        1.    SGSS Fails to Plead Facts Supporting a Strong Inference of Conscious Misbehavior or Recklessness ................................................. 26

        2.    SGSS Fails to Plead Facts Supporting a Motive to Commit Fraud .......... 34

II.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR "CONTROL PERSON" LIABILITY UNDER SECTION 20(a) OF THE EXCHANGE ACT............ 35

CONCLUSION.................................................................................................... 36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abrams v. Baker Hughes Inc.*,
  292 F.3d 424 (5th Cir. 2002) ................................................................34

*Anderson v. Abbott Labs.*,
  140 F. Supp. 2d 894 (N.D. Ill. 2001), *aff'd sub nom. Gallagher v. Abbott
  Labs.*, 269 F.3d 806 (7th Cir. 2001)................................................................21

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
  827 F.3d 1229 (10th Cir. 2016) ................................................................33

*In re Bally Total Fitness Sec. Litig.*,
  2006 WL 3714708 (N.D. Ill. July 12, 2006)................................................25, 33, 34

*Brophy v. Jiangbo Pharm., Inc.*,
  781 F.3d 1296 (11th Cir. 2015) ................................................................29

*In re Ceridian Corp. Sec. Litig.*,
  542 F.3d 240 (8th Cir. 2008) ................................................................33

*City Capital Assocs. Ltd. P'ship v. Interco, Inc.*,
  696 F. Supp. 1551 (D. Del. 1988)................................................................21

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)................................................................21

*Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*,
  114 F. Supp. 3d 633 (N.D. Ill. 2015) ................................................................19, 30

*Cozzarelli v. Inspire Pharm. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ................................................................29

*Davis v. SPSS, Inc.*,
  385 F. Supp. 2d 697 (N.D. Ill. 2005) ................................................................*passim*

*DeMarco v. DepoTech Corp.*,
  149 F. Supp. 2d 1212 (S.D. Cal. 2001)................................................................30

*DH2, Inc. v. Athanassiades*,
  359 F. Supp. 2d 708 (N.D. Ill. 2005) ................................................................35

*Eckstein v. Balcor Film Investors*,
  8 F.3d 1121 (7th Cir. 1993) ................................................................24

*In re First Union Corp. Sec. Litig.*,
   128 F. Supp. 2d 871 (W.D.N.C. 2001) ...................................................................28

*Fry v. UAL Corp.*,
   895 F. Supp. 1018 (N.D. Ill. 1995) ......................................................................24

*Garden City Emps. Ret. Sys. v. Anixter Int'l, Inc.*,
   2011 WL 1303387 (N.D. Ill. Mar. 31, 2011).........................................................3

*Greer v. Advanced Equities, Inc.*,
   683 F. Supp. 2d 761 (N.D. Ill. 2010) ...................................................................15

*Grimes v. Navigant Consulting, Inc.*,
   185 F. Supp. 2d 906 (N.D. Ill. 2002) .....................................................................3

*Hershfang v. Citicorp*,
   767 F. Supp. 1251 (S.D.N.Y. 1991).....................................................................30

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) ........................................................................24, 29

*Howe v. Shchekin*,
   238 F. Supp. 3d 1046 (N.D. Ill. 2017) .................................................................15

*In re Hutchinson Tech., Inc. Sec. Litig.*,
   536 F.3d 952 (8th Cir. 2008) ...............................................................................29

*Izadjoo v. Helix Energy Sols. Grp., Inc.*,
   237 F. Supp. 3d 492 (S.D. Tex. 2017) .................................................................28

*Johnson v. Tellabs, Inc.*,
   262 F. Supp. 2d 937 (N.D. Ill. 2003) ..............................................................24, 26

*Kurtzman v. Compaq Computer Corp.*,
   2002 WL 32442832 (S.D. Tex. Mar. 30, 2002).....................................................32

*Loftus v. Primero Mining Corp.*,
   230 F. Supp. 3d 1209 (C.D. Cal. 2017) ...............................................................18

*Mathews v. Centex Telemanagement, Inc.*,
   1994 WL 269734 (N.D. Cal. June 8, 1994).........................................................28

*In re Midway Games, Inc. Sec. Litig.*,
   332 F. Supp. 2d 1152 (N.D. Ill. 2004) ....................................................... *passim*

*Mogell v. Calhoun*,
   2016 WL 3369233 (C.D. Ill. Mar. 15, 2016)............................................. *passim*

*Neca-Ibew Pension Fund v. N. Trust Corp.*,
    2013 WL 1290202 (N.D. Ill. Mar. 28, 2013)........................................................................35

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ......................................................................................30

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)............................................................................................22, 23

*In re One Commc'ns Corp.*,
    2009 WL 857535 (S.D.N.Y. Mar. 31, 2009) ...............................................................31

*Ong v. Chipotle Mexican Grill, Inc.*,
    2017 WL 933108 (S.D.N.Y. Mar. 8, 2017) .................................................................24

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
    673 F. Supp. 2d 718 (S.D. Ind. 2009), *aff'd* 679 F.3d 952 (7th Cir. 2012) ......................31, 33

*PR Diamonds, Inc. v. Chandler*,
    91 F. App'x 418 (6th Cir. 2004) ..................................................................................34

*In re Pretium Res. Inc. Sec. Litig.*,
    2017 WL 2560005 (S.D.N.Y. June 13, 2017) .............................................................22

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ........................................................................................25

*In re PXRE Grp., Ltd. Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).................................................................32

*Raab v. Gen. Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) ..........................................................................................22

*In re Rexall Sundown, Inc. Sec. Litig.*,
    2000 WL 33539428 (S.D. Fla. Mar. 29, 2000).........................................................28

*Roth v. OfficeMax, Inc.*,
    527 F. Supp. 2d 791 (N.D. Ill. 2007) .........................................................................33

*In re Rough Rice Commodity Litig.*,
    2012 WL 473091 (N.D. Ill. Feb. 9, 2012) ..................................................................3

*Searls v. Glasser*,
    64 F.3d 1061 (7th Cir. 1995) ......................................................................................17

*Selbst v. McDonald's Corp.*,
    432 F. Supp. 2d 777 (N.D. Ill. 2006) .........................................................................31

*Sinay v. CNOOC Ltd.*,
    2013 WL 1890291 (S.D.N.Y. May 6, 2013) ........................................................25

*In re Sotheby's Holdings, Inc.*,
    2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ....................................................32

*St. Lucie Cty. Fire Dist. Firefighters' Pension Trust Fund v. Motorola, Inc.*,
    2011 WL 814932 (N.D. Ill. Feb. 28, 2011) .......................................................18

*Stavros v. Exelon Corp.*,
    266 F. Supp. 2d 833 (N.D. Ill. 2003) ........................................................ *passim*

*Stern v. Leucadia Nat'l Corp.*,
    844 F.2d 997 (2d Cir. 1988) .............................................................................30

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) .........................................................................................16

*Tatz v. Nanophase Techs. Corp.*,
    2002 WL 31269485 (N.D. Ill. Oct. 9, 2002) ...................................................27

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
    551 U.S. 308 (2008) ...................................................................................25, 29

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) .............................................................................22

*Vallabhaneni v. Endocyte, Inc.*,
    2016 WL 51260 (S.D. Ind. Jan. 4, 2016) .....................................................22, 23

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................................................32

**Statutes, Rules, and Regulations**

17 C.F.R. § 229.303 ..................................................................................................6

15 U.S.C. § 78u-4(b)(1) ..........................................................................................15

15 U.S.C. § 78u-4(b)(2) .....................................................................................15, 25

15 U.S.C. § 78u-5(i)(1) ...........................................................................................18

15 U.S.C. § 78u-5(c) ...............................................................................................17

Fed. R. Civ. P. 9(b) .......................................................................................... *passim*

Fed. R. Evid. 201 ......................................................................................................3

## Other Authorities

Am. Compl., *Mogell v. Calhoun*,
No. 1:15-cv-01239 (C.D. Ill. Aug, 4, 2015) ...........................................................13

*Caterpillar's Offshore Tax Strategy*, Hearing before the Permanent Subcomm. on
Investigations, S. Hrg. 113–408 (Apr. 1, 2014), *available at*
https://tinyurl.com/yc337ug8 ...............................................................10, 11

Compl., *Schlicksup v. Caterpillar Inc.*,
No. 1:09-cv-01208 (C.D. Ill. June 12, 2009) ........................................................11

Expert Witness Report of Prof. John P. Steines, Jr. Before the Permanent
Subcomm. on Investigations (Mar. 7, 2014), *available at*
https://goo.gl/koCTdn ........................................................................... *passim*

IRS, 4.46.4.11, https://tinyurl.com/y7vbsv7s (last accessed Sept. 28, 2017) ..................................6

IRS, Revenue Agent Reports (RARs), https://tinyurl.com/y8rsc3q7 (last accessed
Oct. 5, 2017) ...........................................................................................7

Majority Staff Report, Permanent Subcomm. on Investigations, *Caterpillar's
Offshore Tax Strategy* (Aug. 28, 2014), *available at*
https://tinyurl.com/yczmdyyc ...............................................................10, 11, 27

Press Release: Caterpillar Continues to Cooperate with Law Enforcement
(Mar. 2, 2017), *available at* https://tinyurl.com/ybebbkeu....................................14

Statement of Julie A. Lagacy Before the Permanent Subcomm. on Investigations
(April 1, 2014), *available at* https://tinyurl.com/y7xmf4la ...............................3, 4, 5

Stipulation for Dismissal with Prejudice, *Schlicksup v. Caterpillar Inc.*,
No, 1:09-cv-01208 (C.D. Ill. Feb. 14, 2012) ........................................................11

For several years, agencies of the Federal Government have been investigating whether Caterpillar's tax position regarding a supply chain restructuring complies with U.S. law. Beginning in February 2011 — nearly two years prior to the start of the putative Class Period in this case — Caterpillar publicly disclosed the existence and nature of those investigations in SEC filings. Among other things, Caterpillar disclosed that investigations had been opened by the IRS, SEC, and a federal grand jury; the subject matter and general status of those investigations; and Caterpillar's intention to cooperate with the Government. Caterpillar also stated its firm belief that the Company's tax position on its supply chain restructuring complied with applicable laws, but made clear that it was unable to predict the outcome of the Government's investigations, or reasonably estimate any potential loss in the event of an adverse ultimate disposition. These disclosures were repeated (and expanded as new facts developed) in numerous SEC filings made over the years.

On March 2, 2017, the Government executed search warrants at three Caterpillar facilities in connection with the pending grand jury investigation. Plaintiffs filed this action the next day. Although Caterpillar has not been charged with — much less convicted of — any crime, Société Générale Securities Services GmbH ("Plaintiff" or "SGSS") alleges that the Government's execution of the search warrants somehow proves that Caterpillar's prior statements in SEC filings were knowingly false, and thus that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act.

For two separate and independent reasons, SGSS's Section 10(b) allegations fail to satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") and should therefore be dismissed. ***First***, the Amended Complaint does not identify an actionable misstatement or omission of material

fact. Whether phrased as a challenge to Caterpillar's opinion concerning the likely ultimate disposition of the Government's investigations, *see* Am. Compl. ¶ 104b, or as a challenge to Caterpillar's belief that it was cooperating with those investigations, *see id.* at ¶ 104c, Plaintiff's claim seeks to impose liability for a series of forward-looking statements of optimism, or statements of opinion, that courts have long held cannot form the basis of securities fraud. ***Second***, the Amended Complaint fails to plead facts giving rise to the requisite "strong inference" of scienter. SGSS does not (and cannot) allege facts showing that Defendants disbelieved the general optimism reflected in Caterpillar's SEC filings. Instead, the Amended Complaint relies on a litany of benign facts that courts have routinely rejected as supporting any inference of fraudulent intent. And because it fails to plead a primary securities violation, SGSS's claim under Section 20(a) fails as well.

Significantly, a court in the Central District of Illinois recently dismissed substantially similar allegations against members of Caterpillar's Board of Directors. *See Mogell v. Calhoun*, 2016 WL 3369233, at *1 (C.D. Ill. Mar. 15, 2016) (Ex. 40).[1] In *Mogell*, the plaintiff alleged that the Caterpillar Directors had made material misstatements and omissions in a proxy statement because they did not, among other things, disclose purported facts related to the Government's investigation of the Company's supply chain restructuring. *See id.* at *2. Relying on many of the same disclosures SGSS cites here, the *Mogell* Court found that the proxy statement set forth "significant disclosures" such that "shareholders had sufficient information to understand the various legal and regulatory investigations the Company was [ ] facing," and that the proxy statement contained no false statements or material omissions. *Id.* at *7. The court also rejected

---

[1]     References herein to "Ex." refer to exhibits to the Declaration of K. Winn Allen filed concurrently with this Memorandum of Law.

the theory (which SGSS asserts here) that Caterpillar had some duty under the securities laws to confess to "uncharged, unadjudicated charges" that the Company was disputing. *Id.* at *5.

This Court should reach the same result as the *Mogell* court and dismiss the Amended Complaint. The only new fact since *Mogell* to which SGSS points is the Government's execution of search warrants. But a search warrant is merely an investigatory tool. It is not probative of whether Caterpillar's tax position regarding its restructured supply chain is unlawful, much less whether Caterpillar knew as much at the time it expressed optimism regarding the outcome of the various government proceedings. For those reasons, and for those explained below, Plaintiff's allegations do not satisfy the pleadings requirements of Rule 9(b) and the PSLRA.

## BACKGROUND

### A.     The CSARL Tax Dispute

Caterpillar is one of the world's leading manufacturers of construction and mining equipment, diesel and natural gas engines, and industrial gas turbines. The Company sells not only heavy machinery, such as bulldozers and excavators, but also the replacement parts for that equipment. Some of those replacement parts — in particular, some of those known as purchased finished replacement parts ("PFRPs") — are purchased from unrelated third-party suppliers in the United States and sold to customers overseas. *See* 2016 Form 10-K, at 1–2, 19–20 (Feb. 15, 2017) (Ex. 22); *see also* Statement of Julie A. Lagacy Before the Permanent Subcomm. on Investigations at 3 (April 1, 2014) ("Lagacy Statement"), *available at* https://tinyurl.com/y7xmf4la (Ex. 25).[2]

---

[2]    The Court may consider facts alleged in the Amended Complaint and documents appended to or incorporated in it by reference; documents relied upon by the Amended Complaint, even if not attached or expressly incorporated; public disclosure documents filed with the Securities and Exchange Commission ("SEC"); and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence. *See Garden City Emps. Ret. Sys. v. Anixter Int'l, Inc.*, 2011 WL 1303387, at *12 (N.D. Ill. Mar. 31, 2011) (Ex. 32); *Grimes v. Navigant Consulting, Inc.*, 185 F. Supp. 2d 906, 913 (N.D. Ill. 2002); *In re Rough Rice Commodity Litig.*, 2012 WL 473091, at *1 n.3 (N.D. Ill. Feb. 9,

This case arises from Caterpillar's restructuring of its supply chain for PFRPs, which was implemented from 1999 through the early 2000s. Legacy Statement at 4. Under that restructuring, a Swiss subsidiary of Caterpillar — Caterpillar SARL ("CSARL") — became the entity that purchases PFRPs from unrelated U.S. suppliers and sells those parts to customers abroad.[3] *Id.* at 3. CSARL directly contracts with the unrelated U.S. suppliers, obtains title to the parts, assumes the inventory risks associated with the parts, and directly interacts with and sells the parts to non-U.S. customers. *Id.* at 4. A net effect of the restructuring was that income earned by CSARL from the purchase and sale of PFRPs was subject to non-U.S. tax rates on a current basis and not subject to U.S. income tax unless and until repatriated to the U.S. *Id.* at 3.

For several years, the U.S. Government has been investigating whether Caterpillar's tax position concerning the CSARL supply chain complies with U.S. tax laws (the "CSARL Tax Dispute"). At core, the dispute can be summarized as follows: the IRS has proposed taxing certain profits earned from the CSARL PFRP transactions as domestic income, but Caterpillar believes that these profits are foreign income not currently subject to taxation in the U.S. *See* 2014 Form 10-K at A-30 (Feb. 17, 2015) (Ex. 14). In particular, the IRS has been investigating whether the Company's tax position comports with (1) the "substance-over-form" doctrine, under which the Government can characterize a transaction based on its actual substance, rather than its form, and tax the transaction accordingly; and (2) the "assignment-of-income" doctrine, which prevents businesses from shifting taxable income to entities that did not earn it. *See, e.g.*, 2016 Form 10-K

2012) (Ex. 36). The documents cited herein fall into one or more of those categories, and therefore are appropriate for this Court's consideration at the motion-to-dismiss stage.

[3]   CSARL (and its predecessor companies) had been selling parts to foreign customers for decades. The principal change implemented by the restructuring was that CSARL became the entity that purchased PFRPs from unrelated U.S. suppliers.

at 58 (Feb. 15, 2017) (Ex. 22); *see also* Expert Witness Report of Prof. John P. Steines, Jr. Before the Permanent Subcomm. on Investigations at 7 ("Steines Report") (Mar. 7, 2014), *available at* https://goo.gl/koCTdn (Ex. 26); Lagacy Statement at 5–6 (Ex. 25). Throughout the CSARL Tax Dispute, Caterpillar has maintained that its CSARL tax position is "entirely consistent with the letter and spirit of U.S. tax law" and does not run afoul of either doctrine. Lagacy Statement at 3–4 (Ex. 25).

The CSARL Tax Dispute has played out in a number of fora over the years. The chronology of pertinent CSARL events is detailed below. The key takeaway is that Caterpillar has made extensive public disclosures concerning the existence, nature, and status of the CSARL Tax Dispute. Over the past six years, Caterpillar's SEC filings repeatedly (i) disclosed the existence and nature of the Government's inquiries; (ii) stated the Company's belief that the CSARL tax position complied with applicable tax laws and did not violate the substance-over-form or assignment-of-income doctrines; and (iii) acknowledged that the Company could not predict the outcome of the CSARL Tax Dispute or reasonably estimate potential losses if Caterpillar was ultimately unsuccessful defending its CSARL tax position.

***IRS Examinations and Inquiries.*** In early 2011, nearly two years before the start of the putative Class Period, Caterpillar disclosed that the Internal Revenue Service ("IRS") was conducting a field examination of Caterpillar's tax returns from 2007 to 2009. *See* 2010 Form 10-K at A-26 (Feb. 22, 2011) ("The Internal Revenue Service (IRS) is currently examining U.S. tax returns for 2007 to 2009.") (Ex. 1). Caterpillar repeated these disclosures in its Forms 10-K from 2011 to 2013, and further explained that "[d]ue to the uncertainty related to the timing and potential outcome of these matters, we cannot estimate the range of reasonably possible change in unrecognized tax benefits in the next 12 months." *See, e.g.*, 2011 Form 10-K at A-26 (Feb. 21,

5

2012) (Ex. 2); 2012 Form 10-K at A-29 (Feb. 19, 2013) (Ex. 6); 2013 Form 10-K at A-29 (Feb. 18, 2014) (Ex. 10). Plaintiff relies on the date Caterpillar filed its 2012 10-K — February 19, 2013 — as the beginning of the putative Class Period, and March 1, 2017 as the end of the Class Period. *See* Am. Compl. ¶ 8.

Caterpillar disclosed these matters, and made the other disclosures discussed below, in order to comply with a number of SEC disclosure rules. Among other things, and depending on specific facts and events, those rules required Caterpillar to state whether or not an event was likely to have a material adverse effect on the Company's consolidated financial position and to state the Company's belief about whether or not it was likely to prevail upon the ultimate disposition of these matters. *See generally* 17 C.F.R. § 229.303. That belief, in turn, impacts the amount of profit Caterpillar reported in its consolidated financial statements. *See, e.g.*, 2015 Form 10-K at 56 (Feb. 16, 2016) (Ex. 18).

Pursuant to its disclosure requirements, on May 2, 2014, Caterpillar disclosed in a Form 10-Q that it had received Notices of Proposed Adjustment ("NOPA") concerning the IRS's examination of tax years 2007 to 2009. 2014 Form 10-Q at 27 (May 2, 2014) (Ex. 11).[4] In that filing, Caterpillar stated:

> While we have not yet received a Revenue Agent's Report generally issued at the end of the field examination process, **we have received Notices of Proposed Adjustment from the IRS relating to U.S. taxation of profits earned by one of our non-U.S. subsidiaries, Caterpillar SARL, from certain parts transactions and to the disallowance of foreign tax credits incurred in connection with unrelated financings. We disagree with these proposed adjustments, which the IRS did not propose in previous audits of U.S. tax returns in which the same tax positions were taken**. To the extent that adjustments are assessed upon completion of the field examination relating to these matters, we would vigorously contest the

---

[4]  Among other things, an IRS NOPA summarizes the agency's proposed tax adjustment. That proposal is based primarily on the facts gathered during an IRS investigation, and is presented to the taxpayer before any final determination is reached. *See* IRS, 4.46.4.11, https://tinyurl.com/y7vbsv7s (last accessed Sept. 28, 2017).

> adjustments in appeals. The completion of the field examination for this audit is expected in the next 12 months. In our major non-U.S. jurisdictions, tax years are typically subject to examination for three to eight years. In the opinion of management, the ultimate disposition of these matters will not have a material adverse effect on our consolidated financial position, liquidity or results of operations. ***Due to the uncertainty related to the timing and potential outcome of these matters, we cannot estimate the range of reasonably possible change in unrecognized tax benefits in the next 12 months***.

*Id.* (emphases added here, and unless otherwise noted, all emphases in quotations throughout the brief are added). Caterpillar reiterated this cautionary language — including the Company's belief that it had complied with applicable tax laws and that it could not estimate the range of potential tax changes if Caterpillar was ultimately unsuccessful defending its CSARL tax position — in subsequent quarterly and annual SEC filings. *See, e.g.*, 2014 Form 10-Q at 33 (Aug. 1, 2014) (Ex. 12); 2014 Form 10-Q at 33 (Oct. 31, 2014) (Ex. 13); 2014 Form 10-K at 22 (Feb. 17, 2015) (Ex. 14); *see also* Am. Compl. ¶ 112.

On January 30, 2015, the IRS issued a Revenue Agent's Report ("RAR") for tax years 2007 to 2009, including the impact of a loss carryback to 2005.[5] The RAR proposed tax increases and penalties of approximately $1 billion. 2014 Form 10-K at A-30 (Feb. 17, 2015) (Ex. 14). Caterpillar promptly disclosed receipt of the RAR in its 10-K filed in February 2015, noted its disagreement with the RAR, and further stated that it would "vigorously contest" the IRS's findings through the appropriate appellate channels. *Id.*; *see also* Am. Compl. ¶ 136. Specifically, the Company announced:

> On January 30, 2015, we received a Revenue Agent's Report (RAR) from the Internal Revenue Service (IRS) indicating the end of the field examination of our U.S. tax returns for 2007 to 2009 including the impact of a loss carryback to 2005.

---

[5] RARs, which are issued at the conclusion of an IRS examination, supply taxpayers with the information necessary to ensure "a clear understanding of the [proposed] adjustments and demonstrate how the tax liability was computed." IRS, Revenue Agent Reports (RARs), https://tinyurl.com/y8rsc3q7 (last accessed Oct. 5, 2017). RARs also disclose the procedures utilized by the IRS, the tests the agency performed, and the information it gathered. *Id.*

> ***The RAR proposed tax increases and penalties for these years of approximately $1 billion primarily related to two significant areas that we intend to vigorously contest through the IRS Appeals process.*** In the first area, the IRS has proposed to tax in the United States profits earned from certain parts transactions by one of our non-U.S. subsidiaries, Caterpillar SARL (CSARL), based on the IRS examination team's application of the "substance-over-form" or "assignment-of-income" judicial doctrines. ***We believe that the relevant transactions complied with applicable tax laws and did not violate judicial doctrines.*** We have filed U.S. tax returns on this same basis for years after 2009. In the second area, the IRS disallowed approximately $125 million of foreign tax credits that arose as a result of certain financings unrelated to CSARL. Based on the information currently available, we do not anticipate a significant increase or decrease to our recognized tax benefits for these matters within the next 12 months. ***We currently believe the ultimate disposition of these matters will not have a material adverse effect on our consolidated financial position, liquidity or results of operations.***

2014 Form 10-K at A-30 (Feb. 17, 2015) (Ex. 14).

In the same filing, Caterpillar told investors that it expected the IRS to begin its examination of the 2010 to 2012 tax years. *See* Am. Compl. ¶ 136 (citing 2014 Form 10-K at A-30 (Feb. 17, 2015) ("We expect the IRS field examination of our U.S. tax returns for 2010 to 2012 to begin in 2015.")). The IRS thereafter examined Caterpillar's tax returns for those years, which Caterpillar promptly disclosed. *See, e.g.*, Am. Compl. ¶ 157 (citing 2015 Form 10-K at 95 (Feb. 16, 2016) ("The IRS field examination of our U.S. income tax returns for 2010 to 2012 began in 2015.")). In November 2016, Caterpillar received additional NOPAs from the IRS for years 2010 to 2012, which increased proposed tax adjustments and penalties for years 2005 and 2007 to 2012 to approximately $2 billion. 2016 Form 10-K at 101 (Feb. 15, 2017) (Ex. 22). Again Caterpillar informed the public, and reiterated that because "the relevant transactions complied with applicable tax laws," the Company "do[es] not anticipate a significant increase or decrease to [its] unrecognized tax benefits . . . within the next 12 months." *See* Am. Compl. ¶ 171 (citing 2016 Form 10-K at 58 (Feb. 15, 2017)). Caterpillar is still "vigorously contesting the proposed increases to tax and penalties for these years." 2017 Form 10-Q at 34 (Aug. 2, 2017) (Ex. 24).

Caterpillar's relevant disclosures during the Class Period did not end there. In its 2012 and 2013 10-Ks, Caterpillar explained that it is subject to "continuous examination of [its] income tax returns by the U.S. Internal Revenue Service" and that the "results of audit and examination of previously filed tax returns and continuing assessments of [its] tax exposures may have an adverse effect on the company's provision for income taxes and cash tax liability." 2012 Form 10-K at 16 (Feb. 19, 2013) (Ex. 6); 2013 Form 10-K at 16 (Feb. 18, 2014) (Ex. 10). This passage appeared under the header "***We may incur additional tax expense or become subject to additional tax exposure.***" *Id*. (emphasis in originals). Caterpillar's subsequent Forms 10-K contained similar language, including warnings that the Company could provide "no assurance as to the outcome of [IRS] examinations." 2014 Form 10-K at 16 (Feb. 17, 2015) (Ex. 14). Caterpillar's filings also included the following cautionary language:

> Despite our belief that our tax return positions are consistent with applicable tax laws, we believe that taxing authorities could challenge certain positions. Settlement of any challenge can result in no change, a complete disallowance, or some partial adjustment reached through negotiations or litigation. We record tax benefits for uncertain tax positions based upon management's evaluation of the information available at the reporting date. To be recognized in the financial statements, a tax benefit must be at least more likely than not of being sustained based on technical merits. The benefit for positions meeting the recognition threshold is measured as the largest benefit more likely than not of being realized upon ultimate settlement with a taxing authority that has full knowledge of all relevant information. Significant judgment is required in making these determinations and adjustments to unrecognized tax benefits may be necessary to reflect actual taxes payable upon settlement. Adjustments related to positions impacting the effective tax rate affect the provision for income taxes. Adjustments related to positions impacting the timing of deductions impact deferred tax assets and liabilities.

2015 Form 10-K at 56 (Feb. 16, 2016) (Ex. 18); 2016 Form 10-K at 57 (Feb. 15, 2017) (Ex. 22).

***Senate Permanent Subcommittee on Investigations.*** While the IRS examined the CSARL tax position, the Senate Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations ("PSI") held a hearing concerning Caterpillar's overseas business structure

generally, and the CSARL tax position specifically. *See* Am. Compl. ¶ 9. The hearing was one of several "case studies" undertaken by the PSI to examine the lawful foreign tax strategies of certain multinational companies (including Microsoft, Hewlett-Packard, and Apple), and, based on the findings of that review, offer recommendations for ***future policy changes*** to the U.S. tax laws. *See e.g.*, Majority Staff Report, Permanent Subcomm. on Investigations, *Caterpillar's Offshore Tax Strategy* at 1 n.1, 3 (Aug. 28, 2014) ("Majority Staff Report"), *available at* https://tinyurl.com/yczmdyyc (Ex. 27).

At the public PSI hearing, multiple witnesses testified that Caterpillar's CSARL tax position had economic substance and complied with all relevant tax laws. *See Caterpillar's Offshore Tax Strategy*, Hearing before the Permanent Subcomm. on Investigations, S. Hrg. 113–408 at 28, 38, 58 (Apr. 1, 2014), *available at* https://tinyurl.com/yc337ug8 (Ex. 28). Notably, Professor John P. Steines, Jr., an international tax expert at New York University's School of Law, testified that "it is extremely unlikely that Caterpillar's supply chain restructuring and the countless ensuing sales conducted pursuant to the restructuring are vulnerable to attack for lack of economic substance." Steines Report at 3 (Ex. 26). It is also "extremely unlikely," according to Professor Steines, "that a court adjudicating with fidelity to the law . . . would find that the restructuring or the countless ensuing outbound PFRP transactions offend the doctrines of substance over form or economic substance." *Id.* at 16.

Contrary to the allegations in the Amended Complaint, *see* Am. Compl. ¶ 54, the Majority Staff Report did ***not*** conclude that Caterpillar had violated the U.S. Tax Code. The Majority Staff instead made policy recommendations for Congress to consider to "develop better international principles for taxing multinational corporations." *See* Majority Staff Report at 7 (Ex. 27); *see also* Am. Compl. ¶ 66. Of note, the Minority Staff refused to join the Report's findings, and the

10

Committee itself did not endorse it. All 1,280 pages of the transcript of the PSI hearing, associated exhibits, and Majority Staff Report, were made public. *See generally* S. Hrg. 113–408 (Ex. 28).

The PSI commenced its case study of Caterpillar after learning of an employment discrimination lawsuit brought by former Caterpillar employee Daniel Schlicksup. Majority Staff Report at 3 (Ex. 27); *see also* Compl., *Schlicksup v. Caterpillar Inc.*, No. 1:09-cv-01208 (C.D. Ill. June 12, 2009); Am. Compl. ¶ 42. Schlicksup's claim for retaliation principally stemmed from his allegation that Caterpillar's CSARL tax position violated U.S. tax laws. Majority Staff Report at 3 (Ex. 27). While the retaliation claim was ultimately settled, Am. Compl. ¶ 51; *see also* Stipulation for Dismissal with Prejudice, *Schlicksup v. Caterpillar Inc.*, No, 1:09-cv-01208 (C.D. Ill. Feb. 14, 2012) (Ex. 29), "all of the experts, both internally and externally, . . . found there to be no merit in" Schlicksup's whistleblower allegations. Am. Compl. ¶ 115 (citing S. Hrg. 113–408 at 68 (Legacy)).

*SEC Investigation.* Shortly after the PSI hearing, the SEC informed Caterpillar it was conducting an informal investigation into the impact of the CSARL tax position on Caterpillar's financial statements. *See* 2014 Form 10-K at 22 (Feb. 17, 2015) (Ex. 14). Caterpillar plainly disclosed the existence and nature of the SEC's investigation:

> On September 12, 2014, the SEC notified the Company that it was ***conducting an informal investigation relating to Caterpillar SARL and related structures***. The SEC asked the Company to preserve relevant documents and, on a voluntary basis, the Company made a presentation to the staff of the SEC on these topics. The Company is cooperating with the SEC regarding this investigation. ***The Company is unable to predict the outcome or reasonably estimate any potential loss***; however, we currently believe that this matter will not have a material adverse effect on the Company's consolidated results of operations, financial position or liquidity.

*Id.* On December 8, 2015, Caterpillar was notified by the SEC that the agency had "concluded its investigation" and "did not intend to recommend an enforcement action." 2015 Form 10-K at 57 (Feb. 16, 2016) (Ex. 18).

***Grand Jury Investigation.*** In the same filing that disclosed the existence of the informal SEC investigation, Caterpillar also informed the public that the Company had recently received a grand jury subpoena from the U.S. District Court for the Central District of Illinois:

> On January 8, 2015, the Company received a grand jury subpoena from the U.S. District Court for the Central District of Illinois. The subpoena requests documents and information from the Company relating to, among other things, financial information concerning U.S. and non-U.S. Caterpillar subsidiaries (including undistributed profits of non-U.S. subsidiaries and the movement of cash among U.S. and non-U.S. subsidiaries). The Company is cooperating with this investigation. ***The Company is unable to predict the outcome or reasonably estimate any potential loss***; however, we currently believe that this matter will not have a material adverse effect on the Company's consolidated results of operations, financial position or liquidity.

2014 Form 10-K at 22 (Feb. 17, 2015) (Ex. 14); *see also* Am. Compl. ¶¶ 12, 67, 134. The Company has also disclosed the grand jury investigation, and the risks associated with it, in its subsequent annual and quarterly SEC filings. *See, e.g.*, 2015 Form 10-K at 57 (Feb. 16, 2016) (Ex. 18); 2016 Form 10-K at 58 (Feb. 15, 2017) (Ex. 22); 2015 Form 10-Q at 32–33 (Oct. 30, 2015) (Ex. 17); 2016 Form 10-Q at 29–30 (May 2, 2016) (Ex. 19); 2017 Form 10-Q at 33 (Aug. 2, 2017) (Ex. 24).

***Independent Auditor Review.*** Throughout the six-year period in which the Government conducted the investigations described above, Caterpillar's annual financial statements were audited by PricewaterhouseCoopers ("PwC"), Caterpillar's independent auditor. Each year, PwC stated that "the accompanying consolidated statements of financial position . . . present fairly in all material respects, the financial position of Caterpillar Inc. and its subsidiaries." 2015 Form 10-K at 68 (Feb. 16, 2016) (Ex. 18); *see also* 2014 Form 10-K at A-4 (Feb. 17, 2015) (Ex. 14); 2013 Form 10-K at A-4 (Feb. 18, 2014) (Ex. 10); 2012 Form 10-K at A-4 (Feb. 19, 2013) (Ex. 6); 2011 Form 10-K at A-4 (Feb. 21, 2012) (Ex. 2). PwC did so with knowledge of the public record, IRS audits and examinations, and SEC and grand jury investigations. To this day, PwC has not modified or withdrawn any of its audit opinions.

**B.      Similar Litigation Is Filed And Dismissed In The Central District Of Illinois**

In 2015, nearly six months after Caterpillar disclosed the opening of the grand jury investigation, Caterpillar shareholder Rosalie Mogell brought suit against members of Caterpillar's Board of Directors.  Mogell asserted claims under Section 14(a) of the Exchange Act, alleging facts and legal theories strikingly similar to those alleged by SGSS.  *See Mogell*, 2016 WL 3369233, at *2 (Ex. 40).  In particular, Mogell alleged that Caterpillar's Notice of Annual Meeting and Proxy Statement dated May 2, 2015 ("2015 Proxy Statement") was deceptive because it misrepresented and omitted material facts concerning the CSARL Tax Dispute.  *Id.*  Mogell's principal allegations were (1) a purported cover-up of what Caterpillar supposedly knew was an unlawful overseas tax structure, and (2) the failure to prepare financial statements in accordance with Generally Accepted Accounting Principles ("GAAP").  *See, e.g.*, Am. Compl., *Mogell v. Calhoun*, No. 1:15-cv-01239 (C.D. Ill. Aug, 4, 2015) ¶¶ 8, 11, 46–99 (Ex. 30).  Like SGSS here, Mogell relied on the the grand jury investigation, SEC investigation, and the *Schlicksup* Litigation to make her case.  *See, e.g.*, *id.* at ¶¶ 10, 25, 78, 97.

The Central District of Illinois dismissed the complaint for failure to state a claim, in part because Mogell failed to plead any actionable misstatements or omissions.[6]  2016 WL 3369233, at *6 (Ex. 40).  In doing so, the court emphasized that Caterpillar made "significant disclosures" regarding the CSARL Tax Dispute, including Caterpillar's receipt of the RAR, the existence of the SEC's informal investigation, and the risks associated with the grand jury subpoena.  *Id.* at *7. The court thus concluded that "shareholders had sufficient information to understand the various

---

[6]     Notably, because Section 14(a) does not contain a scienter requirement, the court in *Mogell* never addressed the defendants' mental state.  As a result, and as discussed in greater detail below, Plaintiff here is in an even weaker position than Mogell: it has the additional burden of pleading facts giving rise to a "strong" inference of fraudulent intent.  *See infra* at 25.

legal and regulatory investigations" the Company faced.  *Id.*  Further disclosure, according to the court, was unnecessary, particularly in light of a well-settled body of case law "indicating that uncharged, unadjudicated charges of mismanagement need not be disclosed."  *Id.*

### C.    March 2, 2017 Execution Of Search Warrants And Filing Of This Class Action

Almost a year after the Central District dismissed the *Mogell* action, federal agents executed search warrants at three Caterpillar facilities.  Caterpillar issued a press release regarding the Government's action.  *See* Press Release: Caterpillar Continues to Cooperate with Law Enforcement (Mar. 2, 2017), *available at* https://tinyurl.com/ybebbkeu (Ex. 31).  Caterpillar also disclosed the execution of the search warrants in its Form 10-Q and affirmed that, although the Company was "unable to predict the outcome or reasonably estimate any potential loss," it "believe[d] that this matter will not have a material adverse effect on the Company's consolidated results of operations, financial position or liquidity."  2017 Form 10-Q at 63 (May 3, 2017) (Ex. 23).  Since the execution of the search warrants, Caterpillar has not been charged with, much less convicted of, any wrongdoing.

Shareholders commenced this securities lawsuit on March 3, 2017, one day after the Government executed the search warrants.  *See* ECF No. 1.  After being appointed Lead Plaintiff, Société Générale Securities Services GmbH filed an Amended Complaint on August 8, 2017 against Caterpillar Inc. and individuals D. James Umpleby III, Douglas R. Oberhelman, Bradley M. Halverson, James B. Buda, and Jananne A. Copeland (together with Caterpillar Inc., "Defendants"), on behalf of all persons and entities who purchased Caterpillar common stock between February 19, 2013 and March 1, 2017.  *See* ECF No. 29.  Although it is prolix, the gravamen of Plaintiff's Amended Complaint boils down to two theories of liability.  ***First***, SGSS argues that Caterpillar committed fraud when it expressed optimism that the CSARL tax position would ultimately be found to be in compliance with applicable tax laws.  *See, e.g.*, Am. Compl.

14

¶¶ 114a, 114c, 124a, 124c, 128a, 128c, 132a, 132c, 138b, 138c, 145a, 145b, 153a, 153b, 159a, 159c. In sum, SGSS alleges that when Caterpillar repeatedly stated in its securities filings that it "believe[d]" that the CSARL tax position "complied with applicable tax laws and did not violate judicial doctrines," *see, e.g.*, 2016 Form 10-K at 58 (Feb. 15, 2017) (Ex. 22), Caterpillar allegedly knew that statement was false. **Second**, Plaintiff argues that Caterpillar committed fraud when it stated that it was cooperating with the Government's investigations. *See, e.g.*, Am. Compl. ¶¶ 138a, 141, 143, 149a, 153a, 159b, 163a, 167a, 173b. According to Plaintiff, Caterpillar was not in fact cooperating and allegedly was aware it was not cooperating when it made such statements in SEC filings.

## PLEADING STANDARDS

Plaintiff's claims in this case are subject to the heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the PSLRA. To satisfy Rule 9(b), SGSS is required to plead its claims "with particularity, providing the circumstances of the claim — 'the who, what, when, where, and how.'" *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 704–05 (N.D. Ill. 2005). The PSLRA, moreover, mandates that SGSS: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *id.* § 78u-4(b)(2). Courts in this District routinely dismiss securities fraud cases that fall short of these strict pleading requirements. *See, e.g.*, *Howe v. Shchekin*, 238 F. Supp. 3d 1046, 1053 (N.D. Ill. 2017); *Greer v. Advanced Equities, Inc.*, 683 F. Supp. 2d 761, 778 (N.D. Ill. 2010); *Davis*, 385 F. Supp. 2d at 720; *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1172 (N.D. Ill. 2004).

**ARGUMENT**

The Amended Complaint should be dismissed. Plaintiff's Section 10(b) claim is deficient on the pleadings because it has (1) failed to identify any misrepresentation or omission of material *fact* (as opposed to statements of opinion or prospective belief) in Caterpillar's SEC filings; and (2) failed to plead facts giving rise to a "strong inference" that Defendants acted with the required scienter — namely, knowledge of, or extreme recklessness regarding, the falsity of a material statement. Each of these defects independently warrants dismissal of the Amended Complaint. And because SGSS has failed to plead a primary violation of the securities laws, the Amended Complaint also necessarily fails to plead a derivative violation of Section 20(a).

## I. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT

Plaintiff's primary securities claim arises under Section 10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 promulgated thereunder. To state a viable Section 10(b) claim, SGSS must adequately allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). As an initial matter, Plaintiff's Section 10(b) claim fails under each of the first two elements: It has not alleged that Defendants made a misstatement or omission of material fact, or that Defendants acted with scienter.

### A. SGSS Fails To Plead Actionable Misstatements Or Omissions Of Material Fact

Under Section 10(b) of the Exchange Act, Plaintiff must sufficiently allege that Caterpillar either made a false statement of material fact or omitted a material fact thereby rendering an affirmative statement misleading. *In re Midway Games*, 332 F. Supp. 2d at 1162–63 (citing

16

*Searls v. Glasser*, 64 F.3d 1061, 1065 (7th Cir. 1995)). SGSS primarily relies on two statements from Caterpillar's SEC filings in an effort to satisfy that requirement: (1) Caterpillar's repeated statement that it "believe[s] that the relevant transactions complied with applicable tax laws [and] did not violate judicial doctrines," *see, e.g.,* Am. Compl. ¶¶ 115, 118, 134, 136, 140, 156; and (2) Caterpillar's statement that "[t]he Company is cooperating with [the Government's] investigation[s]," *see, e.g.*, *id.* at ¶¶ 134, 139, 143, 147, 151, 155, 160, 165, 171.[7] The Amended Complaint, however, fails adequately to allege that either statement is false, much less that either statement is false under the heightened pleading requirements of the PSLRA.

### 1. Caterpillar's Statements Regarding the Soundness of the CSARL Tax Position Are Not Misstatements of Material Fact

To begin, Caterpillar's statements concerning the soundness of its tax position (and related optimism about the outcome of the Government's investigations) are not misstatements of material fact. *See e.g.*, Am. Compl. ¶¶ 102, 112, 115. That is true for three independent reasons.

*First*, these statements are *per se* non-actionable under the PSLRA's safe harbor for forward-looking statements. *See* 15 U.S.C. § 78u-5(c); *see also Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 842–43 (N.D. Ill. 2003). That safe harbor applies to any written or oral statement that is (1) "identified as a forward-looking statement"; and (2) accompanied by "meaningful cautionary language." *Stavros*, 266 F. Supp. 2d at 842–43; *see also* 15 U.S.C. § 78u-5(c). Language is meaningful and cautionary if it puts an investor "on notice of the danger of the

---

[7]   To be sure, the Amended Complaint identifies other statements that are alleged to have been misleading, *see, e.g.*, Am. Compl. ¶ 105 (preparation of financial statements in accordance with GAAP); *id.* at ¶ 102 (impact of the IRS examinations and other Government investigations on Caterpillar's consolidated financial position). But those allegations are derivative of SGSS's primary theory concerning Caterpillar's belief that its CSARL tax position complied with U.S. tax laws. As noted above, the Company's belief that it will prevail in the CSARL Tax Dispute drives Caterpillar's CSARL profit recognition in its financial statements. *See supra* at 6.

investment to make an intelligent decision about it according to her own preferences for risk and reward." *Stavros*, 266 F. Supp. 2d at 842–43 (citation and quotes omitted). "The PSLRA does not require the ***most*** helpful caution; it is enough to identify important factors that could cause actual results to differ materially from those in the forward looking statement. [I]t it enough to point to the principal contingencies that could cause actual results to depart from the projection." *St. Lucie Cty. Fire Dist. Firefighters' Pension Trust Fund v. Motorola, Inc.*, 2011 WL 814932, at *9 (N.D. Ill. Feb. 28, 2011) (citation and quotes omitted). "For purposes of § 78u-5(c)(1)(A), proof of knowledge of the falsity of a forward-looking statement is 'irrelevant' when the statement is accompanied by meaningful cautionary language." *In re Midway Games*, 332 F. Supp. 2d at 1167.

Both elements of the PSLRA safe harbor are satisfied with respect to Caterpillar's statements regarding the soundness of its tax position and the likely outcome of the Government's investigations. With respect to the first element, the statements to which SGSS points were all identified as, and by their nature are, "forward-looking" statements. *See* 15 U.S.C. § 78u-5(i)(1). Those statements all concerned the Company's projections as to the ultimate disposition of the CSARL Tax Dispute. *See, e.g.*, *Loftus v. Primero Mining Corp.*, 230 F. Supp. 3d 1209, 1224 (C.D. Cal. 2017) (concluding that statements related "directly to Primero's future tax obligations and the way in which it planned to record its taxes" were forward-looking within the PSLRA). The Company, moreover, clearly identified those statements as forward-looking by using language such as "may," "could," "believe," "expect," or "will." *See, e.g.*, 2014 Form 10-K at A-30 (Feb. 17, 2015) ("We ***believe*** that the relevant [CSARL supply chain] transactions complied with applicable tax laws and did not violate judicial doctrines.") (Ex. 14); Am. Compl. ¶ 102 ("In the ***opinion*** of management, the ultimate disposition of [the IRS's examination of tax years 2007 to

18

2009] **_will not_** have a material adverse effect"); *id.* at ¶ 134 ("[W]e currently **_believe_** that [the grand

jury subpoena] **_will not_** have an adverse effect"); *id.* at ¶ 140 ("We **_believe_** that again our structures,

our transactions, were in full accordance with the tax laws").  As the Company made clear in all

its quarterly and annual filings, such language identified a forward-looking statement protected by

the PSLRA's safe harbor provision:

> Certain statements . . . relate to future events and expectations and are forward-looking statements within the meaning of the [PSLRA].  **_Words such as "believe," "estimate," "will be," "will," "would," "expect," "anticipate," "plan," "project," "intend," "could," "should" or other similar words or expressions often identify forward-looking statements_**.  All statements other than statements of historical fact are forward-looking statements, including, without limitation, statements regarding our outlook, projections, forecasts or trend descriptions.

2013 Form 10-Q at 69 (May 2, 2013) (Ex. 7); *see also, e.g.*, 2012–2017 Forms 10-K and 10-Q

(Ex. 3–24).  Courts in this District have also repeatedly held that statements employing similar

language are forward-looking within the meaning of the PSLRA.  *See, e.g., Constr. Workers*

*Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 647–48 (N.D. Ill.

2015); *Stavros*, 226 F. Supp. at 839.

Caterpillar's disclosures are also replete with "meaningful cautionary language"

concerning the CSARL Tax Dispute.  *See, e.g.*, 2012 Form 10-K at 16 (Feb. 19, 2013) ("The results

of the audit and examination of previously filed tax returns and continuing assessments of our tax

exposures **_may have an adverse effect_** on the company's provision for income taxes and cash tax

liability.") (Ex. 6); *id.* ("**_We may incur additional tax expense or become subject to additional_**

**_tax exposure_**." (emphasis in original)); 2014 Form 10-K at 16 (Feb. 17, 2015) ("Our future results

of operations **_could be adversely affected by_** . . . the results of audits and examinations of

previously filed tax returns and continuing assessments of our tax exposures. . . . **_There can be no_**

**_assurance as to the outcome of these examinations_**.") (Ex. 14); 2015 Form 10-K at 56 (Feb. 16,

2016) ("Despite our belief that our tax return positions are consistent with applicable tax laws, we

believe that ***taxing authorities could challenge certain positions***. ***Settlement of any challenge can result in no change, a complete disallowance, or some partial adjustment reached through negotiations or litigation***.") (Ex. 18). That cautionary language was more than sufficient to put SGSS "on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward," *Stavros*, 266 F. Supp. 2d at 842–43, and was "sufficiently related in subject matter and strong in tone to counter" Caterpillar's consistent optimistic opinion concerning the outcome of the Government's investigative efforts. *In re Midway Games*, 332 F. Supp. 2d at 1166.

**Second**, even if Caterpillar's statements regarding the soundness of its tax position were not viewed as forward-looking statements that are *per se* barred by the PSLRA, SGSS's claim based on those statements still fails because the Amended Complaint does not plausibly allege that those statements are false. SGSS's theory appears to be that Defendants should have confessed to alleged violations of the U.S. Tax Code and disclosed in its SEC filings that the "CSARL tax strategy lacked economic substance, was done to evade U.S. taxes, and was done without making any real changes in the Company's business operations," *see, e.g.*, Am. Compl. ¶¶ 104c, 114c, 117, 120, 149b. By SGSS's logic, Caterpillar should have stated, contrary to the Company's own beliefs, that "it was more likely than not that [Caterpillar's] tax position did not comply with U.S. tax laws," *see, e.g.*, *id.* at ¶ 103. Plaintiff, in other words, suggests that Caterpillar abandon its defense of a multi-billion dollar dispute to the significant detriment of shareholders.

But it is well-established that corporate defendants have no duty under Section 10(b) to confess to uncharged, unadjudicated wrongdoing. *See Mogell*, 2016 WL 3369233, at *5 ("[C]ourts in this and other circuits have held that there is no per se rule . . . requiring the disclosure [of] mere mismanagement or uncharged, adjudicated criminal activity.") (Ex. 40); *see also, e.g.*, *City of*

20

*Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("'[d]isclosure is not a rite of confession,' and companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'"); *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 906–907 (N.D. Ill. 2001) ("Abbott's maintenance of its innocence is not fraud. SEC rules do not create a duty to confess contested charges."), *aff'd sub nom. Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001); *City Capital Assocs. Ltd. P'ship v. Interco, Inc.*, 696 F. Supp. 1551, 1557–58 (D. Del. 1988) ("Where there exists a good faith dispute as to facts or an alleged legal violation, the [law] only requires disclosure of the dispute. There are good reasons for this limitation. A tender offeror should not be placed in a position of being forced to either admit liability, while he or she disputes it, or violate the securities law by failing to disclose the alleged and disputed violation.").

The Second Circuit's 2014 decision in *City of Pontiac* illustrates the point. There, plaintiffs brought Section 10(b) and 20(a) claims. Plaintiffs argued that "in addition to disclosing the existence of a [DOJ] investigation, defendants were required to disclose that [the company] was, in fact, engaged in an ongoing tax evasion scheme." 752 F.3d at 184. The Second Circuit affirmed the dismissal of plaintiffs' claims, explaining that "'[d]isclosure is not a rite of confession,' and companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'" *Id.* (citations omitted). According to the Second Circuit, "[b]y disclosing its involvement in multiple . . . government investigations and indicating that its involvement could expose [the company] 'to substantial monetary damages . . . and the potential for regulatory restrictions,' [the company] complied with its disclosure obligations under our case law." *Id.* For the same reasons, dismissal is warranted here.

***Third***, in addition to being forward-looking statements within the meaning of the PSLRA's safe-harbor provision, statements regarding the likely outcome of the IRS examinations and

Government investigations are also non-actionable because they are predictive statements of opinion, not statements of fact. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015) ("Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty."); *In re Pretium Res. Inc. Sec. Litig.*, 2017 WL 2560005, at *10 (S.D.N.Y. June 13, 2017) (Ex. 34). Statements of opinion are actionable only in very narrow circumstances, such as when a plaintiff can allege that (1) "'the speaker did not hold the belief she possessed'" or (2) "'the supporting facts she supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare*, 135 S.Ct. at 1327); *see also Vallabhaneni v. Endocyte, Inc.*, 2016 WL 51260, at *16 (S.D. Ind. Jan. 4, 2016) (holding that plaintiff must plead sufficient facts to suggest defendant "lacked a reasonable basis for making the statement or that he did not honestly believe the statement at the time") (Ex. 47). The Amended Complaint, however, contains no such allegations. Moreover, numerous federal courts, including courts in this District, have held that general statements of corporate optimism — such as Caterpillar's repeated belief that the Government's investigations would ultimately be resolved in its favor and would not have a material adverse effect on the Company's financial position — cannot serve as the basis for a securities fraud claim.[8] *See, e.g.*, *Raab v. Gen. Physics*

---

[8] While not clearly pled (and therefore deficient under applicable pleading standards for securities complaints), SGSS also may be contending that Caterpillar concealed the tax years for which the IRS was conducting an audit. *See, e.g.*, Am. Compl. ¶ 104a. If Plaintiff is trying to make that claim, it too fails. Caterpillar's disclosure of the dates of the IRS's examination does not misrepresent the nature or the extent of that investigation. Caterpillar accurately disclosed the specific tax years under IRS examination, *see* 2010 Form 10-K at A-26 (Feb. 22, 2011) (Ex. 1); 2015 Form 10-K at 95 (Feb. 16, 2016) (Ex. 18), and the IRS's substantive bases for those examinations, *see* 2014 Form 10-K at A-30 (Feb. 17, 2015) (Ex. 14); 2016 Form 10-K at 57 (Feb. 15, 2017) (Ex. 22). Caterpillar has also consistently informed regulators and investors that it would continue to employ the CSARL tax strategy going forward. *See, e.g.*, 2014 Form 10-K at A-30 (Feb. 17, 2015) (Ex. 14); 2015 Form 10-K at 57 (Feb. 16, 2016) (Ex. 18); 2016 Form 10-K at 58 (Feb. 15, 2017) (Ex. 22).

*Corp.*, 4 F.3d 286, 289–90 (4th Cir. 1993) ("Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen."); *see also In re Midway Games*, 332 F. Supp. 2d at 1165 (noting that "general statements of optimism" constitute immaterial statements of puffery, which are non-actionable); *Vallabhaneni*, 2016 WL 51260, at *16 ("Endocyte and its officers and directors were not required to take a gloomy, fearful or defeatist view of the future but were instead expected to be confident about their stewardship and the prospects of the business that they manage within the bounds of the information that they actually had when the statements were made.") (internal quotations omitted) (Ex. 47).

### 2. Caterpillar's Statements That it Was Cooperating with the Government's Investigations Are Not Misstatements of Material Fact

SGSS also cannot parlay Caterpillar's statements that the Company was "cooperating with [the Government's] investigation[s]" into a viable Section 10(b) claim. *See, e.g.*, Am. Compl. ¶ 138a. As is true above, Caterpillar's assertion that it was "cooperating" with the Government was not a statement of objective fact, but was instead an assertion of Caterpillar's subjective opinion. And the Amended Complaint does not include sufficient allegations that would render that statement of opinion actionable. Most significantly, Plaintiff offers no facts whatsoever showing that Caterpillar's assertion that it was cooperating with the Government's investigations was "disbelieved by the [Company] ***at the time it was expressed***." *Omnicare*, 135 S.Ct. at 1327. Instead, Plaintiff relies entirely on *post hoc* facts, including (1) the Government's execution of search warrants at Caterpillar facilities on March 2, 2017, *see, e.g.*, Am. Compl. at ¶¶ 138a, 145a, 149a; and (2) press accounts following the raid that feature highly-speculative, unquoted, and unattributed third-party opinions, *see id.* at ¶¶ 178, 181, 189–190. Neither of those facts suffices to show that Caterpillar's assertions of cooperation were in fact known by the Company to be false at the time they were made.

23

To begin, the search warrants were executed months (and sometimes years) after Caterpillar stated in its SEC filings that it was cooperating with the Government's investigations, *see, e.g.*, *id.* at ¶ 134 (citing 2014 Form 10-K at 22 (Feb. 17, 2015)), and the mere fact that the Government **later** elected to execute search warrants does nothing to prove that Caterpillar's **earlier** statements were known to be false when they were made (or ever[9]). The securities laws "typically do not act as a Monday Morning Quarterback." *Fry v. UAL Corp.*, 895 F. Supp. 1018, 1052 (N.D. Ill. 1995) (citation omitted). And SGSS cannot rely on "*post hoc, ergo propter hoc* pleading*" to try to argue that the mere execution of the search warrants somehow shows that earlier assurances of cooperation were in fact disbelieved by Defendants when they were made. *Ong v. Chipotle Mexican Grill, Inc.*, 2017 WL 933108, at *11 (S.D.N.Y. Mar. 8, 2017) ("Plaintiffs argue awareness from the mere fact that the later events transpired, but such *post hoc, ergo propter hoc* pleading has been repeatedly rejected by the courts: Corporate officials need not [be] clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."); *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 952 (N.D. Ill. 2003) ("'An inability to foresee the future does not constitute fraud, because the securities laws approach matters from an *ex ante* perspective.'" (quoting *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1132 (7th Cir. 1993)); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759–60 (7th Cir. 2007) ("[T]here is no fraud by hindsight").

Nor can Plaintiff rely on various press accounts of the raid, which contain the opinions of anonymous individuals theorizing about the possible meaning of the Government's decision to

---

[9] To be clear, Caterpillar believes that the Company always has — and continues to — cooperate with the Government's investigations.

execute the search warrants. *See, e.g.*, Am. Compl. ¶ 180. Those third-party theories, made by individuals not connected to the Company long after Caterpillar released the relevant financial disclosures, do nothing to show that ***Caterpillar's*** statements of cooperation were in fact disbelieved when they were made. *See Sinay v. CNOOC Ltd.*, 2013 WL 1890291, at *8 (S.D.N.Y. May 6, 2013) (determining that plaintiffs cannot rely on post-class-period statements unless plaintiffs actually confirm what defendants knew or should have known) (Ex. 44). Accordingly, SGSS has not stated an actionable misstatement of material fact.

### B. The Amended Complaint Does Not Plead Facts Giving Rise To A "Strong Inference" Of Scienter

In any event, even assuming SGSS had pled actionable misstatements or omissions — and it has not — the Amended Complaint independently fails adequately to allege scienter. Securities-fraud plaintiffs may allege scienter in one of two ways: (1) by producing "strong circumstantial evidence of recklessness or conscious misbehavior," or (2) by alleging that each defendant had the "motive and opportunity" to commit fraud. *In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at *2 n.4 (N.D. Ill. July 12, 2006) (Ex. 33). The PSLRA further mandates that plaintiffs "state with particularity facts giving rise to a ***strong inference*** that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2). This "strong inference" of scienter "must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, *Inc. v. Makor Issues & Rights Ltd.,* 551 U.S. 308, 314 (2008). Thus, when evaluating the adequacy of SGSS's scienter allegations, this Court must consider not only inferences urged by SGSS, but also "plausible, nonculpable explanations for [D]efendants' conduct." *Id.* at 324; *see also Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). Here, Plaintiff's allegations do not support ***any*** inference of scienter, much

less the strong inference required by the PSLRA. For this reason alone, Count I of the Amended Complaint must be dismissed.

### 1. SGSS Fails to Plead Facts Supporting a Strong Inference of Conscious Misbehavior or Recklessness

The Amended Complaint is striking for what it does not allege. The thrust of SGSS's scienter allegations is that Defendants knew the supposed falsity of Caterpillar's statements concerning the CSARL Tax Dispute and subsequent Government investigations. *See* Am. Compl. ¶¶ 185–218. But conspicuously absent from the Amended Complaint is a single allegation that Defendants disbelieved the optimism reflected in Caterpillar's financial disclosures and public statements. As the Amended Complaint makes clear, Caterpillar and its executives consistently maintained that, in their view, the CSARL Tax Dispute would not have a material adverse effect on the Company's financial position. *See, e.g.*, Am. Compl. ¶¶ 102, 112, 122, 126, 130. Defendants are also alleged to have insisted that they were cooperating with the Government's investigations. *See, e.g.*, *id.* at ¶¶ 139, 143, 147, 151, 155. These statements are mere expressions of the Defendants' confidence and expectations; the most compelling inference is that Defendants believed them to be true.[10]

The Amended Complaint likewise fails to identify any internal documents or communications demonstrating unlawful intent. While a "smoking-gun" allegation is not always necessary to support an inference of scienter, securities complaints have often been dismissed on the pleadings without it. *See, e.g.*, *Stavros*, 266 F. Supp. 2d at 849. That is especially true where

---

[10]   To the extent Plaintiff says that Defendants "recklessly disregarded" the falsity of Caterpillar's financial disclosures, that argument fares no better in light of the demanding standard for recklessness under the securities laws. "Recklessness is highly unreasonable conduct beyond simple or even inexcusable negligence that represents an extreme departure from the standards of ordinary care, ***such that its danger is either known to the defendant or so obvious that the defendant must have been aware of it***." *Davis*, 385 F. Supp. 2d at 712; *see also Johnson*, 262 F. Supp. 2d at 954.

a common-sense, non-culpable explanation for Defendants' conduct can be readily inferred. Here, Caterpillar's SEC filings reveal that Caterpillar's independent auditors found that the Company's consolidated financial statements "present fairly in all material respects[ ] the financial position of Caterpillar Inc. and its subsidiaries." *See, e.g.*, 2015 Form 10-K at 68 (Feb. 16, 2016) (Ex. 18). An international tax expert similarly testified that "it is extremely unlikely that Caterpillar's supply chain restructuring and the countless ensuing sales conducted pursuant to the restructuring are vulnerable to attack for lack of economic substance." Steines Report at 3 (Ex. 26). And although Caterpillar was the subject of ongoing Government investigations, Plaintiff's own allegations confirm that the Company has steadfastly contested any proposed tax increases. *See, e.g.*, Am. Compl. ¶ 171 (citing 2016 Form 10-K at 57 (Feb. 15, 2017)). To date, Caterpillar has not paid a cent in fines or increased taxes, or faced any charges of wrongdoing (let alone any convictions) as a result of the Government's investigative efforts. The SEC has closed its investigation without bringing an enforcement action, 2016 Form 10-K at 57 (Feb. 15, 2017) (Ex. 18), the PSI found no violation of existing U.S. law, Majority Staff Report at 6–7 (Ex. 27), and, in *Mogell*, the Central District of Illinois concluded that Caterpillar's 2015 Proxy Statement contained no false statements or material omissions, *see* 2016 WL 3369233, at *11 (Ex. 40). Defendants were thus given no reason to think that their public statements and corporate disclosures surrounding the CSARL Tax Dispute were not made in good faith. The contrary inference suggested by Plaintiff simply blinks at reality.

Finally, in stark contrast to cases in which plaintiffs have established scienter with allegations that defendants profited from fraudulently-inflated share prices or committed insider trading, *see, e.g.*, *Tatz v. Nanophase Techs. Corp.*, 2002 WL 31269485, at *7 (N.D. Ill. Oct. 9, 2002) (Ex. 46), the Amended Complaint here does not allege that Defendants collectively engaged

in net stock sales or otherwise engaged in unusual trading activity. To the contrary, during the Class Period, ***Caterpillar repurchased over 55 million shares of common stock for approximately $4.7 billion***. *See* 2013 Form 10-Q at 27–28 (Aug. 2, 2013) (Ex. 8); 2014 Form 10-Q at 28 (Aug. 1, 2014) (Ex. 12); 2015 Form 10-Q at 29 (Oct. 30, 2015) (Ex. 17). Numerous courts have instructed that scienter can rarely (if ever) be found when a company has engaged in significant share repurchases during the Class Period because "it is illogical that [a] company would have been repurchasing its shares had it been aware of the facts that would indicate the price would fall." *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 518 (S.D. Tex. 2017); *see also In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 899 (W.D.N.C. 2001) ("[D]uring the 'Class Period,' First Union was aggressively buying back its stock on the open market, a sign that the Company believed its stock was undervalued, not 'artificially inflated.'"); *In re Rexall Sundown, Inc. Sec. Litig.*, 2000 WL 33539428, at *4 (S.D. Fla. Mar. 29, 2000) ("As to the stock repurchase plan, one could argue that a corporation buying back its stock would not do so if it had been engaged in artificially pumping up that stock.") (Ex. 35); *Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734, at *8 (N.D. Cal. June 8, 1994) ("It would have made no sense to [re]purchase that stock if defendants knew the prices to be inflated.") (Ex. 39). On this score, the only "cogent" or "compelling" inference that can be drawn is that Defendants in fact believed (and continue to believe) that Caterpillar will prevail in the CSARL Tax Dispute.

Having failed to plead the sorts of scienter allegations that courts might deem sufficient to advance past the pleadings stage, SGSS instead proffers a grab-bag of supposedly "additional scienter allegations." Am. Compl. ¶¶ 185–218. But none of these items, whether viewed individually or collectively, supports a "strong" inference of scienter.

*Execution of Search Warrants.* The cornerstone of Plaintiff's scienter theory is that "the government sought and obtained judicial permission to execute three search warrants in 2017." *Id.* at ¶ 185. Plaintiff theorizes that the Government's election to pursue those warrants somehow demonstrates that Defendants knew their prior statements about tax liabilities and cooperation to be false. *Id.*

SGSS's reasoning is a *non sequitur* that enjoys no support in the law of this Circuit (or anywhere else). It is one thing to acknowledge — as Caterpillar has consistently and publicly done — that the ultimate outcome of a government investigation is inherently unpredictable. But it is another thing altogether to assert that the execution of a search warrant — which is merely an investigative tool that may never lead to an indictment, much less a conviction — somehow reveals the mental state of those who made statements prior to the search warrant's execution. The fact that the Government executed a search warrant does nothing to suggest that Caterpillar's corporate officers knew that the challenged statements were false when made. Instead, the Seventh Circuit has held that statements of "anonymous accusers," such as "unnamed informants in affidavits for search warrants," cannot "demonstrate that scienter is 'at least as [likely] as any opposing inference one could draw from the facts alleged.'" *Higginbotham*, 495 F.3d at 757 (citation omitted). Simply put, hindsight is the only basis for SGSS's proposed inference, and, as the Supreme Court observed in *Tellabs*, there can be no "fraud by hindsight." 551 U.S. at 320.[11]

---

[11] To the extent Plaintiff relies on the mere existence of the Government's investigations to plead scienter, that too fails. *See Brophy v. Jiangbo Pharm., Inc.*, 781 F.3d 1296, 1304 (11th Cir. 2015) ("The 'mere existence of [a government] investigation' [ ] does not equip a reviewing court to explain which inferences might be available beyond a general suspicion of wrongdoing." (citation omitted)); *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008) ("The mere existence of an SEC investigation does not . . . add an inference of scienter.")); *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 628 n.2 (4th Cir. 2008) ("Plaintiffs allege that the SEC is investigating Inspire and Shaffer for fraud, but that assertion is too speculative to add much, if anything, to an inference of scienter.").

**Third-Party Reports and Analyses.**  Not to be deterred, SGSS further attempts to make out a "strong inference" of scienter by referencing media reports published after the government executed its search warrants.  *See* Am. Compl. ¶¶ 188–90.  Media reports, however, shed no light on Defendants' state of mind during the Class Period.[12]  As the Second Circuit has emphatically declared, "[i]t is not enough to quote press speculation about defendants' motives."  *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1004 (2d Cir. 1988).  That is so because a "complaint must rise or fall on allegations about *defendants'* conduct, and not on wide-eyed citation to the gratuitous commentary of outsiders."  *Hershfang v. Citicorp*, 767 F. Supp. 1251, 1255 (S.D.N.Y. 1991); *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1060 (9th Cir. 2014) (noting that articles cited by the plaintiffs did not contribute to a strong inference of scienter, in part because they "d[id] not reflect [the defendants'] knowledge" at the time of the alleged misstatements); *Constr. Workers Pension*, 114 F. Supp. 3d at 649 ("It is difficult to adequately allege that Defendants knew that their statements would be misleading when they are not the ones in control of the information that is released or the context in which their statements are placed.").  In short, the *post hoc* opinions of outsiders offer no insight into Defendants' intent at the time the alleged misstatements were made.[13]

---

[12]  Though it is unclear from the Amended Complaint, SGSS may also be contending that a Government-commissioned expert report concerning the CSARL Tax Dispute ("Robinson Report") supports an inference of scienter.  *See* Am. Compl. ¶ 188.  That is wrong.  SGSS does not rely on the Robinson Report itself, but instead relies on hearsay from a *New York Times* article that purports to quote isolated, conclusory snippets from a report.  Moreover, those conclusory snippets cannot demonstrate the requisite inference of fraudulent intent because they are inconsistent with the Steines Report.  *See* Steines Report at 3 ("[I]t is extremely unlikely that Caterpillar's supply chain restructuring and the countless ensuing sales conducted pursuant to the restructuring are vulnerable to attack for lack of economic substance.") (Ex. 26); *see also, e.g.*, *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1225 (S.D. Cal. 2001) ("Although Plaintiffs may have established a legitimate difference in opinion as to the proper [ ] analysis, they have hardly stated a securities fraud claim." (citation omitted)).

[13]  The same rationale applies to Plaintiff's reliance on the *Schlicksup* Litigation, which arose years before the beginning of the Class Period.  *See* Am. Compl. ¶ 187.  It is illogical to think that unsubstantiated, unadjudicated employment-discrimination allegations advanced by third parties prior to the Class

The inadequacy of SGSS's two primary scienter theories dooms the Amended Complaint's other allegations. Courts have consistently concluded that SGSS's remaining scienter theories — that (1) the individual defendants were senior executives at Caterpillar, (2) some of the individual defendants no longer work at Caterpillar, (3) the individual defendants signed various Sarbanes-Oxley certifications and SEC filings, and (4) the individual defendants allegedly violated Caterpillar's Code of Conduct — cannot establish the requisite "strong" inference of scienter. *See, e.g., In re One Commc'ns Corp.*, 2009 WL 857535, at *11 (S.D.N.Y. Mar. 31, 2009) ("[C]onclusory allegations that Defendants were aware of [allegedly fraudulent] practices by virtue of their positions or their access to unspecified financial documents, without more," fails to give rise to a strong inference of scienter. (citations omitted)) (Ex. 43).

      a.     ***Senior Status of Individual Defendants.*** SGSS repeatedly suggests that the individual defendants must have known of the alleged fraud because they held leadership positions with the Company. *See, e.g.*, Am. Compl. ¶ 201 ("As the Company's most senior executives, the Individual Defendants were intimately familiar with Caterpillar's operations."). But it is long settled that allegations founded on nothing more than an individual's status as a corporate officer cannot support an inference of scienter. *See Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 673 F. Supp. 2d 718, 746 (S.D. Ind. 2009) ("[R]espective positions within the company prove nothing about fraud or knowledge thereof but rather are exactly the type of generalized allegations that the court must disregard under the PSLRA." (citation and quotes omitted)), *aff'd* 679 F.3d 952 (7th Cir. 2012); *Selbst v. McDonald's Corp.*, 432 F. Supp. 2d 777, 787 (N.D. Ill. 2006) ("[T]he plaintiffs' attempt to establish scienter based upon [the defendants']

---

Period reveal anything about whether Defendants knew that Caterpillar's alleged misstatements during the Class Period were false.

high-level positions within [the company] are [ ] inadequate."); *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("It is well-established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter.") (Ex. 37).

    **b.**    ***Executive Departures*.**   Plaintiff likewise cannot support a strong inference of scienter with bare allegations that defendants Oberhelman, Buda, and Halverson left Caterpillar. *See* Am. Compl. ¶¶ 211–13. Courts have routinely held that such allegations are insufficient to satisfy the strict pleading requirements of the PSLRA and Rule 9(b). *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) (finding no inference of scienter where complaint merely alleged CFO's resignation in close proximity to alleged fraud); *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 545 (S.D.N.Y. 2009) (holding that resignation does not demonstrate scienter absent "factual allegations linking [the] resignation . . . to the alleged fraud"), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009). On this point, the Southern District of Texas said it best: "[T]here are many reasons not related to fraud why people resign and more is needed before one reasonably could infer, no less before a strong inference arises, that the resignations were motivated by [fraud]." *Kurtzman v. Compaq Computer Corp.*, 2002 WL 32442832, at *10 (S.D. Tex. Mar. 30, 2002) (Ex. 38).

    **c.**    ***Sarbanes-Oxley Certifications and SEC Filings*.**   SGSS's suggestion that the individual defendants' Sarbanes-Oxley certifications and signing of various Caterpillar SEC filings provide a strong inference of scienter is equally implausible. *See* Am. Compl. ¶¶ 214–15. Courts in this District have long instructed that "[a defendant's] signature on [ ] SEC filings and Sarbanes Oxley certifications . . . does not suffice to allege scienter without allegations that [the defendant] was aware of the material weaknesses in its internal controls over financial reporting

32

at the time he signed those statements or that such weaknesses were obvious." *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 804 (N.D. Ill. 2007). Put simply, "[i]f an allegation that a mandatory Sarbanes-Oxley certification was later proved to be inaccurate is sufficient to give rise to the requisite strong inference, 'scienter would be established in every case where there was an accounting error or auditing mistake by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA.'" *Plumbers & Pipefitter Local Union*, 673 F. Supp. 2d at 748 (quoting *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008)).

> **d.** *Alleged Violation of Company Policies.* Plaintiff's final scienter theory — which

asks this Court to infer fraudulent intent from the individual defendants' alleged violation of a Company Code of Conduct (Am. Compl. ¶¶ 206–210) — fails as well. As an initial matter, SGSS has given no explanation as to how the individual defendants violated Company policy. *See Davis*, 385 F. Supp. 2d at 704 ("To satisfy [Rule 9(b)], a complaint must plead fraud claims with particularity, providing the circumstances of the claim — 'the who, what, when, where, and how: the first paragraph of any newspaper story.'" (citation omitted)). And even putting aside this threshold pleading deficiency, Plaintiff's "Code of Conduct" theory cannot survive on the merits, for courts in this District have made plain that "[a]llegations that . . . internal [ ] policies were violated do not establish that the misstatements were made with the requisite intent." *In re Bally*, 2006 WL 3714708, at *10 (Ex. 33); *see also Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1250 (10th Cir. 2016) ("Even if we assume that Spirit had violated established accounting principles or internal policies, these violations would not have been enough to state a valid cause of action." (citation omitted)). There is no reason to reach a different result here.

In sum, SGSS's theories of knowledge or recklessness are neither cogent nor compelling. And they are not nearly as compelling as the opposing, non-fraudulent explanation for Defendants' alleged misstatements: Defendants believed the statements of corporate optimism reflected in Caterpillar's SEC filings and public disclosures, and properly divulged that confidence throughout the Class Period. That is the only "strong" inference here, and SGSS has advanced no particularized facts or plausible inferences to suggest otherwise.

### 2. SGSS Fails to Plead Facts Supporting a Motive to Commit Fraud

Plaintiff further contends that Defendants acted with the requisite fraudulent intent because they were financially motivated to lie. In particular, Plaintiff asserts that the individual defendants, whose compensation during the Class Period "was heavily weighted on stock awards and other incentive[s]," Am. Compl. ¶ 203, would "directly benefit[ ] financially" if Caterpillar kept its stock prices high. *Id.* at ¶ 204. As a result, SGSS hypothesizes, the individual defendants "were strongly incentivized to misrepresent the likelihood that Caterpillar's tax scheme was not legitimate and to conceal the Company's non-cooperation with the investigations to inflate the price of Caterpillar shares." *Id.* at ¶ 205. Not only is that contention plainly incorrect, but it also reflects a fundamental misunderstanding of securities law.

It has long been settled that, for purposes of Section 10(b) liability, fraudulent motive cannot be inferred from the mere desire to maintain high stock prices or promote the financial standing of a company. "All corporate managers share a desire for their companies to appear successful. That desire does not comprise a motive for fraud." *PR Diamonds, Inc. v. Chandler*, 91 F. App'x 418, 435 (6th Cir. 2004). Nor is it enough for securities-fraud plaintiffs to allege that corporate executives wished to protect or increase their compensation. *See, e.g.*, *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated."); *In re Bally*, 2006 WL 3714708, at *9 ("Regarding

34

the motive to earn bonuses and awards, . . . these allegations are too common among corporations and their officers to be considered evidence of scienter.") (Ex. 33). As Judge Moran aptly put it:

> The desire to increase the value of a company and attain the benefits that result, such as meeting analyst expectations and reaping higher compensation, are basic motivations not only of fraud, but of running a successful corporation. Were courts to accept these motives as sufficient to establish scienter, most corporate executives would be subject to such allegations, and the heightened pleading requirements for these claims would be meaningless.

*Davis*, 385 F. Supp. 2d at 714. A motive to defraud, in other words, is not pled where a plaintiff rests its allegations on the ordinary and omnipresent incentive to make money. SGSS has done just that, and, accordingly, has not pled facts establishing Defendants' motive to commit securities fraud.

## II. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR "CONTROL PERSON" LIABILITY UNDER SECTION 20(a) OF THE EXCHANGE ACT

Count II, which seeks to hold the individual defendants liable as "controlling persons" under Section 20(a) of the Exchange Act, also must be dismissed. *See* Am. Compl. ¶¶ 261–68. To establish a prima facie case of control-person liability, Plaintiff is required to show: (1) a primary violation of the securities laws; (2) that each individual defendant exercised general control over the primary violator's operations; and (3) that each individual defendant "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *DH2, Inc. v. Athanassiades*, 359 F. Supp. 2d 708, 720 (N.D. Ill. 2005) (citation and quotes omitted). For the reasons set forth above, the Amended Complaint does not properly allege a violation of Section 10(b) or Rule 10b-5. Absent a primary violation, the derivative claim for control-person liability fails as a matter of law. *See id.* ("Because Plaintiff has failed to state a primary securities violation, its Section 20(a) claim also fails."); *Neca-Ibew Pension Fund v. N. Trust Corp.*, 2013 WL 1290202, at *11 (N.D. Ill. Mar.

28, 2013) ("Because the plaintiffs failed to plead a primary securities violation in Count I, Count II is also dismissed.") (Ex. 41).

## CONCLUSION

For the foregoing reasons, SGSS's Amended Class Action Complaint should be dismissed with prejudice.

Dated:  October 10, 2017          Respectfully submitted,

*/s/ Mark Filip, P.C.*

Mark Filip, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
mark.filip@kirkland.com
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

James P. Gillespie, P.C., *pro hac vice*
K. Winn Allen, *pro hac vice*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
james.gillespie@kirkland.com
winn.allen@kirkland.com
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Attorneys for Defendants Caterpillar Inc., D. James Umpleby III, Douglas R. Oberhelman, Bradley M. Halverson, James B. Buda, and Jananne A. Copeland*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing Memorandum of Law

was filed electronically on October 10, 2017. Notice of this filing will be sent to all counsel of

record by operation of the Court's electronic filing system.


*/s/ Mark Filip, P.C.*
Mark Filip, P.C.